UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, LLC and TONY DEROSA-GRUND | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 4:14-CV-00793 ("Senior Case") |
| WARNER BROS. ENTERTAINMENT, INC. and NEW LINE PRODUCTIONS, INC. | § § § | |
| Defendants. | § § | |

*Consolidated with*

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, LLC, TONY DEROSA-GRUND, and GERALD D. BRITTLE, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 4:14-CV-01117 ("Junior Case") |
| LORRAINE WARREN, TONY SPERA, GRAYMALKIN MEDIA, LLC, NEW LINE PRODUCTIONS, INC., and WARNER BROS. ENTERTAINMENT, INC., | § § § § § | |
| Defendants. | § § | |

**DEFENDANTS NEW LINE PRODUCTIONS, INC. AND WARNER BROS. ENTERTAINMENT INC.'S**

**(1) MOTION TO STAY OR DISMISS ALL OF PLAINTIFFS EVERGREEN MEDIA HOLDINGS, LLC AND TONY DEROSA-GRUND'S CLAIMS IN FAVOR OF ONGOING ARBITRATION OR TO TRANSFER VENUE; OR, ALTERNATIVELY, MOTION TO DISMISS PLAINTIFFS EVERGREEN MEDIA HOLDINGS, LLC AND TONY DEROSA-GRUND'S CLAIMS AGAINST NEW LINE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6); AND**

**(2) MOTION TO DISMISS PLAINTIFF GERALD D. BRITTLE'S CLAIMS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDING.................................................................1

SUMMARY OF THE ARGUMENT ...............................................................................2

STATEMENT OF ISSUES ...........................................................................................4

STATEMENT OF FACTS ............................................................................................5

ARGUMENT ...............................................................................................................7

I.      ALL OF DeROSA-GRUND'S CLAIMS SHOULD BE STAYED OR
        DISMISSED IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE,
        DeROSA-GRUND'S CLAIMS AGAINST NEW LINE SHOULD BE
        TRANSFERRED TO THE CENTRAL DISTRICT OF CALIFORNIA ...........................7

II.     PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIMS FAIL AS A MATTER
        OF LAW ....................................................................................................10

        A.      Standard of Review ........................................................................10

        B.      DeRosa-Grund Does Not Own A Copyright In The Demonologist ...................12

        C.      Plaintiffs Fail To Allege, And Cannot Allege, Substantial Similarity of
                Protected Elements Between The Works.................................................13

        D.      The Works At Issue ........................................................................14

                1.      The Warrens' "Annabelle" And "Enfield Poltergeist"
                        Investigations .....................................................................14
                2.      The Demonologist: Chapter III "Annabelle"..............................15
                3.      New Line's Unreleased Motion Picture Production "Annabelle" ............16
                4.      The Demonologist: Chapter XIV "The Enfield Voices" ....................17
                5.      New Line's Unreleased Motion Picture Production "The Conjuring
                        2"....................................................................................18

        E.      There Is No Actionable Similarity Between The Works ..........................19

III.    PLAINTIFFS' STATE LAW CLAIMS AGAINST NEW LINE ARE
        PREEMPTED ...............................................................................................22

IV.     THE DEPENDENT CLAIMS AGAINST NEW LINE FALL WITH THE
        CLAIMS DISCUSSED ABOVE ........................................................................24

CONCLUSION............................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Am. Exp. Co. v. Italian Colors Restaurant*,
   133 S.Ct. 2304 (2013)........................................................................................9

*Ambraco, Inc. v. Bossclip B.V.*,
   570 F.3d 233 (5th Cir. 2009) .............................................................................9

*Architecture, LLC v. Simone Development Corp.*,
   602 F.3d 57 (2d Cir. 2010)...............................................................................11

*Bell Atlantic Corp. v. Twombly*,
   127 S.Ct. 1955 (2007)................................................................................10, 14

*Benay v. Warner Bros. Entmt.*,
   607 F.3d 620 (9th Cir. 2010) ...........................................................................20

*Campbell v. Walt Disney Co.*,
   718 F.Supp.2d 1108 (N.D. Cal. 2010) .............................................................11

*Capcom Co., Ltd. v. MKR Group, Inc.*,
   2008 WL 4661479 (N.D. Cal. 2008) ...............................................................11

*Christianson v. West Publishing Co.*,
   149 F. 2d 202 (9th Cir. 1945) ..........................................................................10

*Cole v. Fed. Home Loan. Mortg. Group*,
   No. 3:11-cv-1833, 2012 WL 555194 (N.D. Tex. Jan. 23, 2012)..........................24

*Compliance Review Services, Inc. v. Davis-Osuawu*,
   No. H-04-3635, 2006 WL 3541715 (S.D. Tex. 2006).................................22, 23

*Daboub v. Gibbons*,
   42 F.3d 285 (5th Cir. 1995) .............................................................................22

*Elsensohn v. St. Tammarny Parish Sheriff's Office*,
   530 F.3d 368 (5th Cir. 2008) ...........................................................................10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991).............................................................................11, 19, 20

*Funky Films, Inc. v. Time Warner Entm't Co.*,
   462 F.3d 1072 (9th Cir. 2006) .........................................................................11

*Gemcraft Homes, Inc. v. Sumurdy*,
    688 F. Supp. 289 (E.D. Tex. 1988) ...................................................................22, 23

*Houts v. Universal City Studios, Inc.*,
    603 F. Supp. 26 (C.D. Cal. 1984) ...............................................................15, 16, 21

*Iqbal*,
    556 U.S. at 678...........................................................................................................14

*Midwest Mech. Contractors Inc. v. Commonwealth Constr. Co.*,
    801 F.2d 748 (5th Cir. 1986) ......................................................................................9

*Miller v. Universal City Studios, Inc.*,
    650 F.2d 1365 (5th Cir. 1981) ..................................................................................19

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) ...............................................................................20, 21

*Nelson v. PRN Prods.*,
    873 F.2d 1141 (8th Cir. 1989) ..................................................................................11

*Novak v. Warner Bros. Pictures, LLC*,
    387 Fed. Appx. 747 (9th Cir. 2010)..........................................................................20

*Oliver v. Saint Germain Foundation*,
    41 F. Supp. 296 (S.D. Cal. 1941)........................................................................15, 21

*Peel & Co. v. The Rug Market*,
    238 F.3d 391 (5th Cir. 2001) ...............................................................................11, 12

*Positive Black Talk, Inc. v. Cash Money Records, Inc.*,
    394 F.3d 357 (5th Cir. 2004) ....................................................................................11

*Randolph v. Dimension Films*,
    630 F.Supp.2d 741 (S.D. Tex. 2009) ("*Randolph I*").................................10, 11, 12, 13, 21

*Randolph v. Dimension Films*,
    634 F. Supp. 2d 779 (S.D. Tex. 2009) ("*Randolph II*").............................................10

*Rucker v. Harlequin Ent., Ltd.*,
    2013 WL 707922 (S.D. Tex. 2013) ("*Harlequin*")..............................10, 11, 12, 13

*Sybersound Records v. UAV*,
    517 F. 3d 1137 (9th Cir. 2008) .................................................................................13

*Tabachnik v. Dorsey*,
    257 Fed. Appx. 409 (2d Cir. 2007)...........................................................................12

iii

*Taylor v. IBM*,
    54 Fed. Appx. 794, 2002 WL 31845220 (5th Cir. 2002).........................................................12

*Turner v. Pavlicek*,
    No. H-10-00749, 2011 WL 4458757 (S.D. Tex. Sept. 22, 2011)............................................24

**FEDERAL STATUTES**

17 U.S.C. § 106(2) .................................................................................................................23

17 U.S.C. § 501(a) .................................................................................................................12

28 U.S.C. § 1404(a) ........................................................................................................4, 5, 7, 9

FAA.................................................................................................................................4, 7, 8, 9

§ 3 of the Federal Arbitration Act ("FAA")...................................................................2, 4, 8, 9

**RULES**

Fed. R. Civ. P. 8(a) ................................................................................................................10

Fed. R. Civ. P. 8(a)(2) ...........................................................................................................10

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 10, 12, 24

**OTHER AUTHORITIES**

1 *Nimmer*, § 1.01(B)(1)..........................................................................................................23

1 *Nimmer*, § 2.11..............................................................................................................15, 21

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs Evergreen Media Holdings, LLC and Tony DeRosa-Grund (collectively, "DeRosa-Grund") and Plaintiff Gerald D. Brittle (collectively with DeRosa-Grund, "Plaintiffs") spuriously allege that Defendants New Line Productions, Inc. and Warner Bros. Entertainment, Inc. (collectively, "New Line") have based its unreleased motion picture productions currently entitled "Annabelle" and "The Conjuring 2" on a book entitled *The Demonologist: The Extraordinary Career of Ed and Lorraine Warren* ("*The Demonologist*" or the "Book"), in order to avoid paying DeRosa-Grund a "rights payment" for the motion picture "Annabelle" under agreements previously entered into between the parties. Further, without alleging a single similarity between the works, Plaintiffs claim that New Line's motion pictures infringe on Brittle's copyright in *The Demonologist* and on DeRosa-Grund's purported right to exploit *The Demonologist* (the "Demonologist Option"). Because there is no basis in law or fact for any of Plaintiffs' claims, and because DeRosa-Grund's claims in this action are not properly before this court in any event, all of Plaintiffs' claims against New Line should be dismissed.

New Line brings this motion to stay or dismiss in favor of a currently pending arbitration in California, or in the alternative to transfer venue, as to all of the claims brought by DeRosa-Grund in this action: Counts I, II, III, IV, and XIII. Alternatively, New Line moves to dismiss all of DeRosa-Grund's claims against it in this action pursuant to Fed. R. Civ. P. 12(b)(6): Counts II, III, XII, and XIII. New Line further moves to dismiss all of Brittle's claims against it in this action pursuant to Fed. R. Civ. P. 12(b)(6): Counts X, XI, XII, and XIII.

Because New Line's motion pictures have not been released, and disclosing details about their content could fatally harm the market for these works, New Line has filed a Motion for Limited Protective Order (Dkt. 33), concurrently herewith, seeking to file synopses of the unreleased motion pictures under seal, and to lodge a copy of the motion picture "Annabelle"

and a script for "The Conjuring 2," which is still in development, with the Court for *in camera* review.  Pending the Court's decision on New Line's Motion for Limited Protective Order (Dkt. 33), New Line has only included a minimal comparison between the works in this Motion, in order to protect the details of these unreleased motion pictures.  New Line respectfully requests that it be allowed to file a supplemental brief with a more detailed comparison of the works after the Court rules on its Motion for Limited Protective Order.

## SUMMARY OF THE ARGUMENT

This action involves two sets of claims against New Line.  One set arises from and relates to contracts among DeRosa-Grund and New Line.  The other consists of facially meritless copyright infringement claims.  All of the claims should be stayed or dismissed for the following reasons:

*First*, all of <u>DeRosa-Grund's</u> claims in this action (Counts I, II, III, IV, and XIII) are subject to binding arbitration, as they arise from rights he purportedly acquired under the Demonologist Option and the Warren Agreements.[1]  The issue of who, in fact, owns the rights under the Demonologist Option and the Warren Agreements – New Line maintains it owns these rights – is currently being litigated in an ongoing arbitration between the parties in Los Angeles, California, which is being conducted subject to binding arbitration provisions in agreements entered into between New Line and DeRosa-Grund.  As a result, pursuant to Section 3 of the

---

[1] As discussed in greater detail below, the "Demonologist Option" refers to rights DeRosa-Grund purportedly acquired from Brittle to exploit *The Demonologist.*  However, DeRosa-Grund admits in the Complaint that these rights are only exercisable if Ms. Warren, the co-owner of the copyright in *The Demonologist*, grants DeRosa-Grund the same rights.  Compl. ¶ 72.  The "Warren Agreements" refers to a series of agreements entered into by a third party and DeRosa-Grund that purport to transfer rights in certain property related to the Warrens' paranormal investigations.  The validity of the Warren Agreements is disputed, however, regardless of this dispute, any rights that actually existed under the Warren Agreements were expressly transferred to New Line under an agreement between New Line and DeRosa-Grund.  Ex. 4, Quitclaim Agreement ¶ 1A(c)(i)(4)-(10)).

Federal Arbitration Act ("FAA"), these claims should be stayed or dismissed.  Alternatively, DeRosa-Grund's claims should be transferred to the Central District of California, based on valid forum selection clauses in the parties' agreements.

*Second,* DeRosa-Grund's claim for  copyright infringement against New Line (Count III) fails because DeRosa-Grund's allegations reveal that he has a mere option from only one of the two copyright owners of the Book, namely Brittle.  Such an option is at most only a contract right to acquire a copyright ownership interest, according to the conditions of the agreement.  It is not ownership of the copyright.  Adding to its speculative nature, DeRosa-Grund cannot even exercise the option without the consent of Defendant Lorraine Warren, the other owner in *The Demonologist's* copyright.  Based on this, DeRosa-Grund necessarily admits that he does not own a copyright interest in *The Demonologist*.  But even if he were able to exercise his option with Ms. Warren's consent, it would give him, at most, a non-exclusive license from Brittle because that is all a co-owner of copyright can grant.  The United States Copyright Act explicitly provides that a non-exclusive license is not a form of copyright ownership.  As a result, DeRosa-Grund has no standing to bring any claim for copyright infringement.  Accordingly, this claim fails as a matter of law.

*Third*, Plaintiffs' claims based on copyright infringement against New Line (Counts III and XI) fail because any similarities between the works relate to historical *facts*, and facts are not copyrightable.  Though it deals with the supernatural, *The Demonologist* is presented entirely as a work of non-fiction, a factual account of the work of the Warrens.  Plaintiffs are estopped to assert otherwise.  Accordingly, because Brittle cannot own a copyright in the facts and events set forth in his book, he cannot base a copyright claim upon those facts.  When the historical facts

are filtered out, there are no actionable similarities between New Line's motion pictures and the non-fiction Book.  As a result, Plaintiffs' copyright infringement claims fail as a matter of law.

*Fourth*, the claims for tortious interference with contract against New Line (Counts II and X) are preempted by Plaintiffs' copyright infringement claims, and thus must be dismissed.

*Finally*, Plaintiffs' claims for declaratory judgment and civil conspiracy (Counts XII and XIII), to the extent they are derivative of the meritless claims discussed above, must be dismissed.

## STATEMENT OF ISSUES

1.     Whether all of DeRosa-Grund's claims (Counts I, II, III, IV, and XIII) should be stayed or dismissed pursuant to Section 3 of the FAA, or in the alternative, whether these claims should be transferred to the Central District of California pursuant to 28 U.S.C. § 1404(a) and the forum selection clauses in the agreements;

2.     Whether DeRosa-Grund's claim for copyright infringement (Count III) should be dismissed because he is not an owner of the relevant exclusive right in the Book's copyright and thus does not have standing to bring a copyright claim;

3.     Whether all of Plaintiffs' claims for copyright infringement (Counts III and XI) should be dismissed because, as a matter of law, there is no actionable similarity between the works;

4.     Whether Plaintiffs' state law claims (Counts II and X) against New Line are preempted by the United States Copyright Act; and

5.     Whether Plaintiffs' claims for declaratory judgment and civil conspiracy (Counts XII and XIII), to the extent they are dependent on the claims that fail, also fail as a matter of law.

## STATEMENT OF FACTS[2]

**The Works:**  There are three works at issue in this case: *The Demonologist* book, New Line's unreleased motion picture "Annabelle," and New Line's motion picture project "The Conjuring 2."

*The Demonologist* details several of Ed and Lorraine Warren's paranormal investigations. Ex. 1, *Demonologist*.  The Warrens are real people and the book is presented as a work of non-fiction.  *Id.*, Author's Preface, p. ix.  Ms. Warren and Mr. Brittle co-own the copyright for the Book.  Request for Judicial Notice, Ex. 1, Declaration of William J. Stowe ("Stowe Decl."), Ex. G (federal copyright registration); *see also* Ex. 1, *The Demonologist* (the first page lists Ms. Warren and Brittle as copyright owners).  The Book contains a chapter entitled "Annabelle" discussing the Warrens' investigation of a possessed Raggedy Ann doll, and a chapter entitled "The Enfield Voices" discussing the Warrens' investigation of a haunted house in Enfield, England.  Ex. 1, *The Demonologist*.  Large portions of both chapters appear to be transcripts of tape recorded conversations.  *Id.*, pp. 40-50, 210-18.

New Line's unreleased "Annabelle" movie, though inspired by the real doll from the Warrens' paranormal investigation, features a fictitious couple who come to own the doll and relates events not found in or based on the Book.  Ex. 3, Declaration of Craig Alexander ("Alexander Decl."), ¶ 2, Ex. A.  New Line has completed principal photography of "Annabelle."  *Id.* ¶ 2.  It is set to be released in October 2014.  *Id.*

New Line is developing a motion picture project currently entitled "The Conjuring 2." *Id.* ¶ 3.  "The Conjuring 2" is still in the screenplay stage and dramatizes the well-publicized

---

[2]  The arbitration clauses in the agreements between New Line and DeRosa-Grund, as well as facts related to the pending arbitration, were set forth in New Line's Motion to Dismiss or Stay in Favor of Ongoing Arbitration in the Senior Action (Dkt. 8, pp. 3-8).  New Line hereby refers to and incorporates those factual references herein.

Enfield Poltergeist haunting in Enfield, England during the late 1970s.  *Id.*, Ex. B; Request for Judicial Notice, Stowe Decl., Exs. A-C.

The contents of the three works are summarized in more detail in § II.D.*, infra*.

**The Contracts:**  There are three main contracts relevant to this motion to dismiss:  Two agreements between New Line and DeRosa-Grund, and a purported option agreement between DeRosa-Grund and Brittle.

New Line and DeRosa-Grund entered into two agreements related to "The Conjuring" property in 2009:  the Quitclaim Agreement, and Amendment thereto ("Quitclaim Agreement") and the Producer Loanout Agreement ("Producer Agreement") (collectively, the "Agreements").  The Agreements provide for binding arbitration over any disputes that "aris[e] out of or relate[] to [the] Agreement[s] or the interpretation, performance or breach thereof . . . ."  Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25.

Plaintiffs' Complaint alleges that DeRosa-Grund and Brittle entered into an agreement under which Brittle granted DeRosa-Grund an option to acquire Brittle's rights in *The Demonologist*, which he refers to as the Demonologist Option.  Compl. ¶ 72.  DeRosa-Grund admits, however, that his rights "are exercisable if and only if [DeRosa-Grund] secures corresponding rights from Mrs. Warren."  *Id.*  DeRosa-Grund does not (and cannot) allege that he secured such rights from Ms. Warren.  *See* Compl. Tellingly, DeRosa-Grund fails to even attach a copy of the purported Demonologist Option to his Complaint.  *See* Compl.

**ARGUMENT**

I.   **ALL OF DeROSA-GRUND'S CLAIMS SHOULD BE STAYED OR DISMISSED IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE, DeROSA-GRUND'S CLAIMS AGAINST NEW LINE SHOULD BE TRANSFERRED TO THE CENTRAL DISTRICT OF CALIFORNIA[3]**

Aside from the numerous legal defects with DeRosa-Grund's claims (discussed *infra*), **all** of DeRosa-Grund's claims in this action (Counts I, II, III, IV, and XIII) rely on his assertion that he owns the Warren Agreements and the Demonologist Option.  Put another way, if DeRosa-Grund does not own the Warren Agreements and the Demonologist Option, he lacks standing to bring any of his current claims.

As more fully briefed in Defendants Warner Bros. Entertainment Inc. and New Line Productions, Inc.'s Motion to Dismiss or Stay in Favor of Ongoing Arbitration; or in the Alternative to Transfer Venue (Dkt. 8), New Line and DeRosa-Grund entered into two agreements related to "The Conjuring" property in 2009:  the Quitclaim Agreement and the Producer Agreement.  The Agreements provide for binding arbitration over any disputes that "aris[e] out of or relate[] to [the] Agreement[s] or the interpretation, performance or breach thereof . . . ."  Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25.  Under the Agreements, <u>any</u> rights relating to the "Property" that DeRosa-Grund acquires *before* or *after* the Agreements are entered into are the property of New Line.  Ex. 4, Quitclaim Agreement, ¶ 1A(d); Ex. 5, Producer Agreement, ¶ 9(a).  The Property is broadly defined as the entire case file library (approximately 8,000 case files) related to the Warrens' paranormal investigations, the life stories of the Warrens, any prior scripts related to the project, and all rights under any agreement previously entered into between DeRosa-Grund and any other entity in his prior

---

[3] The standards for review to stay or dismiss claims under the FAA, and to transfer venue under 28 U.S.C. § 1404(a), were set forth in New Line's Motion to Dismiss or Stay in Favor of Ongoing Arbitration in the Senior Action (Dkt. 8, pp. 12-15).  New Line hereby incorporates those standards here.

attempts to make a movie based on the Warrens' lives or case files.  Ex. 4, Quitclaim Agreement ¶ 1A.  The Quitclaim Agreement also lists the Warren Agreements as part of the Property that DeRosa-Grund explicitly quitclaimed to New Line.  *Id.* ¶ 1A(c)(i)(4)-(10).

Based on the clear language in the Agreements, New Line is asserting in the Arbitration that it – and not DeRosa-Grund – owns the Demonologist Option and the Warren Agreements.  Ex. 2, Declaration of Michael J. O'Connor, Ex. A, Second Amended Demand for Arbitration, ¶ 82.  The arbitration is set for November 3-7, 2014, at which time the arbitrator will determine whether New Line or DeRosa-Grund owns the Warren Agreements and the Demonologist Option.  *Id.* ¶ 2.  Specifically, New Line has asked the Arbitrator for a declaration that "[a]ny rights acquired by DeRosa-Grund with respect to the Demonologist Option are the sole property of New Line under the Agreements" and that "[a]ny rights acquired by DeRosa-Grund under the Warren Agreements are the sole property of New Line under the terms of the Agreements."  *Id.*, Ex. A, Second Amended Demand for Arbitration, ¶ 82.

Even if the Demonologist Option and Warren Agreements were not explicitly part of the ongoing Arbitration (they are), this Court should still stay or dismiss DeRosa-Grund's claims premised on his ownership of the Demonologist Option or the Warren Agreements, as such claims "aris[e] out of or relate[] to [the] Agreement[s] or the interpretation, performance or breach thereof . . . ."  Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25.  Specifically, DeRosa-Grund's claims relate to and require, among other things, an interpretation of the Agreements to determine who in fact owns the Demonologist Option and the Warren Agreements.

Thus all of the claims brought by DeRosa-Grund in this action (Counts I, II, III, IV, and XIII) are clearly arbitrable and should be stayed or dismissed pursuant to Section 3 of the FAA

pending the resolution of an actively-litigated JAMS arbitration in California, which has been pending since June 2013. Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25. As set forth in greater detail in New Line's Motion to Dismiss or Stay in Favor of Ongoing Arbitration in the Senior Action (Dkt. 8), and the Reply in Support thereof (Dkt. 28), "courts must 'rigorously enforce' arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Restaurant*, 133 S.Ct. 2304, 2309 (2013) (citation omitted). Section 3 of the FAA requires a mandatory stay of legal proceedings whenever the issues in a case are within the reach of an arbitration agreement. 9 U.S.C. § 3; *Midwest Mech. Contractors Inc. v. Commonwealth Constr. Co.*, 801 F.2d 748, 751 (5th Cir. 1986). In the alternative, DeRosa-Grund's claims against New Line should be transferred to the Central District of California, in light of the Agreements' forum selection clauses, pursuant to 28 U.S.C. § 1404(a); Ex. 4, Quitclaim Agreement ¶ 21; Ex. 5, Producer Agreement ¶ 25.

Moreover, the Court has the inherent authority to order a discretionary stay to control its own docket. *See Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 243 (5th Cir. 2009). It should exercise such discretion and stay DeRosa-Grund's claims against Warren and Spera (Counts I, IV, and XIII), for although Warren and Spera are not signatories to the Agreements mandating arbitration, the claims DeRosa-Grund asserts against them will necessarily turn on whether DeRosa-Grund (or New Line) actually owns the Warren Agreements and the Demonologist Option – a decision the arbitrator will make in November 2014.

In the event the Court does not grant this motion to stay or dismiss DeRosa-Grund's claims, such claims fail for the reasons discussed below.

## II.   PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIMS FAIL AS A MATTER OF LAW

### A.   Standard of Review

Under Fed. R. Civ. P. 8(a), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may bring a motion for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007); *see also Elsensohn v. St. Tammarny Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1974).  "Complaints alleging copyright infringement are no exception to this rule and can be decided as a matter of law."  *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 787 (S.D. Tex. 2009) ("*Randolph II*").  Here, Plaintiffs' Complaint fails to allege  how and in what manner the New Line's motion picture and unpublished script infringe any copyright in the Book.  Thus, all of Plaintiffs' copyright infringement claims should be dismissed.

Alternatively, the Court may, on a Rule 12(b)(6) motion treat the works described in the Complaint as incorporated by reference into the pleadings, and compare the works to determine whether New Line's motion picture and unpublished script infringe the copyright in the Book.  A court should dismiss a copyright claim pursuant to Rule 12(b)(6) where either the evidence demonstrates that no reasonable jury could find the two works at issue are substantially similar or the court determines that any such similarities pertain only to unprotected elements in the works.  *Christianson v. West Publishing Co*., 149 F. 2d 202, 203-204 (9th Cir. 1945) (affirming grant of 12(b)(6) motion); *Rucker v. Harlequin Ent., Ltd.*, 2013 WL 707922, at *4 (S.D. Tex. 2013) ("*Harlequin*") (granting motion to dismiss for lack of substantial similarity); *Randolph v.*

10

*Dimension Films,* 630 F.Supp.2d 741, 749 (S.D. Tex. 2009) ("*Randolph I*") (granting motion to dismiss for lack of substantial similarity); *Campbell v. Walt Disney Co.*, 718 F.Supp.2d 1108 (N.D. Cal. 2010) (granting 12(b)(6) motion); *Capcom Co., Ltd. v. MKR Group, Inc*., 2008 WL 4661479 (N.D. Cal. 2008) (granting 12(b)(6) motion); *Nelson v. PRN Prods.*, 873 F.2d 1141, 1143-44 (8th Cir. 1989) (affirming grant of motion to dismiss based on lack of substantial similarity); *Architecture, LLC v. Simone Development Corp*., 602 F.3d 57 (2d Cir. 2010) (affirming grant of motion to dismiss based on lack of substantial similarity). "Works referenced in the pleading and critical to the claims are properly considered on a 12(b)(6) motion without converting it to one for summary judgment." *Harlequin*, 2013 U.S. Dist. LEXIS 26299, at *2; *Randolph I,* 630 F. Supp. 2d at 745.

Plaintiffs allege that New Line's motion picture "Annabelle" and the screenplay for "The Conjuring 2" ("The Conjuring 2" is still in development and is only a screenplay at this stage) infringe their copyright in *The Demonologist* (Counts III and XI).   To prove copyright infringement, Plaintiffs must show "ownership of a valid copyright and actionable copying." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Peel & Co. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001).   "A plaintiff bringing a claim for copyright infringement must demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist*, 499 U.S. at 361); *accord Positive Black Talk, Inc. v. Cash Money Records, Inc.,* 394 F.3d 357, 367 (5th Cir. 2004); *Harlequin*, 2013 WL 707922, at *4 (citing *Funky Films*, 462 F.3d 1076).   "When, as here, there is no allegation of or direct evidence of copying, the second element requires the plaintiff to prove that the defendants had access to the plaintiff's copyrighted work and that there is substantial similarity of protected

elements between the works."  *Harlequin*, 2013 WL 707922, at *4 (citing *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003).

The Court may dismiss a claim for copyright infringement at the pleadings stage.  *Id.* ("Complaints alleging copyright infringement can be decided as a matter of law"); *see also Randolph I*, 630 F. Supp. 2d at 745 (substantial similarity may be decided as a matter of law on a motion to dismiss); *Taylor v. IBM*, 54 Fed. Appx. 794, 2002 WL 31845220, at *1 (5th Cir. 2002) (affirming dismissal of copyright infringement claim pursuant to Rule 12(b)(6)); *Tabachnik v. Dorsey*, 257 Fed. Appx. 409 (2d Cir. 2007) (same).

**B.      DeRosa-Grund Does Not Own A Copyright In *The Demonologist***

DeRosa-Grund has brought a claim for copyright infringement against New Line (Count III), based on his assertion that he owns the Demonologist Option.  Compl. ¶¶ 87, 92.  As a threshold requirement, however, DeRosa-Grund must allege that he actually owns the copyright at issue.  *Peel & Co.*, 238 F.3d at 394; 17 U.S.C. § 501(a).  Here, DeRosa-Grund admits that the Demonologist Option is only an option, that is, a contract right to acquire a copyright in the future under defined conditions.  That is not ownership of a copyright.  Additionally, that right is speculative because it is only "exercisable if and only if [DeRosa-Grund] secures corresponding rights from Ms. Warren."  Compl. ¶ 72.  DeRosa-Grund does not (and cannot) allege that he secured such rights from Ms. Warren, however, and thus, DeRosa-Grund has no copyright interest whatsoever.  He has instead an unexercised option to obtain certain rights in the future assuming he can somehow persuade Ms. Warren to agree to grant him her corresponding rights. This admission is fatal to his copyright claims.  *Peel & Co.*, 238 F.3d at 394.

In addition, and more fundamentally, under United States copyright law the most DeRosa-Grund could have through a grant from a single co-owner of a copyright (i.e., Brittle) is an option to obtain non-exclusive rights to the book (regardless of whether the option claims to

be for "exclusive" rights).  *Sybersound Records v. UAV*, 517 F. 3d 1137, 1145 (9th Cir. 2008).
In *Sybersound*, the plaintiff argued that it had standing to sue as a co-owner of the copyright for
nine (9) songs, based on its contention that it "stepped into the shoes" of TVT, the actual co-
owner of the copyright, when it received an "exclusive assignee and licensee" of TVT's
copyright interest in the songs for the purpose of karaoke use.  *Id.*  The Ninth Circuit disagreed,
finding that, "as a co-owner of the copyright, TVT could not grant an exclusive right in the
karaoke-use interest of the nine referenced copyrights."  *Id.*  As the owner of a mere option to
obtain non-exclusive rights, and, even if the option were exercised, as a mere licensee of non-
exclusive rights, DeRosa-Grund lacks standing to bring a copyright infringement action against
New Line.  A licensee of non-exclusive rights is not a copyright owner.  *Id.*

Thus, DeRosa-Grund's claim for copyright infringement should be dismissed with
prejudice as any amendment would be incapable of curing the defects just described.

**C.**  **Plaintiffs Fail To Allege, And Cannot Allege, Substantial Similarity of Protected
Elements Between The Works**

In order to establish copyright infringement, Plaintiffs must prove that New Line had
access to the Plaintiffs' copyrighted work and that there is "substantial similarity of protected
elements between the works."  *Harlequin*, 2013 WL 707922, at *4 (citing *Rice*, 330 F.3d at
1174).  However, here Plaintiffs fail to allege that New Line had access to the Book and, even
more strikingly, Plaintiffs utterly fail to allege any substantial similarities between the works,
whether in plot, theme, dialogue, mood, setting, pace, characters or sequence of events.  *See
Randolph I*, 630 F. Supp. 2d at 746-49.  The Complaint is in fact completely and conspicuously
silent on what protectable element or elements New Line allegedly "copied" from the Book.  As
more fully described below, that failure of allegation is not an oversight capable of cure.  It is the
inevitable result of the fundamentally dissimilar nature of the works at issue in the case—the

13

Book's wholly factual account of the actual work of the Warrens, and New Line's dramatized works which tell different, original stories inspired by the Warrens' work, but add characters and events not found in the Book.

Without meeting this basic pleading requirement as set forth in *Twombly* and *Iqbal*, Plaintiffs cannot possibly maintain these claims, nor can they prevent dismissal by relying on the conclusory statement that "Plaintiffs believe that New Line is attempting to . . . circumvent the [Agreements] by attempting to claim that their productions are based upon a parallel set of rights . . . in connection with chapters from *The Demonologist*." Compl. ¶ 39. Plaintiffs' failure and inability to plead even minimal facts is fatal to their claims. *Iqbal*, 556 U.S. at 678.

Accordingly, Counts III and XI should be dismissed. Because there is no actionable similarity between the works, as demonstrated *supra*, Plaintiffs' copyright claims should be dismissed with prejudice as any amendment would be futile.

**D.    The Works At Issue**

**1.    The Warrens' "Annabelle" And "Enfield Poltergeist" Investigations**

The two historical Warren investigations at issue are "Annabelle" and the "Enfield Poltergeist." Compl. ¶ 39. The "Annabelle" case involved a Raggedy Ann doll named "Annabelle" that was possessed by a demonic spirit. *Id.* ¶¶ 26, 46. The "Enfield Poltergeist" case involved the Hodgson family, living in Enfield, England, who called the police after the children claimed that furniture was moving on its own and heard unexplained knocking sounds. Compl. ¶ 27, 47. This alarming activity escalated to the point where the children claimed to hear demonic voices, and claimed to have levitated. *Id.* ¶ 47.

The historical facts related to *both* the "Annabelle" and the "Enfield Poltergeist" cases have been widely reported on: The "Enfield Poltergeist" generated extensive media interest at the time of the alleged paranormal activities in the 1970s and was widely reported on by a

number of newspapers.  Request for Judicial Notice, Ex. 1, Stowe Decl., Exs. A-C.  In addition, the "Annabelle" case is an occult favorite and a simple Google search on the Internet returns a number of websites reporting the well-known facts of the case.  *Id.*, Exs. D-F.

### 2.      *The Demonologist:* **Chapter III "Annabelle"**

The Book offers Brittle's purely factual account of the Warrens' investigations.  Indeed, in his Author's Preface, Brittle states:  "all the information presented in this book is true.  These are real cases that happened to real people[.]"  Ex. 1, *The Demonologist*, p. ix.  The Plaintiffs are estopped to assert now that any of the book is fictional.  1 *Nimmer*, §2.11; *Houts v. Universal City Studios, Inc.*, 603 F. Supp. 26 (C.D. Cal. 1984) (plaintiff author of book estopped to claim that case studies by medical examiner used to create episodes of the TV show "Quincy" were fictional); *Oliver v. Saint Germain Foundation*, 41 F. Supp. 296 (S.D. Cal. 1941) (plaintiff estopped to disavow earlier claim that his manuscript was dictated to him by spirits from another planet).

*The Demonologist*'s "Annabelle" chapter is essentially a transcript of a recorded interview conducted by Mr. Warren of two nurses who claimed they had communicated with a human spirit.  *Id.*, p. 39.  One nurse told Mr. Warren that a Raggedy Ann doll that her mother bought her for her birthday had begun to move around the apartment on its own.  *Id.*, pp. 40-41.  The nurses further said that the doll started leaving notes written in a small child's handwriting.  *Id.*, p. 41.  These incidents prompted the nurses to contact a medium who told them that a little girl named Anabelle Higgins had died on the property.  *Id.*, p. 42.  The medium told the nurses that the spirit of this little girl asked to move into the doll and stay with them.  *Id.*  The women said yes, and thereafter called the doll "Annabelle."  *Id.*, pp. 42-43.  The incidents with the doll

15

became more violent.  *Id.*, pp. 44-46.  Eventually an exorcism was performed, and the Warrens took the doll home with them to protect the public.  *Id.*, p. 50.

The "Annabelle" chapter is purely factual, as it is essentially a recitation of a recorded interview conducted by the Warrens of the nurses who claimed that the doll they called "Annabelle" was possessed by the human spirit of a little girl who had died.  Historical facts include:  that there was a supposed demonically possessed doll named Annabelle; that two nurses owned the doll; that a medium told the nurses that the spirit of a deceased girl named Annabelle Higgins inhabited the doll; that the doll moved around by itself and communicated with its owners; that a priest tried to perform an exorcism of the doll; and that the Warrens investigated the case and later kept the doll.

### 3.     New Line's *Unreleased* Motion Picture Production "Annabelle"[4]

New Line's unreleased motion picture "Annabelle," though inspired by the real doll from the Warrens' paranormal investigation, features a young couple who come to own the doll and relates events not found in or based on the Book.  Ex. 3, Alexander Decl., ¶ 2, Ex. A.  New Line has completed principal photography of "Annabelle."  *Id.*, ¶ 2.  It is set to be released in October 2014.  *Id.*

The movie "Annabelle" is an original story in which a doll, though not a Raggedy Ann doll, is manipulated by a demonic spirit.  *Id.*, Ex. A.  Other than Ed and Lorraine Warren, the only individuals from the Annabelle chapter of *The Demonologist* appearing in the film are the

---

[4] As discussed above, because the parties could not agree on a stipulated protective order, in order to protect the value of its unreleased properties, New Line is filing this Motion without a detailed discussion of the motion picture productions "Annabelle" and "The Conjuring 2" pending the outcome of the Court's decision on New Lines' Motion for Limited Protective Order (Dkt. 33).  New Line respectfully requests that it be allowed to file a supplemental brief containing a more detailed summary and analysis of the works upon the Court's determination of its Motion for Limited Protective Order (Dkt. 33).

real life nurses and their roommate who historically owned the Annabelle doll, and even then they make only a fleeting appearance in the film. *Id.* Instead of depicting the documented story of Annabelle, the movie revolves around a young couple who owned the Annabelle doll before the nurses acquired it. *Id.* While in this couple's possession, Annabelle haunts them through supernatural events depicted in the film. *Id.* Notably, the young couple and the story told in the movie are not found in the Book. *Id.* Although there is a character in the movie named "Annabelle Higgins," this character is an adult woman and is not the human spirit of a deceased young girl.[5]

### 4.   *The Demonologist:* Chapter XIV "The Enfield Voices"

Half of *The Demonologist*'s "The Enfield Voices" chapter is spent discussing the Warrens' thoughts on the practice of demonology in general, and the other half is spent once again transcribing a recorded interview conducted by Mr. Warren related to the paranormal events that took place in England.

The chapter opens with a story in which Mr. Warren loses control of his car while driving in a place called the "Lord's Valley" in Pennsylvania. Ex. 1, *The Demonologist*, p. 207-08. The Warrens were discussing past paranormal investigations when the car began to swerve and lift off the ground. *Id.* The story appears to have been included in the chapter to illustrate the author's point that, "[n]ext to exorcism, demonology is perhaps the most dangerous business on earth." *Id.*, p. 208. The chapter then discusses the many precautions the Warrens take to keep themselves safe during their paranormal investigations. *Id.*, p. 208-09.

Next, the chapter recounts Mr. Warren's investigation into the alleged paranormal activity occurring in the home of a single mother and her children (the book does not identify the

---

[5] A synopsis of the movie "Annabelle" and a copy of the unreleased movie will be lodged with the Court upon determination of New Line's Motion for Limited Protective Order (Dkt. 33).

family by name).  *Id.*, p. 210.  The children allegedly drew the spirits into the house after playing

with an Ouija board.  *Id.*   As a result, a demonic spirit entered the home and brought "six

buddies" along.  *Id.*  The spirits caused "knockings, rappings, scratchings, [and] poundings," and

as time went on, the phenomena intensified, causing the girls to levitate.  *Id.*  It is not clear from

the chapter whether Lorraine Warren also travelled to England to investigate the case.

Mr. Warren thought that the most compelling aspect of the case was the voice

manifestations of the six different spirits.  *Id.*, p. 212.  As a result, most of the discussion of the

Enfield investigation is comprised of a lengthy transcript of an alleged conversation between Mr.

Warren and the spirits.  *Id.*, p. 212-18.  Notably, the chapter does not discuss what happened to

the family or how the case was resolved.  *Id.*, p. 223.  The chapter concludes with a discussion of

Ms. Warren's opinion on why "so much negative supernatural activity [is] happening right

now[.]"  *Id.*, p. 219-23.

Historical facts include:  that an unidentified family was haunted by demoniac spirits in a

house in Enfield, England; that the family included a single mother and her children; that the

children invited the spirits into the house while playing with an Ouija board; that there were

unexplained knockings, scraping and poundings in the house; that allegedly furniture moved and

the children levitated; and that the spirits vocalized.

## 5.    New Line's *Unreleased* Motion Picture Production "The Conjuring 2"

New Line is developing a motion picture project currently entitled "The Conjuring 2," an

original screenplay based on the "Enfield Poltergeist" haunting in Enfield, England during the

late 1970s.  Ex. 3, Alexander Decl., ¶ 3.  The historical facts related to these paranormal events

were widely reported on in the news.  Request for Judicial Notice, Stowe Decl., Exs. A-C.

Unlike the Book, "The Conjuring 2" actually tells the story of the Hodgson family and does not

merely report facts about the haunting as the Book largely does.  Ex. 1, Alexander Decl., Ex. B.

The screenplay also does not include any of the minor narrative elements included in the Book.

*Id.*  For example, "The Conjuring 2" does not open up with a flash back of the Warrens' car

sliding down a cliff (*id.*), and it does not include the lengthy dialogue between Mr. Warren and

six (6) demons inhabiting the home in Enfield, England, that makes up a large portion of the

discussion of the Warrens' investigation into the case in the Book.  *Id.*  Likewise, "The

Conjuring 2" is not presented in an interview format with Mr. Warren.  *Id.*  While the Warrens

do appear as characters in the movie, no one is disputing their existence as paranormal

investigators who investigated this case.[6]

**E.     There Is No Actionable Similarity Between The Works**

Here, the only arguable similarities between the works are certain facts concerning the

cases.  Because facts are not subject to copyright protection, these claims must fail.

Facts, like ideas, are not entitled to copyright protection.  In *Feist*, the Supreme Court of

the United States confirmed that "[t]o qualify for copyright protection, a work must be *original

to the author*." 499 U.S. at 345 (emphasis added).  "'No one may claim originality as to facts."

*Id.* at 347 (citations omitted). "The same is true of *all* facts – scientific, historical, biographical,

and news of the day. '[T]hey may not be copyrighted and are part of the public domain available

to every person.'" *Id.* at 348 (emphasis added).  Thus, facts themselves are beyond the scope of

copyright protection.  *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir. 1981).

While the selection and sequencing of facts may receive some limited copyright

protection, the very same facts may be reshuffled without infringement.  *Feist*, 499 U.S.  at 349.

---

[6] A synopsis of the current version of the screenplay for "The Conjuring 2" and a copy of the current version of screenplay will be lodged with the Court upon determination of New Line's Motion for Limited Protective Order (Dkt. 33).

"Thus, if the compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression.  Others may copy the underlying facts from the publication, but not the precise words used to present them."  *Id.* at 348.

An instructive case on this issue, is the Ninth Circuit's decision in *Novak v. Warner Bros. Pictures, LLC*, 387 Fed. Appx. 747 (9th Cir. 2010).  In *Novak*, the plaintiff alleged that the dramatic film *We Are Marshall* infringed on the copyright in plaintiff's documentary film about the tragedy that struck a university's football program after most of the players, coaches, and prominent supporters of the team, were killed is a plane crash in the 1970s.  *Id.* at 748.  The Ninth Circuit upheld the district court's dismissal of the claim, finding that, while the same historical facts underlie both productions, historical facts are not protected by copyright.  *Id.* (citations omitted).  The plaintiff argued that substantial similarity could be shown in the same sequencing of events in the opening montages of the two films, but the court disagreed, finding that the opening sequences significantly differed, in that the opening sequence in the documentary included the film's title and many additional shots of the town and university campus.  *Id.* at 749.  Because the only "concrete or articulable similarities" between the works consisted of historical facts and *scenes a faire*, the plaintiff could not show that the works were substantially similar, thus defeating her claim as a matter of law.  *Id.* at 749.  *Novak* is illustrative of how courts analyze copyright infringement claims where the works at issue are based on historical facts.  *See Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) (copying historical facts from a copyrighted book was not actionable, because facts and ideas are not protected and the scope of protection for historical accounts is narrow indeed); *see also Benay v. Warner Bros. Entmt.*, 607 F.3d 620, 625 (9th Cir. 2010) (substantial similarities between a screenplay and a movie were not

actionable, since the similarities resulted from shared historical facts, familiar stock scenes, and characteristics naturally flowing from the works' shared basic plot premise).

Though it deals with the supernatural, the Book is presented entirely as a work of non-fiction, a factual account of the work of the Warrens.  Plaintiffs are estopped to assert otherwise. 1 *Nimmer*, §2.11; *Houts*, 603 F. Supp. 26 (C.D. Cal. 1984); *Oliver*, 41 F. Supp. 296 (S.D. Cal. 1941).  Accordingly, since Brittle cannot own a copyright in the facts and events set forth in his book, he cannot base a copyright claim upon those facts.  These include the historical persons of Ed and Lorraine Warren; the family haunted in Enfield, England (unnamed in the Book, but the real life Hodgson family); and the nurses who owned a possessed doll named Annabelle.  It also includes the historical facts of the possessed doll in Annabelle; the poltergeist in Enfield; the use of Ouija board, knocking sounds, levitation of children, and demonic voices in Enfield; and any other historical person or fact contained in the Book.  *See Narell*, 872 F.2d 907, 911.  These facts are not protectable.

Because New Line's works and the Book share historical inspiration, it is not surprising that there are some historical facts in common between the works such as the appearance of the Warrens, a possessed doll, or a haunted house is Enfield, England.  It is also not actionable.  In the Court's substantial similarity analysis all such facts must be filtered out as unprotectable elements.  "A court must distinguish between the protectable and unprotectable material because a party claiming infringement may place no reliance upon any similarity in expression resulting from unprotectable elements."  *Randolph I*, 630 F. Supp. 2d at 746 (citations omitted).  And once the historical facts are "filtered" out of the substantial similarity analysis, there are no similarities between the Book and movies, much less "substantial" ones.

Accordingly, the copyright claims fail.

### III.   PLAINTIFFS' STATE LAW CLAIMS AGAINST NEW LINE ARE PREEMPTED

A state cause of action is preempted by Section 301 of the Copyright Act if the rights at issue come within the subject matter of copyright, as set forth in Sections 102 and 103, and the rights at issue are equivalent to the exclusive rights of Section 106. *Daboub v. Gibbons*, 42 F.3d 285, 289-90 (5th Cir. 1995); *Gemcraft Homes, Inc. v. Sumurdy*, 688 F. Supp. 289, 294 (E.D. Tex. 1988). In *Gemcraft*, the court found that architectural plans fixed in a tangible medium are within the subject matter of copyright. *Id.* The court held that "to the extent plaintiff's claims for tortious interference with contract complain that plaintiff has lost benefits from its exclusive rights to the architectural plans, the cause of action would be preempted." *Id.* at 295. Moreover, where the "defendant's alleged acts would violate both state law and federal copyright law, then the state right is deemed 'equivalent to copyright.'" *Compliance Review Services, Inc. v. Davis-Osuawu*, No. H-04-3635, 2006 WL 3541715, at *3-4 (S.D. Tex. 2006) (citations omitted) (claim for tortious interference with contract preempted where it arose out of the same set of operative facts as the copyright infringement claim).

Plaintiffs assert two claims for tortious interference of contract against New Line, both of which allege that New Line's motion pictures are based on *The Demonologist*: (1) in Count II, DeRosa-Grund alleges that New Line tortiously interfered with the Demonologist Option by creating the "Annabelle" and "The Conjuring 2" motion pictures "based on" *The Demonologist*; and (2) in Count X, Brittle alleges that New Line tortiously interfered with the Collaboration Agreement by "exploiting" chapters from *The Demonologist* for its motion pictures "Annabelle" and "The Conjuring 2." Compl. ¶¶ 78, 83, 127.

There can be no dispute that *The Demonologist*, a book, comes within the subject matter of copyright, as set forth in Sections 102 and 103. *Gemcraft Homes*, 688 F. Supp. at 294. In Count II, DeRosa-Grund alleges that New Line tortiously interfered with his exclusive right to

exploit *The Demonologist* under the Demonologist Option by basing its motion pictures on *The Demonologist*.  Compl. ¶ 83.  DeRosa-Grund's allegation that New Line interfered with his "exclusive rights" under the Demonologist Option is equivalent to the exclusive rights granted under Section 106, i.e., the right to prepare derivative works based on the copyrighted work.  17 U.S.C. § 106(2).  As a result, DeRosa-Grund's claim is preempted as a matter of law.  *Gemcraft Homes*, 688 F. Supp. at 295.

Brittle's claim that New Line tortiously interfered with the Collaboration Agreement by basing its motion pictures on *The Demonologist* (Count X), is based on the same conduct giving rise to his copyright infringement claim against New Line (Count XI), i.e., that New Line improperly based its motion pictures on *The Demonologist*.  *Compare* Compl. ¶ 127, *with id.* ¶¶ 130, 131.  As discussed above, where the "defendant's alleged acts would violate both state law and federal copyright law, then the state right is deemed 'equivalent to copyright.'"  *Davis-Osuawu*, 2006 WL 3541715, at *3-4; *see also* 1 *Nimmer*, § 1.01(B)(1) (claim for interference with contract is pre-empted where not qualitatively different from claim for copyright infringement).  Here, if New Line did in fact base its motion pictures on *The Demonologist*, as Brittle alleges, this conduct would give rise to a copyright claim by Brittle as the co-owner of *The Demonologist*.  Accordingly, Brittle's state law claim is preempted.  *Id.*

Finally, both of these claims fail for the additional reason that, as discussed in §II.D., New Line's motion picture productions are not "based on" *The Demonologist*, which can be proven by either a review of the Complaint (Plaintiffs allege no similarities between the works), or a review of the works themselves.

## IV.    THE DEPENDENT CLAIMS AGAINST NEW LINE FALL WITH THE CLAIMS DISCUSSED ABOVE

Because the claims for declaratory judgment (Count XII) and civil conspiracy (Count XIII) against New Line are derivative of the claims discussed above, which fail as a matter of law, these dependent claims should be dismissed as well.  *See, e.g., Turner v. Pavlicek*, No. H-10-00749, 2011 WL 4458757, at *14 (S.D. Tex. Sept. 22, 2011) (noting that "a defendant's liability for conspiracy depends on participating in some underlying tort," and "[i]f the underlying tort claim fails, the conspiracy claim fails as well as a matter of law."); *Cole v. Fed. Home Loan. Mortg. Group*, No. 3:11-cv-1833, 2012 WL 555194, at *5 (N.D. Tex. Jan. 23, 2012) (dismissing claim for declaratory relief with prejudice where such claim was derivative of other meritless claims subject to dismissal).

## CONCLUSION

WHEREFORE New Line respectfully requests that this Court grant its motion to stay or dismiss all of DeRosa-Grund's claims in this action (Counts I, II, III, IV, and XIII) in favor of ongoing arbitration, or in the alternative, transfer venue to the Central District of California. Alternatively, New Line respectfully requests that all of DeRosa-Grund's claims against it be dismissed, with prejudice pursuant to Fed. R. Civ. P. 12(b)(6). New Line further respectfully requests that all of Brittle's claims against it (Counts X, XI, and XII) be dismissed, with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully Submitted,

JACKSON WALKER L.L.P.

*/s/ Charles L. Babcock*
Charles L. "Chip" Babcock
State Bar No. 01479500
S.D. ID # 10982
*Attorney-in-Charge*
cbabcock@jw.com

24

1401 McKinney, Suite 1900
Houston, Texas 77010
(713) 752-4200
(713) 752-4221 – Fax

**ATTORNEYS FOR DEFENDANTS WARNER BROS. ENTERTAINMENT, INC., NEW LINE PRODUCTIONS, INC., TONY SPERA AND LORRAINE WARREN**

OF COUNSEL:

JACKSON WALKER L.L.P.

Courtney T. Carlson
State Bar No. 24065004
S.D. ID # 1115579
ccarlson@jw.com
1401 McKinney, Suite 1900
Houston, Texas  77010
(713) 752-4200
(713) 752-4221 – Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with Plaintiffs' counsel prior to filing this Motion and was informed Plaintiffs are opposed to this Motion. Therefore, this Motion is necessary.

/s/ Charles L. Babcock
Charles L. Babcock

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2014, a copy of the foregoing document was filed electronically using the Court's Electronic Case Filing System, which will provide electronic notification of its filing to all counsel who have appeared in this action.

/s/ Charles L. Babcock
Charles L. Babcock

514577