# EXHIBIT 5



**EXECUTION DRAFT**

## PRODUCER LOANOUT AGREEMENT

This agreement dated as of November 11, 2009 ("Agreement") is entered into between NEW LINE PRODUCTIONS, INC. ("Company"), on the one hand, and EVERGREEN MEDIA HOLDINGS, LLC, a California corporation ("Lender") for the producing services of TONY DEROSA-GRUND ("Artist"), on the other hand, in connection with the motion picture project presently entitled "THE CONJURING" ("Picture").

1.   **CONDITIONS PRECEDENT**:  Notwithstanding anything to the contrary contained in this Agreement, Company's obligations hereunder are subject in all respects to satisfaction of the following conditions precedent ("Conditions Precedent"):

  (a)  Receipt by Company of the following documents:

    (i)  a copy of this Agreement signed by Lender and Artist, as applicable;

    (ii)  Artist's completion to Company's satisfaction, of the I-9 form (eligibility verification form), and Artist's submission to Company of documents satisfactory to Company to demonstrate Artist's employment eligibility;

    (iii) Labor permits, visas, and other documentation as may be required by any governmental agency for the purpose of enabling Artist to render services hereunder wherever and whenever such services are required by Company and receipt by Company, in form and substance acceptable to Company, thereof;

  (b) Bankruptcy court/trustee approval of this Agreement, the "Evergreen Quitclaim Agreement" (defined below) and any other agreements in connection with the Picture for which approval is required in connection with the bankruptcy proceeding involving Artist (Company acknowledges that this Condition Precedent is deemed satisfied based on the bankruptcy court order dated January 27, 2010 approving the transaction based on the deal memo dated as of December 4, 2009 between EMH, Safran and Artist, on the one hand, and Company on the other hand, in connection with the Picture, and the email dated March 24, 2010 from Henry ("Hank") J. Fasthoff, IV);

  (c) Signature by Evergreen Media Holdings, LLC ("EMH"), Grund, Silverbird Media Group, LLC ("Silverbird") and Evergreen Media Group, LLC ("EMG") (collectively as "Grund Parties") and delivery to Company of the option quitclaim agreement between Company and the Grund Parties dated as of November 11, 2009 in connection with the Picture ("Evergreen Quitclaim Agreement");

  (d) Signature by Summit Entertainment, LLC ("Summit") and delivery to Company of the quitclaim agreement between Company and Summit dated as of November 11, 2009 in connection with the Picture ("Summit Quitclaim Agreement");

CONFIDENTIAL                                    EMH0000210

(e) Signature by Peter Safran ("Safran") and deliver to Company of the producer agreement between Company and Safran (through his loanout company) dated as of November 11, 2009 in connection with Safran's producing services for the Picture (this Condition Precedent shall be deemed satisfied upon Company's receipt of a signed Company-approved certificate of employment for Safran);

(f) Signature by Chad Hayes and Carey Hayes ("Writer") and delivery to Company of the agreement between Company, on the one hand, and Emerald City, Inc. for the services of Chad Hayes and Copasay, Inc. for the services of Carey Hayes, on the other hand, dated as of November 11, 2009, relating to Writer's writing services in connection with the Picture ("Writer Agreement");

(g)      Company's receipt and approval of complete chain-of-title documentation to the Picture, including, without limitation, (i) a fully executed Company-approved termination of the "Smith/ EMH Film Agreement" (defined in the Evergreen Quitclaim Agreement), the "Smith/ EMT Film Agreement" (defined in the Evergreen Quitclaim Agreement) and the "Smith/ EMT Television Agreement" (defined in the Evergreen Quitclaim Agreement) (this Condition Precedent is hereby deemed satisfied); (ii) a fully executed Company-approved amendment dated as of November 11, 2009 to the "Smith/ Warren Agreement" (defined in the Evergreen Quitclaim Agreement) and a New Line-approved acknowledgement and waiver signed by each of Ed Warren's heirs, including without limitation, Judith Ann Spera, Heather Valentine and Christopher McKinnell; (iii) receipt by Company of an executed copy of a Company-approved amendment to the "EMH/ Perron Agreement" (defined in the Evergreen Quitclaim Agreement) confirming an extension of the deadline for timely payment of the option fee and a power of attorney signed by the following members of the Perron family: M. Carolyn Buchanan, Roger A. Perron, Nancy Connor White, Cynthia A. Brady, April H. Perron, Christine D. Perron and Andrea Perron (collectively, the "Perrons"); (iv) receipt by Company of an executed copy of a Company-approved assignment agreement ("Smith/ EMH Assignment Agreement") between Evergreen Media Holdings, Inc. ("EMH") and B. Harrison Smith, Jr. ("Smith") granting all of Smith's right, title and interest in the "Property" (defined in the Evergreen Quitclaim Agreement) to EMH and superseding and replacing the Smith/ EMH Film Agreement, and Company's receipt of satisfactory confirmation that the "Unrelated Picture" (defined in the EMH/ Smith Assignment Agreement) is not related to the Property; (v) receipt by Company of an executed copy of the Safran Producer Agreement, and the certificate of employment for Safran, both dated as of November 11, 2009, in connection with the Picture (this Condition Precedent shall be deemed satisfied upon Company's receipt of a signed Company-approved certificate of employment for Safran); and (vi)   receipt by Company of an executed copy of the Acknowledgement by Sonja DeRosa-Grund and Evergreen Media Holdings, LLC confirming the entity EMT was never formed or created and never existed (Company acknowledges satisfaction of this Condition Precedent stated in Paragraph 1(g)(vi)).

(g) A successful meeting, as determined by Company in its sole discretion, between Artist and the creative executive designated by Company for the Picture to review Artist's direction and approach to the Picture (this Condition Precedent is hereby deemed satisfied).

CONFIDENTIAL

EMH0000211

No act or omission of Company shall be deemed a waiver by Company of any Condition Precedent. If Company, in its sole discretion, elects to waive any Condition Precedent, such waiver shall only be valid if expressly agreed to by Company in writing and shall only serve as a waiver of the specific condition so waived.

1A.    **CONDITION SUBSEQUENT:** Notwithstanding anything to the contrary contained in this Agreement, Company's obligations hereunder are subject in all respects to satisfaction of the following conditions subsequent ("Conditions Subsequent"): Lender and Artist shall deliver to Company no later than April 30, 2010 a fully executed original of the Company-approved Amendment #3 dated as of March 31, 2010 to the Smith/ Warren Agreement between Company and Lorraine Warren relating to Lorraine Warren's heirs.

2.  **DEVELOPMENT:**

(a) Development:  Commencing on the date hereof, Company engages Lender to furnish the development services of Artist as an individual producer of the Picture to render all customary development services rendered by individual producers of first-class, feature-length motion pictures as may be reasonably requested by Company and any additional services reasonably required by Company in connection therewith. All such services shall be rendered on a non-exclusive but first-priority and regular, in person basis; provided that any services rendered by Artist for himself or Lender or for any third party shall not interfere with the timely and complete performance of any services required of Artist in connection with the Picture. Development services shall commence on the date hereof and shall continue until the completion thereof as required by Company or until abandonment of the Picture or until Company "Elects to Proceed to Production" (as defined below) of the Picture, whichever occurs first.

(b) Completion of Development:  In the event Company "Elects to Proceed to Production" (as defined below) of the Picture based on the screenplay supervised by Artist hereunder (with no intervening rewrite, revision or new screenplay not supervised by Artist), and Company has at no time abandoned development or production of the Picture and provided Artist is available as reasonably required by Company then, subject to Paragraphs 14 and 16 below, Company shall be deemed to have engaged Artist's production services on a "pay or play" basis for the "Basic Compensation", as defined in Paragraph 4 below. Company may "Elect to Proceed to Production" by written notice or shall be deemed to have "Elected to Proceed to Production" when Company has: (i) approved the final screenplay and budget (ii) engaged the director and principal cast on an unconditional "pay or play" basis, and (iii) notified Artist in writing of the start date ("Start Date") for the commencement of principal photography.

(c) Abandonment/Termination:  Company may at any time, in its sole discretion, abandon the Picture. Abandonment shall occur or be deemed to occur only if and when Company gives written notice of its election to abandon the Picture. If Company abandons the Picture, or if Company proceeds based on a screenplay and/or other materials not supervised by Artist, then Company shall have no further obligations hereunder to Lender or Artist.

CONFIDENTIAL

EMH0000212

3. **PRODUCTION SERVICES**:

(a) Engagement/Exclusivity:  If Company has Elected to Proceed to Production and Company has engaged Lender to furnish Artist's production services as an individual producer of the Picture, Lender shall cause Artist to render all services customarily rendered by individual producers of first-class theatrical motion pictures in the motion picture industry, as, where and when required by Company including services in the pre-production, production and post-production of the Picture.  Artist's services shall be on a non-exclusive but first priority basis to Company starting on the date which Company designates as the commencement of pre-production, shall be on an exclusive basis commencing eight (8) weeks prior to commencement of principal photography through completion of principal photography and thereafter shall be on a non-exclusive but first priority basis through delivery of the answer print in accordance with Paragraph 8 below, provided that  any services rendered by Artist for himself or Lender or for any third party shall not interfere with the timely and complete performance of any services required of Artist in connection with the Picture.

(b) Production Services:  Lender shall cause Artist to produce and deliver the Picture within the budget, on schedule and as instructed by Company in all matters, including, without limitation, those involving artistic taste and judgment.  Artist shall not make any material changes to the final shooting script of the Picture or in the shooting schedule or budget without Company's prior written approval in each case and Artist shall comply with all of Company's legal clearance procedures and guidelines with respect to the content of the Picture.  Company shall have the sole authority to regulate all activities on set.  Artist shall not have the right to photograph or videotape any sets, individuals or activities on set, without Company's prior written consent in each instance.  The copyright in any pictures taken or interviews given shall be solely owned by Company.

(c) Further Services:  If, after the expiration or termination hereof, Company requires further producing services of Artist for retakes, added scenes, visual effects, looping, post-synching, publicity interviews, personal appearances, stills and similar services, Artist shall render such services, subject to Artist's next professional availability, without additional compensation to Lender.

4. **COMPENSATION**:  Upon condition that Artist performs all services required hereunder and that neither Lender nor Artist is in default hereof, subject to Company's rights under Paragraphs 14 and 16 hereof, Company shall to pay to Lender, as full and complete consideration for Artist's services and for all rights granted and representations, warranties and agreements made hereunder, the following compensation:

(a) Development Fee:  For the development services referred to herein, Twenty Five Thousand Dollars ($25,000) ("Development Fee"), less any deductions under Paragraph 5A below, payable one-half (1/2) upon satisfaction of the Conditions Precedent and one-half (1/2) upon the earlier of Company's engagement of Artist's production services pursuant to Paragraph 2(b) above or Company's abandonment of the Picture.  All compensation paid pursuant to this Paragraph 4(a) shall be deemed a nonreturnable advance against, and shall be deductible from,

CONFIDENTIAL                                      EMH0000213

the sums payable pursuant to Paragraph 4(b) below.

(b) <u>Basic Compensation</u>: If Company engages Artist's production services on a "pay or play" basis pursuant to Paragraph 2(b) above, Lender shall be entitled to basic compensation ("Basic Compensation") in the amount of Five Hundred Thousand Dollars ($500,000), less the Development Fee and any deductions under Paragraph 5A below. The Basic Compensation shall accrue and be payable in installments as follows:

(i)   Twenty percent (20%) thereof (less the Development Fee) in eight (8) equal weekly installments commencing eight (8) weeks prior to the scheduled date for the commencement of principal photography of the Picture;

(ii)  Sixty percent (60%) thereof in equal installments over the period of principal photography of the Picture;

(iii) Ten percent (10%) thereof upon completion of dubbing and scoring of the Picture; and

(iv)  Ten percent (10%) thereof upon satisfactory delivery to Company of the answer print in accordance with Paragraph 8 below.

(c) <u>Payments</u>: All sums accrued hereunder shall be payable on Company's regular pay day of the week following the week services were rendered. Company shall pay directly to Lender all of the compensation that would have been payable to Artist had Artist rendered services directly to Company in the first instance, and Company shall not be obligated to make any payments of any nature whatsoever to Artist. In no event shall Lender's failure to pay any amounts to Artist be deemed to constitute a breach of this Agreement by Company.

5.  **CONTINGENT COMPENSATION**:   If the Picture, as released, was produced substantially in whole under the direct supervision of Artist as individual producer thereof, and provided that Artist fully performs all services required hereunder and neither Lender nor Artist is in default of this Agreement, subject to Company's rights under Paragraphs 14 and 16 hereof, Lender shall be entitled to the following contingent compensation ("Contingent Compensation") in accordance with the terms of the applicable exhibit attached hereto and incorporated herein by this reference.

(a) <u>Deferments</u>: All sums paid pursuant to this Paragraph 5(a) shall be deemed an advance applicable against and deductible from the participation payable pursuant to Paragraph 5(b) below.

(i)   At such time, if ever, that the domestic gross box office receipts of the Picture, as reported in Daily Variety ("DBO"), reach two and one-half (2.5) times the "Cost of Production" of the Picture, as defined in Paragraph 5(a)(v), Lender shall be entitled to receive a contingent deferment in the amount of Seventy-Five Thousand Dollars ($75,000), less any deductions under Paragraph 5A below.

CONFIDENTIAL                                                                                     EMH0000214

(ii)  At such time, if ever, that DBO reaches three and one-quarter (3.25) times the Cost of Production of the Picture, Lender shall be entitled to receive a contingent deferment in the amount of Seventy-Five Thousand Dollars ($75,000), less any deductions under Paragraph 5A below.

(iii) At such time, if ever, that DBO reaches four (4) times the Cost of Production of the Picture, Lender shall be entitled to receive a contingent deferment in the amount of Seventy-Five Thousand Dollars ($75,000), less any deductions under Paragraph 5A below.

(iv)  Such deferments shall be payable within thirty (30) days after receipt of Lender's notice of the applicable publication in Daily Variety.

(v)  Solely for purposes of calculating the contingent deferments set forth in this Paragraph 5(a) "Cost of Production" shall be defined as the cost of production of the Picture, plus an amount equal to interest thereon, all as provided for in Paragraph 9 of Exhibit "A".  For purposes of calculating the multiples of Cost of Production set forth in this Paragraph 5(a), interest and overhead shall be charged only once.  For the avoidance of doubt, the exclusions to Cost of Production set forth in this Paragraph 5(a)(v) shall only apply for purposes of calculating the contingent deferments set forth in Paragraphs 5(a)(i)-(iv).

(b)  Participation ("Participation"):  An amount equal to 5% of 100% of the Defined Gross of the Picture in excess of the Contractual Start Point on a moving basis ("MCSP") as defined and calculated in Exhibit "A" Defined Gross in Excess of Contractual Start Point Moving Basis, but computed with a 25% distribution fee on Defined Gross from all sources, less any deductions under Paragraph 5A below.

(c)  No Guarantee:  Company makes no representation or warranty that the Picture will be produced, or if the Picture is produced, that the proceeds of the Picture shall be sufficient to generate any contingent compensation.  Nothing contained herein shall be construed to obligate Company to take any action to maximize revenues or gross receipts or to give Lender or Artist any right, title or interest of any kind in or to the revenues or gross receipts derived from the Picture.  Nothing contained in this Agreement shall be construed as creating a fiduciary relationship between Company, on the one hand, and Artist and/or Lender, on the other hand.  The contingent compensation shall not constitute a lien or claim on the Picture or on any revenues or gross receipts derived therefrom.

5A.  **RIGHTS PAYMENT DEDUCTIONS:**  Company may deduct from any and all payments to Lender under Paragraphs 4 and 5 above any "Third Party Rights Payments" that are not deducted under the Evergreen Quitclaim Agreement.  As used herein, "Third Party Rights Payments" shall mean any monies payable by Company to the Warrens, the Warren's heirs, the Perrons, Smith or the bankruptcy court/trustee in connection with any life story or other chain of title rights for the "Property" (as defined in the Evergreen Quitclaim Agreement) or the Picture,

CONFIDENTIAL                                    EMH0000215

excluding only the payments to the Perrons and the bankruptcy court/trustee which are deducted from Company's payments to Writer under the Writer Agreement.

6.      **TRAVEL AND EXPENSES/ADDITIONAL BENEFITS**:  If Company requires Artist to render development or production services hereunder at a location ("Location") more than seventy-five (75) miles from Artist's principal residence (Artist represents and warrants such residence(s) to be principally in Houston, TX), the following shall apply.

(a)      General:  Company will furnish Artist with or reimburse Artist for the cost of (i) one (1) round trip transportation to and from such Location if used (by air, if appropriate, and first class, if reasonably available and used) for each trip made at Company's request and (ii) all reasonable first-class living expenses Artist incurs, not to exceed  One Thousand Five Hundred Dollars ($1,500) per week in New York, Paris and London, One Thousand Two Hundred Fifty Dollars ($1,250) per week in other major cities and One Thousand Dollars ($1,000) per week elsewhere.  Company's obligation to reimburse Lender for transportation and living expenses shall be subject to Company's usual expense accounting procedures.  Partial weeks shall be prorated on the basis of a 7-day week.

(b)      Ground Transportation:  If Artist is required by Company to render services hereunder at a Location during principal photography of the Picture, Company will furnish such Artist with ground transportation to and from airports, hotels and sets.

(c)      Travel Arrangements:  All travel arrangements, including, but not limited to the acquisition of airline tickets, booking of accommodations, etc., shall be made through Company's location or travel department, unless Company's prior written approval is obtained.  Except as otherwise set forth herein, Company shall not be responsible for any other expenses or perquisites of Lender and/or Artist.

7.      **CREDIT**:  Subject to any applicable guild or union requirements and to subparagraph 7(c) below, Company shall accord Artist the following credit in connection with the Picture:

(a)      Personal Credit.  As individual producer substantially in the form "Produced By Tony DeRosa-Grund ":

(i)      On the screen in all positive prints of the Picture, on a separate card (shared only with other persons receiving credit in the same capacity), but in no event in a size of type smaller than that used to display the personal credit of the director, screenwriter, co-producer and executive producers, if any, of the Picture.

(ii)      In paid advertisements, in a size of type not less than 35% of that used for the "Title".

(b)      Production Credit.  A production credit substantially in the form "An Evergreen Media Group Production", subject to Paragraph 7(b)(iii) below:

CONFIDENTIAL

EMH0000216

(i)  On the screen in all positive prints of the Picture, on a separate card (shared only with other producers, if any, receiving a production credit in connection with the Picture).

(ii)  In paid advertisements, in a size of type not less than 35% of that used for the "Title".

(iii)  Lender shall have a one-time right by written notice to Company no later than the commencement of pre-production of the Picture to substitute Gallows Hills for Evergreen Media Group as the entity to receive the production credit in this Paragraph 7(b). For the avoidance of doubt, in no event will Evergreen Media Group and Gallows Hills both be accorded production credit under this Agreement.  Any advertising, publicity or other materials created which contain the name Evergreen Media Group will not be changed.

(c)    General:  References to the "Title" are to the regular as opposed to the artwork title of the Picture.  Any reference to the "main titles" are to the credits, whether before or after the body of the Picture, where the "directed by" credit appears.  Credit will be given only if the Picture as first generally released was produced substantially under the direct supervision of Artist as the sole individual producer thereof, and only if neither Lender nor Artist is in default hereof.  If Artist is to receive credit in paid advertisements, the obligation shall apply only to the billing portion (excluding artwork and advertising copy) of advertisements issued by Company or under its direct control relating primarily to the theatrical exhibition of the Picture, and which are issued prior to the date 5 years after the initial release of the Picture.  Billing requirements shall not apply at any time to teasers, trailers, billboards and other outdoor advertising, radio and television advertising, group, list or special advertisements, commercial tie-ins or by-products, any advertisements of 250 lines or less, or any advertisements which would be excepted advertisements under the Directors Guild of America Basic Agreement ("Excluded Ads").  No casual or inadvertent failure to comply with billing requirements, nor the failure of any third party so to comply, shall be a breach of this Agreement.  The sole remedy for a breach of any of the billing provisions of this Agreement shall be the recovery of damages in accordance with the dispute resolution provisions set forth below, it being agreed that in no event shall Lender or Artist seek or be entitled to injunctive or other equitable relief for breach of any of the billing requirements hereof.

8.    **DELIVERY; LENGTH; RATING; COVER SHOTS**:    Artist shall deliver the completed Picture to Company within a post-production schedule approved by Company.  Time is of the essence with respect to delivery of the Picture.  "Delivery" shall be deemed to have occurred only upon Artist's delivery to Company of an answer print which conforms to all of Company's standard delivery requirements of which Artist is notified in writing, including, without limitation the following requirements, all of which are of the essence of this Agreement:

(a)    Length:  The Picture shall have a running time of not less than ninety-five (95) minutes and not more than one hundred ten (110) minutes, shall be photographed on 35mm film (Eastman Kodak or Fuji, as determined by Company), in color, with an aspect ratio of 1.85:1 or 2.40:1 (flat or scope) at Company's instruction, and shall not be filmed with the use of a hard

CONFIDENTIAL

EMH0000217

matte.

(b)     Budget:  The Picture shall be produced and delivered in accordance with the budget approved by Company, subject only to such changes in the budget as Company has approved in writing.  There shall be no overhead charges in the budget which are payable to Lender or Artist other than the Basic Compensation and any other compensation payable to Lender hereunder.

(c)     Screenplay Conformity:  The Picture shall adhere to the approved shooting script as of the commencement of principal photography of the Picture, and Artist shall not make any changes therein, excepting only minor changes required by the exigencies of production, without the prior written approval of a Business Affairs executive of Company.

(d)     Rating:  The Picture shall qualify for an MPAA rating no more restrictive than the rating designated by Company unless otherwise approved in writing by a Business Affairs executive of Company.

(e)     Cover Shots:  Artist shall cause to be photographed and furnished to Company "cover shots" and alternate scenes and dialogue which can be incorporated into the Picture to render it suitable for exhibition on United States network primetime television in accordance with applicable network "Standard and Practices" regulations and similar network requirements regarding the content of motion pictures.  Such cover shots and alternate scenes and dialogue shall be such that they can be integrated into the primetime network version of the Picture without materially changing or impairing the continuity of the story line of the Picture.

(f)     End Credits:  The Picture shall contain end credits which shall not exceed a total of three (3) minutes in length and shall conform to Company's standard policies relating thereto.

9.     **RIGHTS:**

(a)     Ownership:  All results and proceeds of every kind of the services heretofore and hereafter to be rendered by Lender and/or Artist in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Lender and/or Artist which in any way relate to the Picture or to the material on which the Picture will be based (collectively "Material"), are and shall be deemed to be "works made for hire" for Company.  Accordingly, Company is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights").   The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised.  If under any

CONFIDENTIAL                                                          EMH0000218

applicable law the fact that the Material is a "work made for hire" is not effective to place authorship and ownership of the Material and the Picture and all rights therein in Company, or if the Material is held not to be a "work made for hire", then to the fullest extent allowable and for the full term of protection otherwise accorded to Lender and/or Artist under such applicable law, Lender and Artist hereby assign and transfer to Company the Rights and, in connection therewith, any and all right, title and interest of Lender or Artist in the Picture and any other works now or hereafter created containing the Material.

(b)     Alteration Rights:  Lender and Artist hereby grant Company the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Company may in its sole discretion determine.  To the fullest extent allowable under any applicable law, Lender and Artist hereby irrevocably waive or assign to Company their so-called "moral rights" or "droit moral".  Lender and Artist expressly acknowledge that many parties will contribute to the Picture and other works that will embody all or part of the Material.  Accordingly, if under any applicable law the above waiver or assignment by Lender or Artist of "moral rights" or "droit moral" is not effective, then Lender and Artist agree to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

(c)     Rental Right:  Company, on the one hand, and Lender and Artist, on the other, acknowledge and agree that the following sums are in consideration of, and constitute equitable remuneration for, the rental right included in the Rights: (i) an agreed allocation to the rental right of 3.8% of the Basic Compensation and, if applicable, 3.8% of the contingent compensation provided for in this Agreement; (ii) any sums payable to Lender or Artist with respect to the rental right under any applicable collective bargaining or other industry-wide agreement; and (iii) the residuals payable to Lender or Artist under any such collective bargaining or other industry-wide agreement with respect to home video exploitation which are reasonably attributable to sale of home video devices for rental purposes in the territories or jurisdictions where the rental right is recognized.  If under the applicable law of any territory or jurisdiction, any additional or different form of compensation is required to satisfy the requirement of equitable remuneration, then it is agreed that the grant to Company of the rental right shall nevertheless be fully effective, and Company shall pay Lender or Artist such compensation or, if necessary, the parties shall in good faith negotiate the amount and nature thereof in accordance with applicable law.  Since Company has already paid or agreed to pay Lender and Artist equitable remuneration for the rental right, Lender and Artist hereby assign to Company, except to the extent specifically reserved to Lender and Artist under any applicable collective bargaining or other industry-wide agreement, all compensation for the rental right payable or which may become payable to Lender or Artist on account or in the nature of a tax or levy, through a collecting society or otherwise.  Lender and Artist shall cooperate fully with Company in the collection and payment to Company of such compensation.  Further, since under this Agreement Company has already paid or agreed to pay Lender and Artist full consideration for all services rendered and rights granted by Lender and Artist hereunder, Lender and Artist hereby assign to Company, except to the extent specifically reserved to Lender and Artist under any applicable collective bargaining or other industry-wide agreement, all other compensation payable or which may become payable to Lender or Artist on account or in the nature of a tax or levy, through a collecting society or otherwise, under the applicable law of any territory or jurisdiction, including by way of

CONFIDENTIAL

illustration only, so-called blank tape and similar levies.  Lender and Artist shall cooperate fully with Company in connection with the collection and payment to Company of all such compensation.

(d) General Employer/Additional Documents:  Without limiting the foregoing, Lender hereby grants to Company any and all rights which it may have in and to the Material as Artist's general employer.  Lender and Artist will upon request execute, acknowledge and deliver to Company any and all documents Company may deem necessary to evidence and effectuate all or any of Company's rights under this Agreement.  Lender and Artist hereby irrevocably appoint Company as their attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents Lender or Artist fail to execute, acknowledge and deliver.  The appointment shall be a power coupled with an interest.

10. **NAME AND LIKENESS**:  Lender and Artist hereby grant to Company, its successors, licensees and assigns, the irrevocable right, in perpetuity and throughout the universe, to use and to authorize others to use Artist's name, logo, voice, photograph, likeness and/or biographical data in connection with the production, exhibition, promotion, advertising and exploitation of Company and the Picture (including, without limitation, documentaries, featurettes, promotional films and so-called "behind-the-scenes" programming and interviews) and in connection with the exploitation, promotion and advertising of all subsidiary and ancillary rights therein, in any and all media, including, but not limited to, recordings (in any configuration) containing any material derived from the Picture, including, without limitation, all or any part of the soundtrack of the Picture, publications, merchandising and commercial tie-ups; provided, however, that in no event shall Artist be depicted as endorsing any product other than the Picture, commodity or service without Artist's prior consent.  Notwithstanding the foregoing, it is understood and agreed that Company's use of Artist's name in a billing block or credit list on any item of merchandise or other material related to the Picture shall constitute an acceptable use of Artist's name which shall not require Artist's consent.  Any "approvals" or "consents" required from Lender and/or Artist hereunder shall not be unreasonably withheld.

11. **REPRESENTATIONS AND WARRANTIES**:  Each of Lender and Artist jointly and severally represents, warrants and agrees as follows:

(a) Lender is a duly organized bona fide and existing corporation and is presently in good standing under the laws of the state of its incorporation and was established for a valid business purpose within the meaning of the tax laws of the United States.

(b) Lender has a valid, binding and subsisting agreement with Artist pursuant to which Artist is obligated to render services exclusively to Lender for a term extending at least until the completion of all services required of Artist under this Agreement, and that, by the terms of such agreement, Lender has the right to enter into this Agreement and to grant to Company any and all of the services and rights set forth herein; and to the extent required by law, Lender has workers' compensation insurance covering Artist and will maintain the same at all times while Artist is rendering services hereunder.

CONFIDENTIAL                                                                                                              EMH0000220

(c) Lender and Artist are not subject to any conflicting obligation or disability which will or might prevent or interfere with the execution and full performance of this Agreement by Lender and Artist. Lender and Artist shall not take or authorize any action which will or might interfere with Lender's or Artist's performance under the Agreement.

(d) Neither Lender nor Artist has entered into any agreement (written or oral, implied or express) with any third party which relates to the Picture or the production of the Picture nor have they made any promises to any third party in connection with the Picture or the production of the Picture.

(e) All materials directed, staged, created, submitted or suggested by Artist hereunder shall be wholly original with Artist except for minor or incidental materials in the public domain or materials furnished by Company to Artist for inclusion in the Picture, and shall not (nor shall the exploitation by Company thereof) infringe upon or violate any right of any kind or nature whatsoever of any person or entity.

12. **INDEMNITY:**

(a) General:  Lender and Artist shall indemnify and hold harmless Company, its parent, affiliates, subsidiaries, successors, licensees and assigns and any of their respective agents, employees or representatives against any and all liability, damages, costs and expenses, including, without limitation, reasonable outside attorneys' fees and costs, in connection with any third party claim or action arising out of the breach or alleged breach of any of Lender's or Artist's representations, warranties, agreements, undertakings or certifications herein and/or any rights held by the Warrens' heirs.  Company shall indemnify and defend Lender and Artist against any and all liability, damages, costs and expenses, including reasonable outside attorneys' fees and costs incurred by Artist or Lender as a result of any third party claim or action (other than those arising out of a breach of Lender's or Artist's representations, warranties, agreements, undertakings or certifications hereunder or under any other agreement with Lender or Artist in connection with the Picture, or out of any criminal misconduct or tortious acts or breach of any contract by Lender or Artist) arising from Company's breach of any representation, warranty, undertaking, agreement or certification of Company hereunder; material supplied to Artist by Company or material (other than material supplied to Company by Artist) incorporated into the Picture by Company; and/or Company's development, production, distribution or exploitation of the Picture (including the exploitation of ancillary rights therein).

(b) Notice of Claim/Control:   Company and Lender shall, upon presentation or institution of any claim or action covered by the foregoing indemnity, promptly notify the other of the claim or action, giving the details thereof.  All aspects of the defense of such claims or actions, whether as part of any litigation, negotiation or otherwise (including, without limitation, any decision regarding settlement), shall be controlled by Company. Company shall be free to use counsel of Company's choice in connection therewith. Company's control shall not diminish Artist's and Lender's obligations under Paragraph 12(a) above.   Lender and Artist shall cooperate in the defense of any claim or action for which indemnification is provided hereunder and shall have the right (at Artist's expense) to have counsel present in connection therewith,

CONFIDENTIAL

EMH0000221

provided such counsel fully cooperates with Company's counsel and does not interfere with the reasonable handling of the claim or action by Company.

13. **COMMITMENTS TO OTHERS:** Lender and Artist shall have no right or authority to, and neither of them shall, employ any person in any capacity, contract for the purchase or rental of any services, rights, facilities, articles or material, or make any commitment, agreement or obligation whereby Company shall be required to pay any monies or other consideration (including, without limitation, the appearance or inclusion of any item, product or person in the Picture) without Company's prior written consent in each instance.   Without limiting the generality of the foregoing, neither Lender nor Artist shall permit the terms of any engagement of any cast member of the Picture to contain a "stop date" without prior written approval thereof by Company.

14. **FORCE MAJEURE, DISABILITY OR DEFAULT:**

(a) Force Majeure:  If the development, pre-production, production or post-production of the Picture or the ongoing business of Company is interrupted, disrupted or prevented by matters beyond the control of Company ("Force Majeure Events"), including, without limitation, any act of God (including, but not limited to, floods, fires and earthquakes) acts of terrorism, wars, riots, labor disputes (inclusive of strikes, walk-outs, lock-outs or other disputes), governmental action, the death, illness or incapacity or alteration in the physical appearance or voice of a member of the cast, the breach of contract of any person or entity (other than Lender or Artist) furnishing services or granting rights in connection with the Picture, Company's inability to obtain customary insurance at normal rates and the loss of a leading member of the cast or director due to a deadlock over matters subject to his or her approval, Company shall have the right to automatically suspend  and extend Artist's services and Lender's compensation, and any time periods hereunder, for the duration of any such Force Majeure Event and the period reasonably required by Company thereafter to resume development, pre-production, production or post-production of the Picture.  Company may terminate Artist's services under this Agreement at any time during the continuance of a Force Majeure Event regardless of whether or not Company exercised the foregoing right of suspension.  If any such suspension (other than one arising from a labor dispute) shall last longer than eight (8) weeks, Lender shall have the right to terminate Lender's engagement hereunder on written notice to Company; provided that Company shall have the right to reinstate Artist's services within ten (10) days after Company's receipt of Lender's written notice of termination by ending the suspension and recommencing applicable payments to Lender.  If Artist's services are terminated for a Force Majeure Event, Company shall retain its sole and exclusive ownership of the results and proceeds of Artist's services and any and all of Company's rights hereunder.  The compensation, if any, theretofore accrued to Lender under this Agreement shall be deemed payment in full of the compensation payable to Lender hereunder.  Company shall pay Lender any outstanding balance then accrued and unpaid.

(b)      Disability:  If Artist is unable to fully perform Artist's services hereunder, whether due to death, illness, incapacity, or otherwise, Company shall have the right to suspend and extend Artist's services, compensation, and the running of any time periods hereunder during the occurrence of such inability and for such a period of time thereafter as Company reasonably

requires to resume the use of Artist's services.  If such disability continues for a period of seven (7) consecutive days, or ten (10) days in the aggregate, Company shall have the right to terminate Artist's services hereunder.   In such event, Company shall retain its sole and exclusive ownership of the results and proceeds of Artist's services and any and all of Company's other rights hereunder.  The compensation, if any, theretofore accrued to Lender under this Agreement shall be deemed payment in full of the compensation payable to Lender hereunder.  Company shall pay Lender any outstanding balance then accrued and unpaid.

(c)   Default:  Upon any breach by Lender or Artist of any of the terms and conditions of this Agreement, Company shall immediately have the right, exercisable at any time, to terminate Artist's services hereunder by so notifying Lender; provided that if such breach is curable and was not willful, Company will notify Lender in writing of such election to terminate and Lender shall have a period of forty-eight (48) hours (reducible to twenty-four (24) hours during principal photography or if exigencies require) following receipt of such notice within which to cure such breach.  Such right to cure shall only be available for the first breach by Lender or Artist of this Agreement and shall not be deemed a waiver of Company's right to recover damages resulting from Lender's or Artist's breach.  If Company terminates Artist's services pursuant to this Paragraph 14(c), Company shall be relieved of its obligations and Lender and Artist shall be entitled to no further compensation hereunder and Company shall retain its sole ownership of the results and proceeds of Lender's and Artist's services and any and all of Company's other rights hereunder.  The foregoing shall in no way limit any other remedy which Company may have against Lender and/or Artist.

(d)   Effect of Termination:  Upon termination of this Agreement for any reason, Company shall retain all of the rights granted to it in Paragraphs 9 and 10 above.  If Artist's services are terminated for Artist's disability or for an Event of Force Majeure pursuant to Paragraphs 14(a) and 14(b) above, such termination shall not release Company from its obligations under Paragraph 4(a) (to the extent compensation has accrued and is unpaid).  Further such termination shall not release Lender and/or Artist from their obligations hereunder (but Artist will not be required to render any further services unless reinstated pursuant to Paragraph 14(a)(ii) above) which obligations shall continue in accordance with and subject to the terms and conditions contained in such paragraphs.

## 15. **INSURANCE**:

(A)   Company shall have the right, but not the obligation, to apply for and take out, at Company's expense, life, health, accident, cast or other insurance covering Artist in any amount Company deems necessary to protect Company's interest hereunder.  Neither Lender nor Artist shall have any right, title or interest in or to such insurance.  Lender and Artist agree to assist Company in obtaining such insurance.  Lender shall cause Artist to submit to all usual and customary medical examinations, shall supply to Company any required medical information at anytime during the term of this Agreement for Company's insurance purposes (including self-insurance) and will itself and will cause Artist to truthfully complete and sign any applications and other documents reasonably required.  If any such examination establishes a substantial doubt as to Artist's physical ability to complete Artist's services hereunder or if Artist fails to appear for

CONFIDENTIAL                                                                                                    EMH0000223

any such examination at the time and place designated by Company, Company may terminate Artist's services under this Agreement. If Company cannot obtain insurance on Artist at ordinary rates and under customary conditions, Company may terminate Artist's services under this Agreement without any further obligation to Artist; provided, that Company shall not exercise such termination right if, within three (3) business days of Company's notice to Artist, Artist pays the excess over the normal insurance policy premium, but only if: (i) the condition to Artist's insurability thereunder is a single money payment of excess premium and does not involve any unusual deductibles, policy exclusions or any other condition related to the production of the Picture and (ii) Company, in Company's reasonable judgment, believes that the cause of the premium increase does not constitute a substantial risk to the timely completion of the Picture. Lender agrees that from the date eight (8) weeks prior to commencement of principal photography through delivery to Company of Artist's last cut of the Picture hereunder, Artist will not ride in any aircraft other than as a passenger on an airline flown by a United States or major international air carrier maintaining regularly published schedules, or engage in any extra-hazardous activity without Company's written consent in each and every case.

(b) <u>Additional Insured</u>: Company agrees to name Lender and Artist as additional insureds on Company's errors and omissions and general liability insurance policies with respect to the Picture, in accordance with the terms and subject to the conditions and limitations of such policies, including subrogation, for so long as, and only to such extent as such policies are carried by Company, provided that such additional coverage shall be available at no additional cost to Company and with no additional deductible. The provisions of this paragraph shall not be construed so as to limit or otherwise affect any obligation, representation or agreement by Lender or Artist hereunder.

16. <u>**NO OBLIGATION TO PROCEED/"PAY OR PLAY"**</u>: Notwithstanding any other provision of this Agreement, Company shall have no obligation to utilize Artist's services or to include the results or proceeds thereof in the Picture, or to produce, release, distribute or otherwise exploit the Picture, or to exercise any or all of Company's rights hereunder or to maximize revenues. Company shall have the right to terminate Artist's services with respect to the Picture at any time without legal justification or excuse whereupon Company shall have no further obligations to Lender or Artist with respect to the Picture hereunder, provided that if Artist's services have been engaged on a "pay or play" basis pursuant to Paragraph 2(b) hereof, Company shall pay to Lender any unpaid Basic Compensation otherwise payable hereunder, subject to all of Company's rights and remedies hereunder including, without limitation, the rights of suspension, termination and offset for contingencies set forth in Paragraph 14 and to Company's rights at law and in equity and shall be reduced by any amounts Lender and/or Artist earned or could have earned for Artist's services when Artist's services would have been required hereunder. Company shall have no obligation to pay the Basic Compensation unless Artist becomes "pay or play." If Artist is terminated prior to becoming "pay or play," a subsequent Election to Proceed to Production of the Picture by Company shall not result in Artist becoming "pay or play."

17. <u>**REMEDIES**</u>:

CONFIDENTIAL

EMH0000224

(a) The services to be rendered by Artist hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, for the loss of which Company cannot be reasonably or adequately compensated in damages, and a breach by Lender or Artist of the provisions of this Agreement shall cause Company irreparable injury and damage. Company shall be entitled to injunctive and other equitable relief to prevent a breach of this Agreement or any part thereof by Lender or Artist and/or to secure the enforcement of this Agreement. Resort to such equitable relief shall not be construed to be a waiver of any other rights or remedies which Company may have in the premises, including without limitation the right to recover damages.

(b) In no event shall Lender or Artist seek or be entitled to rescission, injunctive or other equitable relief. Lender and Artist hereby specifically waive any such rights, and acknowledge that Artist's remedy in the event of a breach of this Agreement or any representation or warranty by Company shall be limited to money damages pursuant to the dispute resolution provisions set forth in Paragraph 23 below.

18. **ASSIGNMENT:** Company may assign, license and delegate this Agreement (in whole or in part), or lend Artist's services, to any person or entity. Company may assign and/or license any of its rights to the results and proceeds of Artist's services and/or to use Artist's name, likeness and biographical data, and all of Artist's representations and warranties hereunder, to any person or entity whatsoever. This Agreement and any or all of said rights, obligations, options, privileges and/or services shall inure to the benefit of, and may in turn be freely licensed or assigned by, any such assignee, successor, transferee or delegate. In the event of any assignment, license or delegation of this Agreement or of Company's rights hereunder, or any lending of Artist's services, Company shall be released from all of its further obligations to Lender and Artist hereunder; except that unless the assignee or borrower is a so-called "major" or "mini-major" (as those terms are commonly understood in the motion picture and/or television industries at the time) motion picture or television production company or television network or distribution company or Company affiliate or other financially capable party (such capability to be judged as of the time of assignment), Company shall remain secondarily liable for payment, if and when due, of the Basic Compensation hereunder. The services to be rendered by Artist hereunder are personal to Artist and of the essence of this Agreement. Neither this Agreement nor any of Lender's or Artist's rights or obligations hereunder may be assigned, delegated or otherwise transferred.

19. **NOTICES/PAYMENTS:** Unless otherwise provided hereunder all notices shall be in writing, and shall be sent to the addresses set forth below (subject to changes of which the parties are notified in writing). Notices shall be given by personal delivery, overnight courier, facsimile or by registered or certified mail (postage prepaid), and shall be deemed given on the date delivered or faxed, one (1) business day after a notice is sent by overnight courier, or three (3) business days after the date mailed. The time to respond to notices given during the week between Christmas Eve and New Year's Day shall be tolled until five (5) business days following New Year's Day, unless the Picture is in principal photography or exigencies require an earlier response, in which case the time to respond to notices shall not be tolled. Payments shall be made by check payable to Stroock & Stroock & Lavan, LLP and sent to the below

CONFIDENTIAL

EMH0000225

address.  All payments shall be deemed made when placed in U.S. mail, or sent by courier or messenger.  Until further notice, the addresses of the parties shall be as follows:

LENDER/ARTIST

EVERGREEN MEDIA
HOLDINGS, LLC
f/s/o Tony DeRosa-Grund
c/o Stroock & Stroock
& Lavan LLP
2029 Century Park East
Suite 1600
Los Angeles, CA 90067
Attn: John Gatti
Telephone: (310) 556-5800
Fax: (310) 556-5959

COMPANY

NEW LINE PRODUCTIONS, INC.
c/o New Line Cinema Corp.
116 North Robertson Boulevard
Los Angeles, CA 90048
Attn: Legal Affairs
Fax: (310) 854-0383

20. **WORKER'S COMPENSATION**:  With respect to any injury, illness, disability or death (herein "Event") which may be suffered by Artist during the period of Artist's engagement hereunder, which Event (including disability or death consequent thereto whether during or following such period of Artist's engagement hereunder) is compensable under any applicable Worker's Compensation statute and the body of law pertaining thereto (herein "Applicable Law"), Lender, Artist and Company agree as follows:

(a) General/Special Employers:  Lender is Artist's general employer and Company, having the exclusive right to direct and control Artist's performance of services hereunder, shall be Artist's special employer and thus shall be responsible for maintaining workers compensation coverage as required by Applicable Law.

(b) Election Under Applicable Law:  If the applicability of Applicable Law is dependent upon or is effected by an election by Lender or Artist, or both, Lender and Artist so elect, jointly and severally, to be bound by Applicable Law.

(c) Rights of Claimants:  The rights and remedies of Lender, Artist and all persons (e.g., heirs, executors, administrators, successors, assigns) whose rights are derived through Artist (Lender, Artist and such persons are collectively herein "Claimants") who may have the right to claim compensation or damages for an Event shall be limited to those provided in the Applicable

CONFIDENTIAL                                                            EMH0000226

Law and neither Company nor Company's agents or employees, general or special, shall have any obligation to Lender by reason of the occurrence of an Event. None of the Claimants shall assert any claim or cause of action arising out of an Event against any person, or against any entity which furnishes to Company a person who has the status of a special employee of Company. Lender shall indemnify Company, Company's agents and employees, general and special, from any loss, cost, liability or expense, including reasonable attorneys' fees, arising out of the assertion of a claim or cause of action in breach of the provisions of this Paragraph 20.

21. **MUSIC:**   Lender and Artist represent that the Picture as delivered will not contain any musical composition or performance of a musical composition in which Lender and/or Artist, or any company of which Lender and/or Artist is a principal, has or shall have a financial interest.

22. **CONFIDENTIALITY/PUBLICITY:**   Neither Lender nor Artist shall without Company's prior written approval, (i) issue or authorize the publication of any news story, publicity or publicity materials relating to the Picture, Artist's services hereunder, or Company, (ii) make any derogatory or knowingly false statements concerning the Picture, Company or any officers or employees of Company, (iii) disclose any confidential information regarding Company or the Picture (including, but not limited to, the screenplay or other material, the release plan, the budget, or the terms of any contracts), or (iv) encourage any other individual to do any of the foregoing; provided, however, Lender and/or Artist may issue personal publicity primarily concerning Artist in which the Picture, Company or any officers or employees of Company are mentioned incidentally, so long as such references are not derogatory or knowingly false and do not contain any confidential information.

23. **DVD:**   If Lender and Artist perform all material services required of Lender and Artist by Company, and if Lender and Artist are not in material breach hereof, then at such time, if at all, as DVD copies of the Picture are manufactured for distribution in the homevideo market, Company shall furnish Lender, upon request, with one such DVD copy at no cost to Lender. Said DVD copy shall be used solely for Artist's private home viewing and library purposes, and in no event shall said DVD copy be altered, duplicated or used for any commercial purpose or for profit.

24. **PREMIERE:**   If Lender and Artist perform all services required hereunder and are not in default hereof and Artist is accorded "produced by" credit on the Picture, Company shall invite Artist and a non-business companion to one (1) U.S. celebrity premiere of the Picture, if any. If Artist attends such a celebrity premiere (which is greater than fifty (50) miles from Artist's principal residence), Artist and Artist's non-business companion shall be provided with round-trip transportation, first-class, if available and if used, between such residence (or from wherever Artist and/or Artist's non-business companion then may be, if closer) and the location of such premiere and first-class hotel accommodations.

25. **GOVERNING LAW/DISPUTE RESOLUTION:** The laws of the State of California applicable to contracts signed and to be fully performed within the State of California shall apply to this Agreement. Any and all controversies, claims or disputes arising out of or related to this Agreement or the interpretation, performance or breach thereof, including, but not limited to,

CONFIDENTIAL                                                            EMH0000227

alleged violations of state or federal statutory or common law rights or duties, ("Dispute"), except as set forth in subparagraphs 25(b) and 25(c) below, shall be resolved according to the procedures set forth in subparagraph 25(a) below, which shall constitute the sole dispute resolution mechanism hereunder:

(a)     Arbitration:  In the event that the Parties are unable to resolve any Dispute informally, then such Dispute shall be submitted to final and binding arbitration.  The arbitration shall be initiated and conducted according to either the Streamlined (for claims under $250,000) or the Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the Optional Appeal Procedure, of the Los Angeles office of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules").  The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator appointed in accordance with the Arbitration Rules.  The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute.  There shall be no award of punitive damages.  The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to enforce or vacate the award.  Unless the Parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be retired judges or justices of any California state or federal court with substantial experience in matters involving the entertainment industry.  If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other party may enforce the final award in any court of competent jurisdiction in Los Angeles County.  The party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.

(b)     Injunctive Relief:  Notwithstanding the foregoing, either party shall be entitled to seek injunctive relief (unless otherwise precluded by any other provision of this Agreement) in the state and federal courts of Los Angeles County.

(c)     Other Matters:  Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a court of competent jurisdiction in Los Angeles County.

26.     **MISCELLANEOUS:**

(a)     Entire Understanding; Severability; Counterparts:  This Agreement expresses the entire understanding of the parties hereto and replaces any and all former agreements or understandings, written or oral, relating to the subject matter hereof.  Each of Lender and Artist hereby acknowledges that no representation or promise not expressly contained in this Agreement has been made by Company or any of its officers, employees, agents or representatives.  Paragraph headings are for the convenience of the parties only and shall have no legal effect whatsoever.  This Agreement may not be modified except by a written instrument signed by all parties hereto.  Nothing herein contained shall be construed so as to require the

CONFIDENTIAL                                                              EMH0000228

commission of any act contrary to law, and if there is any conflict between any provision of this Agreement and any present or future statute, law, ordinance, regulation or provision of any applicable collective bargaining agreement contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event, the provision of this Agreement affected shall be curtailed and limited only to the extent necessary to make it consistent with such legal requirements or provisions. This Agreement may be signed in counterpart, each of which shall be deemed an original, but all of which together shall constitute the Agreement.

(b)     Joint and Several Liability: If a party to this Agreement consists of more than one person or entity, the obligations of such party hereunder shall be joint and several between and among such persons and entities, such that each such person or entity shall be fully responsible for such party's full performance of all of its obligations under this Agreement.

(c)     Deductions: Lender authorizes Company to deduct and withhold from Lender's compensation hereunder: (i) 1% of all compensation payable to Lender hereunder, which shall be remitted to the Motion Picture Relief Fund of America, Inc.; (ii) any telephone and restaurant charges and other fixed indebtedness of Lender or Artist to Company; (iii) should Company pay Lender in respect of any period of suspension under the provisions of Paragraph 14 hereof, Company may deduct an equivalent amount from any compensation thereafter accruing; (iv) any applicable union dues and assessments to the extent permitted by law; and (v) all amounts which Company is advised by counsel are required by law to be withheld.

(d)     Foreign Corrupt Practices Act ("FCPA"): In the event Lender causes Artist to provide any services hereunder outside of the United States, Lender and Artist acknowledge that they are familiar with the requirements of the FCPA and that a violation of any of the provisions of the FCPA constitutes a criminal offense. Lender represents and warrants that   Artist has not and will not (i) make, authorize or promise any offer, payment or gift of anything of value to any person, (ii) with the knowledge that all or a portion of it will be offered, given or promised, directly or indirectly to any government agency or officials, political party, leader or candidate for government or political office in foreign country, (iii) in order to influence any such official, party, leader or candidate to assist Lender, Artist and/or Company (or related company) to obtain, retain or direct business or unduly affect a decision.

By countersigning this Agreement, Artist agrees to be bound hereby, and confirms and joins in all acknowledgments, grants and warranties made by Lender hereunder and agrees to perform the services herein provided for in accordance with the terms hereof, and not to render outside services contrary to the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the date first set forth above.

EVERGREEN MEDIA HOLDINGS, LLC     NEW LINE PRODUCTIONS, INC.

By: _____     By: _____
Its:   MANAGER                        Its: _____
                                            Senior Vice President
                                            Business and Legal Affairs

PRO-Grund-LONG.ams
CORPLEGAL #185438 v5 3/31/2010 Producer Agreement for Tony DeRosa-Grund
"THE CONJURING"
Page 20 of 34

CONFIDENTIAL

EMH0000229

COUNTERSIGNED:

_Tony DeRosa-Grund_

TONY DEROSA-GRUND

CONFIDENTIAL

EMH0000230



### EXHIBIT "A"

"THE CONJURING" – PRODUCER LOANOUT AGREEMENT
EVERGREEN MEDIA HOLDINGS, LLC F/S/O TONY DEROSA-GRUND

DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT
MOVING BASIS

COMPUTATION AND PAYMENT

1.      Definition of Parties:  "Warner" means Warner Bros. Entertainment Inc. and its subsidiaries and affiliates engaged in the business of distributing motion pictures for exhibition in theaters and for broadcasting over television stations, but shall not include any other persons, firms or corporations licensed by Warner to distribute motion pictures in any part of the world.  Nor shall such term include: any person, firm or corporation distributing the Picture for purposes other than exhibition in theaters or by television stations; exhibitors or others who may actually exhibit the Picture to the public; radio or television broadcasters or programming services; cable systems or operators; manufacturers, wholesalers or retailers of video discs, cassettes or similar devices; book or music publishers; sound recording; manufacturers, distributors, wholesalers, retailers or operators of any types of merchandise, goods, services or theme park or other attractions; whether or not any of the foregoing excluded parties are subdivisions, subsidiaries or affiliates of Warner.

"Participant" means the party under the foregoing agreement who or which is entitled to participate in the Defined Gross of the Picture which exceeds the Contractual Start Point, computed on a moving basis (all as defined below), and the successors and permitted assigns of such party.

2.      Contractual Start Point:  As between Warner and Participant, the Picture shall be deemed to have reached the "Contractual Start Point" at such time as the Defined Gross (as defined in 3 hereof) of the Picture shall equal the following:

(a)  Warner's distribution fees set forth in 4 hereof.

(b)  Warner's expenses in connection with the distribution of the Picture, as set forth in 5 hereof.

(c)  The cost of production of the Picture, plus an amount equal to interest thereon, all as provided for in 9 hereof, and plus such other costs, if any, as may have been incurred in connection with the financing of the cost of production of the Picture.  Said interest and other costs shall be recouped before said cost of production.

The Contractual Start Point shall be computed on a moving basis.  "Moving basis" means that the Contractual Start Point shall be determined as of the close of each accounting period provided for in paragraph 10 hereof.

3.      "Defined Gross" of the Picture means the aggregate of:

(a)  All film rentals actually received by Warner from parties exhibiting the Picture in theaters and on television where Warner distributes directly to such parties (hereinafter referred to as "exhibitors").

(b)  Where Warner grants theatrical distribution rights to a subdistributor on a basis requiring it to account to Warner with respect to film rentals, either:  (i) the film rentals received by such subdistributor from exhibitors which Warner accepts for the purpose of its accountings with

CONFIDENTIAL                                                          EMH0000231

 

such subdistributor; or (ii) Warner's share (actually received) of film rentals received by such subdistributor; whichever Warner elects from time to time as to each subdistributor.

(c)    In respect of licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices, an amount equal to 20% of (i) the gross wholesale rental income therefrom and (ii) the gross wholesale sales income therefrom less a reasonable allowance for returns.

(d)    All amounts actually received by Warner from the following:  (i) trailers (other than trailers advertising television exhibitions of the Picture); (ii) licenses of theatrical distribution rights for a flat sum; (iii) licenses of exhibition or distribution rights other than those referred to in (a), (b), (c) and (d) (ii) of this 3, specifically including licenses to cable operators; (iv) the lease of positive prints (as distinguished from the licensing thereof for a film rental); and from the sale or licensing of advertising accessories, souvenir programs and booklets; and (v) recoveries by Warner for infringement of copyrights of the Picture.

(e)    All monies actually received by Warner on account of direct subsidies, aide or prizes relating specifically to the Picture, net of an amount equal to income taxes based thereon imposed by the country involved, if any.  If local laws require use of such monies as a condition to the grant of such subsidy or aide, such monies shall not be included in Defined Gross until actually used.

(f)    The sums to be included in Defined Gross under Exhibits "1," "2" and "3" attached hereto.

All costs incurred in connection with any of the foregoing shall be deemed and treated as recoupable distribution expenses.  In no event shall rentals from the exhibition of the Picture which are contributed to charitable organizations be included in Defined Gross.

4.    Distribution Fees:  Warner's distribution fees shall be as follows:

(a)    30% of the Defined Gross of the Picture derived by Warner from all sources in the United States and Canada.

(b)    35% of the Defined Gross of the Picture derived by Warner from all sources in the United Kingdom.

(c)    40% of the Defined Gross of the Picture derived by Warner from all sources other than those referred to in (a) and (b) above.

(d)    Notwithstanding the foregoing; (i) with respect to sums included in the Defined Gross pursuant to 3(b)(ii) and 3(d)(ii) hereof, Warner's distribution fee shall be 15% of such sums; (ii) if Warner shall license the exhibition of the Picture on free television, the aforesaid percentages as to amounts received and collected by Warner from sources in the United States, shall be 30% if collected from a network for national network telecasts in prime time; and 35% in all other instances; and, as to amounts received and collected by Warner from sources outside the United States 40%; (iii) no distribution fee shall be charged on Defined Gross referred to in 3(e) hereof.

All distribution fees shall be calculated on the full Defined Gross without any deductions or payments of any kind whatsoever, except as specifically hereinafter provided.

Notwithstanding anything herein contained, it is agreed that for the accounting period in which the Picture shall first reach the Contractual Start Point and each accounting period thereafter, the distribution

CONFIDENTIAL                                                                          EMH0000232

 

fees for the purpose of calculating the Contractual Start Point shall be calculated only on that portion of the Defined Gross in respect of such accounting period which is equal to the sum of the following:

(1)   An amount equal to the sums specified in subparagraphs (b) and (c) of paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period; and

(2)   An amount equal to the distribution fees on Defined Gross necessary to recoup said deductible items plus the distribution fees.

For example:  if for the accounting period in which the Picture first reaches the Contractual Start Point

(i)   the total Defined Gross is $1,000,000; and

(ii)   "X" represents the amount of Defined Gross on which distribution fees are to be charged for the purpose of calculating the Contractual Start Point; and

(iii) the average distribution fees for such accounting period are 35%; and

(iv)   the sums specified in subparagraphs (b) and (c) of paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period are $500,000,

then said $500,000 would be .65X; X would be $769,230.76; the distribution fees for the purpose of calculating the Contractual Start Point would be $269,230.76 (i.e., 35% of $769,230.76) rather than $350,000 (i.e., 35% of $1,000,000); and the Defined Gross in excess of the Contractual Start Point would be $230,769.24 (i.e., $1,000,000 - $769,230.76).

5.   Distribution Expenses:  Warner's deductible distribution expenses in connection with the Picture shall include all costs and expenses incurred in connection with the distribution, advertising, exploitation and turning to account of the Picture of whatever kind or nature, or which are customarily treated as distribution expenses under customary accounting procedures in the motion picture industry.  If Warner reasonably anticipates that additional distribution expenses will be incurred in the future, Warner may, for a reasonable time, set up appropriate reserves therefor.  Without limiting the generality of the foregoing, the following particular items shall be included in distribution expenses hereunder:

(a)   The cost and expense of all duped and dubbed negatives, sound tracks, prints, release prints, tapes, cassettes, duplicating material and facilities and all other material manufactured for use in connection with the Picture, including the cost of inspecting, repairing, checking and renovating film, reels, containers, cassettes, packing, storing and shipping and all other expenses connected therewith and inspecting and checking exhibitors' projection and sound equipment and facilities.  Warner may manufacture or cause to be manufactured as many or as few duped negatives, positive prints and other material for use in connection with the Picture as it, in its sole discretion, may consider advisable or desirable.

(b)   All direct costs and charges for advertisements, press books, artwork, advertising accessories and trailers (other than (i) prints of trailers advertising free television exhibition of the Picture, and (ii) the trailer production costs which are included in the cost of production of the Picture), advertising, publicizing and exploiting the Picture by such means and to such extent as Warner may, in its uncontrolled discretion, deem desirable, including, without limitation, pre-release advertising and publicity, so-called cooperative and/or theater advertising, and/or other advertising engaged in with or for exhibitors, to the extent Warner pays, shares in, or is charged with all or a portion of such costs and all other exploitation costs relating to such theater exhibition.  Any re-use fees and costs of recording and manufacturing masters for phonograph records, which Warner shall advance in order to assist in the advertising and exploitation of the

CONFIDENTIAL                                                                          EMH0000233

 

Picture, shall be treated as costs hereunder to the extent unrecouped by the record company. Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs hereunder. Any costs and charges referred to in this (b) (and not included in the cost of production of the Picture), expended or incurred prior to delivery of the Picture, shall be included in direct costs under this (b). There shall also be included as an item of cost a sum equal to 10% of all direct costs referred to in this (b) to cover the indirect cost of Warner's advertising and publicity departments, both domestic and foreign.

(c)  All costs of preparing and delivering the Picture for distribution (regardless of whether such costs are the salaries and expenses of Warner's own employees or employees or parties not regularly employed by Warner), including, without limitation, all costs incurred in connection with the production of foreign language versions of the Picture, whether dubbed, superimposed or otherwise, as well as any and all costs and expenses in connection with changing the title of the Picture, recutting, re-editing or shortening or lengthening the Picture for release in any territory or for exhibition on television or other media, or in order to conform to the requirements of censorship authorities, or in order to conform to the peculiar national or political prejudices likely to be encountered in any territory, or for any other purpose or reason. The costs referred to in this (c) shall include all studio charges for facilities, labor and material, whether or not incurred at a studio owned or controlled by Warner.

(d)  All sums paid or accrued on account of sales, use, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authority assessed upon the negatives, duplicate negatives, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof, or upon the remittance of such revenues, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, "Kontingents", and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. In no event shall the deductible amount of any such tax (however denominated) imposed upon Warner, be decreased (nor the Defined Gross increased) because of the manner in which such taxes are elected to be treated by Warner in filing net income, corporate franchise, excess profits or similar tax returns. Subject to the foregoing, (i) Warner's own United States federal and state income taxes and franchise taxes based on Warner's net income; and (ii) income taxes payable to any country or territory by Warner based on the net earnings of Warner in such country or territory and which is computed and assessed solely by reason of the retention in such country or territory by Warner of any portion of the Defined Gross shall not be deductible hereunder.

(e)  Expenses of transmitting to the United States any funds accruing to Warner from the Picture in foreign countries, such as cable expenses, and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars.

(f)  All costs and expenses, including reasonable attorneys' fees, loss, damage or liability suffered or incurred by Warner in connection with: any action taken by Warner (whether by litigation or otherwise) in copyrighting, protecting and enforcing the copyright of, and other rights and sources of revenue to be derived from, the Picture; reducing or minimizing the matters referred to in (d) and (e) above, the collection of film rentals, and other sums due Warner from exhibitors, subdistributors and others in respect of the Picture or to recover monies due pursuant to any agreement relating to the distribution or the exhibition of the Picture; checking attendance and exhibitors' receipts; preventing and/or recovering damages for unauthorized exhibition or distribution of the Picture, or any impairment of, encumbrance on or infringement upon, the rights

CONFIDENTIAL

EMH0000234

 

of Warner in and to the Picture; prosecuting and defending actions under the antitrust laws, communications laws, and federal, state and local laws, ordinances and regulations (including censorship) affecting the exhibition and/or distribution of the Picture and/or the ability of Warner to derive revenue from the Picture and its component parts and by-products; and auditing of books and records of any exhibitor, subdistributor or licensee.

(g)     Royalties payable to manufacturers of sound recording and reproducing equipment and dues and assessments of, and contributions by Warner to, AMPTP, MPAA, MPEA, the Academy of Motion Picture Arts and Sciences and other trade associations or industry groups comprised of a substantial number of motion picture producers and/or distributors, but only for purposes relating to the production, distribution, export, import, advertising, exploitation and general protection and/or promotion of motion pictures.

(h)     In the event any person shall make a claim relating to the Picture against Warner or any of its licensees, which claim, in Warner's judgment, is of sufficient merit to constitute a reasonable probability of ultimate loss, cost, damage or expense, Warner may deduct under this (h) such amount as Warner may deem necessary to cover any loss, cost, damage or expense which may be suffered as a result thereof. Warner shall have the right to settle and pay any such claim. After the settlement of any such claim, or after the final judicial determination thereof, the amount previously deducted hereunder shall be adjusted accordingly with the next accounting statement rendered hereunder. Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or a waiver of any right or remedy at law or otherwise which may exist in favor of Warner, including, but not limited to, the right to require Participant to reimburse Warner on demand for any liability, cost, damage or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses.

(i)     All amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulation or decree now or hereafter in force by reason of, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, supplemental markets, or otherwise (all herein called "residuals"), together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture; provided, however, that if Participant or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participation in any pension fund, to any such residuals, or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement, the amount payable on account thereof shall be treated as an advance against Participant's participation hereunder.

(j)     The cost of all insurance (to the extent that the same is not included in the cost of production of the Picture) covering or relating to the Picture, including, but not limited to, errors and omissions insurance and all insurance on negatives, positive prints, sound materials or other physical property, it being understood, however, that Warner shall not be obligated to take out or maintain any such insurance.

(k)     If Warner shall proceed under 3(b)(i) hereof, all items deducted by the subdistributor as distribution expenses, and which Warner accepts for the purpose of its accountings with such subdistributor, shall be treated as Warner's expenditures under the corresponding subdivision of this paragraph 5.

CONFIDENTIAL                                                                              EMH0000235



6.     Film Rentals:  "Film Rentals" shall be determined after all refunds, credits, discounts, allowances and adjustments granted to exhibitors, whether occasioned by condemnation by boards of censorship, settlement of disputes or otherwise.  Until earned, forfeited or applied to the Picture, neither advance payments nor security deposits shall be included in film rentals.  No cost (regardless of how incurred, paid or allowed) of Warner's share of cooperative and/or theater advertising shall be deducted in determining film rentals.  Where allowances are granted and paid on account of Warner's share of cooperative theater or joint advertising, such payments shall not be deducted in determining film rental, and where Warner's share of cooperative theater or joint advertising is deducted by the exhibitor Warner's share of cooperative theater or joint advertising shall be added back into the film rental received from such exhibitor, and all such costs, payments, discounts and allowances shall be treated as distribution expenses.  Wherever Warner exhibits the Picture in a theater or over a television station owned or controlled by Warner, or licenses the Picture or rights connected therewith to theaters, television stations or other agencies in which Warner has an interest, directly or indirectly, or to which Warner is obligated to pay a fixed sum for exhibiting the Picture or for the use of its premises or facilities, Warner shall include in the film rentals of the Picture such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.

7.     Allocations:  Wherever Warner (i) receives from any license either a flat sum or a percentage of the receipts, or both, for any right to a group of motion pictures (including the Picture) under any agreement (whether or not the same shall provide for the exhibition, lease or delivery of positive prints of any of said motion pictures) which does not specify what portion of the license payments apply to the respective motion pictures in the group (or to such prints or other material, if any, as may be supplied), or (ii) receives foreign currency under 8 hereof relating to a group of motion pictures (including the Picture), then in any and all such situations Warner shall include in, or deduct from, the Defined Gross, as the case may be, such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.  All costs described in 5 hereof shall be fairly apportioned to the Picture if incurred or expended on an industry basis, or in conjunction with other motion picture producers and/or distributors, or with respect to the Picture and other motion pictures distributed by Warner.

8.     Foreign Receipts:     No sums received by Warner relating to the Picture shall be included in Defined Gross hereunder unless and until such sums have been (i) received by Warner in U.S. dollars in the United States; or (ii) used by Warner for the production or acquisition of motion pictures or television films which can be lawfully removed from the country or territory involved, in which event they shall be included in Defined Gross for the accounting period during which an amount (computed at the official or unofficial rate of exchange, as Warner may elect) equal to the amount expended for such production or acquisition, plus interest thereon, as herein provided, has been recouped by Warner (in excess of normal distribution fees and distribution expenses) from distribution thereof outside the country or territory involved; or (iii) used by Warner for acquisition of tangible personal property which can be and is lawfully exported from the country or territory involved, in which event the U.S. dollar equivalent of the currency utilized to acquire such property shall be included in Defined Gross hereunder for the accounting period during which such property was so exported, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect, in effect on the date of export.  Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually) advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, such part thereof as would have been payable to Participant hereunder.  Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor.  Warner makes no warranties or representations that any part of any such foreign currencies may be converted into U.S. dollars or transferred to the account of Participant in any foreign country.  In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner

CONFIDENTIAL



in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other country.

9.     Cost of Production; Interest:

(a)  The "cost of production" of the Picture means the total direct cost of production of the Picture, including the cost of all items listed on Warner's standard Delivery Schedule, computed and determined in all respects in the same manner as Warner then customarily determines the direct cost of other motion pictures distributed and/or financed by it, plus Warner's overhead charge.  The determination of what items constitute direct charges and what items are within said overhead charge shall be made in all respects in the same manner as Warner customarily determines such matters.  The full amount of all direct costs of production of the Picture (whether payable in cash, deferred or accrued) shall be included in the direct cost of the Picture at the time liability therefor is incurred or contracted, regardless of whether the same has actually been paid to the party or parties entitled thereto at the time involved.  Deferments and participations in Defined Gross of the Picture consented to by Warner (however defined) shall be treated as direct costs of production, whether the same shall be in a definite amount or based on a percentage of the Defined Gross, and whether the same are fixed obligations or are contingent upon receipts of the Picture; provided, however, contingent participations based on a percentage of Defined Gross as defined in the applicable agreement shall not be included in the direct cost of production beyond recoupment under 2(c) hereof.

(b)     Warner's overhead charge shall be in an amount equal to 15% of the direct cost of production of the Picture, with the understanding that any production facilities, equipment or personnel supplied by Warner or by a studio owned or controlled by Warner, or in which Warner has a substantial financial interest (and which are not furnished within the overhead charge), shall be supplied at Warner's usual rental rates charged for such items, and such charges shall be treated as direct costs of production of the Picture and shall bear said 15% overhead charge.  Warner's overhead charge shall accrue and be included in the cost of production of the Picture concurrently with the incurring of the respective items of direct cost to which it applies.

(c)     The amount equal to interest provided for in 2(c) hereof shall be calculated at a rate per annum equal to 125% of the rate announced from time to time by the Bank of America as its prime rate on unsecured loans to its preferred customers.  Said amount shall be calculated from the respective dates that each item is charged to the Picture until the close of the accounting period during which the cost of production is recouped under 2(c) hereof, except that interest on deferred amounts shall be calculated from the date of payment.

(d)     Concurrently with delivery to Participant of the first earnings statement hereunder, Warner will (subject to revisions and correction) deliver to Participant an itemized summary of the cost of production of the Picture.  Participant shall have the right to audit such statement in accordance with 11 hereof.

(e)     If the final cost of production shall exceed the budgeted cost by 5% or more, then for the purposes of 2(c) hereof there shall be added to the actual cost of production of the Picture an amount equal to the amount by which the final direct cost exceeds 105% of the budgeted direct cost.  For the purposes of this subdivision (e), the final direct cost shall not include costs incurred solely by reason of force majeure events, union increases not reflected in the budget, and overbudget costs incurred at the request of an officer of Warner having the rank of Vice President or higher over the written objection of Participant.

10.     Earnings Statements:  Warner shall render to Participant periodic statements showing, in summary form, the appropriate calculations under this Agreement.  Statements shall be issued for each calendar quarter until the Picture has been in release for four (4) years from and including the quarter in

CONFIDENTIAL                                                                                                    EMH0000237

which the Picture was first released, and thereafter annually. Each such quarterly or annual period, as the case may be, is herein referred to as an "accounting period". No statements need be rendered for any accounting period during which no receipts are received. Statements rendered by Warner may be changed from time to time to give effect to year-end adjustments made by Warner's Accounting Department or Public Accountants, or to items overlooked, to correct errors and for similar purposes. If Warner shall extend credit to any licensee with respect to the Picture and if such credit has been included in the Defined Gross, and if, in the opinion of Warner, any such indebtedness shall be uncollectible, the uncollected amount may be deducted in any subsequent earning statement. Should Warner make any overpayment to Participant hereunder for any reason, Warner shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by Warner to Participant or for Participant's account, or may demand repayment from Participant, in which event Participant shall repay the same when such demand is made. Any U.S. dollars due and payable to Participant by Warner pursuant to any such statement shall be paid to Participant simultaneously with the rendering of such statement; provided, however, that all amounts payable to Participant hereunder shall be subject to all laws and regulations now or hereafter in existence requiring deductions or withholdings for income or other taxes payable by or assessable against Participant. Warner shall have the right to make such deductions and withholdings and the payment thereof to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations, and shall not be liable to Participant for the making of such deductions or withholdings or the payment thereof to the governmental agency concerned. In any such event Participant shall make and prosecute any and all claims which it may have with respect to the same directly with the governmental agency having jurisdiction in the premises. The right of Participant to receive, and the obligation of Warner to account for, any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statement issued thereafter shows a deficit under 2 hereof such that at least $500,000 of Defined Gross would be required before Participant would be entitled to receive any participation hereunder. In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $500,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of the Contractual Start Point and if, as a result of such audit, it is determined by mutual agreement, or in the event of dispute appropriate legal proceedings, that the Picture has earned, or is likely to earn, Defined Gross in excess of the Contractual Start Point as herein defined, accountings hereunder and payments, if required, shall be reinstated.

     11.    <u>Accounting Records re Distribution; Audit Rights</u>:  Warner shall keep books of account relating to the distribution of the Picture, together with vouchers, exhibition contracts and similar records supporting the same (all of which are hereinafter referred to as "records"), which shall be kept on the same basis and in the same manner and for the same periods as such records are customarily kept by Warner. Participant may, at its own expense, audit the applicable records at the place where Warner maintains the same in order to verify earnings statements rendered hereunder. Any such audit shall be conducted only by a reputable public accountant during reasonable business hours in such manner as not to interfere with Warner's normal business activities. In no event shall an audit with respect to any earnings statement commence later than twenty-four (24) months from the rendition of the earnings statement involved; nor shall any audit continue for longer than thirty (30) consecutive business days; nor shall audits be made hereunder more frequently than once annually; nor shall the records supporting any earnings statement be audited more than once. All earnings statements rendered hereunder shall be binding upon Participant and not subject to objection for any reason unless such objection is made in writing, stating the basis thereof and delivered to Warner within twenty-four (24) months from rendition of the earnings statement, or if an audit is commenced prior thereto, within thirty (30) days from the completion of the relative audit. If Warner, as a courtesy to Participant, shall include cumulative figures in any earnings or other statement, the time within which Participant may commence any audit or make any objection in respect of any statement shall not be enlarged or extended thereby. Participant's right to examine Warner's records is limited to the Picture, and Participant shall have no right to examine records

CONFIDENTIAL

EMH0000238



relating to Warner's business generally or with respect to any other motion Picture for purposes of comparison or otherwise; provided, however, that where any original income or expense document with third parties relates to the Picture and to other motion pictures, Participant shall have the right to examine the entire document without deletions therefrom.

12.   Ownership:  Participant expressly acknowledges that Participant has and will have no right, title or interest of any kind or character whatsoever in or to the Picture, and no lien thereon or other rights in or to the Defined Gross of the Picture; and that the same shall be and remain Warner's sole and exclusive property, and Warner shall not be obligated to segregate the same from its other funds, it being the intent and purpose hereof that the Defined Gross of the Picture, including the Defined Gross in excess of Contractual Start Point, is referred to herein merely as a measure in determining the time and manner of payment to Participant; and that Warner shall not be deemed a trustee, pledgeholder or fiduciary.  Participant shall have no right, title or interest of any kind or character whatsoever in or to the literary, dramatic or musical material upon which the Picture is based, or from which it may be adapted; and Warner shall have the sole and exclusive right to utilize, sell, license or otherwise dispose of all or any part of its rights in such material upon such terms and conditions as it may deem advisable, all without consulting or advising Participant and without accounting to Participant in any manner with respect thereto.

13.   Distribution:  As between Participant and Warner, Warner shall have complete authority to distribute the Picture and to license the exhibition thereof throughout the world in accordance with such sales methods, policies and terms as it may, in its uncontrolled discretion, determine.  Warner shall have the broadest possible latitude in the distribution of the Picture, and the exercise of its judgment in good faith in all matters pertaining thereto shall be final.  Warner has not made any express or implied representation, warranty, guarantee or agreement as to the amount of proceeds which will be derived from the distribution of the Picture, nor has Warner made any express or implied representation, warranty, guarantee or agreement that there will be any sums payable to Participant hereunder, or that the Picture will be favorably received by exhibitors or by the public, or will be distributed continuously.  In no event shall Warner incur any liability based upon any claim that Warner has failed to realize receipts or revenue which should or could have been realized.  Warner may distribute the Picture either itself or through such distributors, subdistributors and other parties as Warner may, in its uncontrolled discretion, determine, and Warner may refrain from releasing and/or distributing the Picture in any territory for any reason whatsoever.  Warner may license the Picture or rights connected therewith to any and all theaters or other agencies in which Warner may have an interest directly or indirectly upon such terms and rentals as Warner may deem fair and proper under the circumstances.  Nothing herein contained shall be construed as a representation or warranty by Warner that it now has or will hereafter have or control any theaters or agencies in the United States or elsewhere.

14.   Sale of Picture:  Warner shall have the right at any time after completion of the Picture to sell, transfer or assign all or any of its rights in and to the Picture and the negative and copyright thereof.  Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming performance of this agreement in place and stead of Warner, Warner shall be released and discharged of and from any further liability or obligation hereunder.  No part of any sale price or other consideration received by, or payable to, Warner shall be included in the Defined Gross hereunder and participant shall have no rights in respect of any thereof.

15.   Assignments, etc.:  Participant shall have the right to sell, assign, transfer or hypothecate (all herein called "assign") all or any part of Participant's right to receive the moneys payable to Participant hereunder.  Any such assignment shall be subject to all pertinent laws and governmental regulations and to the rights of Warner hereunder.  In the event of any such assignment by Participant, a Notice of Irrevocable Authority and Distributor's Acceptance in Warner's usual form shall be executed by Participant and by the transferee and delivered to Warner.  If at any time more than three parties shall be entitled to receive payments, which under the terms hereof are to be paid to or for the account of

CONFIDENTIAL

EMH0000239

 

Participant, Warner may, at its option, require that all such parties execute and deliver an agreement in Warner's usual form appointing a disbursing agent for all such parties.

Form 802 rev. 11/15/05                    Exhibit "A"
CSP Moving Basis                          10

CONFIDENTIAL                                    EMH0000240

 

## MUSIC PUBLISHING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in publishing revenues, there shall also be included in Defined Gross of the Picture:

A sum equal to 75% of the "publisher's share" of mechanical reproduction and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided such publisher is vested with all rights therein and all of the "publisher's share" of the receipts therefrom, and provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The "publisher's share" of mechanical reproduction fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof. Mechanical reproduction fees do not include synchronization fees.

The "publisher's share" of performing fees shall be the net amount actually received by the publisher from any performing rights society in respect of the music and lyrics involved; or, if Warner or the publisher shall administer the collection of all or any part of performance fees, the full amount of all performance fees collected by Warner or the publisher, less the composer's share of such fees and all reasonable costs and expenses in administering the collection of such fees.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

Form 802 rev. 4/1/03                         Exhibit "1"
CSP Moving Basis                                   1

CONFIDENTIAL                                                                    EMH0000241

 

### SOUND TRACK RECORD INCOME

In the event the party entitled to share in the Defined Gross of the Picture under the foregoing agreement is not entitled to receive any artists' royalties in respect of phonograph records derived from the sound track of the Picture, then Warner agrees to include in the Defined Gross of the Picture royalties on sound track records, as herein defined, computed at the applicable royalty rate.

As used herein:

The term "sound track records" means and refers to phonograph records, tapes, or other sound recordings which contain either (i) portions of the sound track transferred directly to phonograph record masters from sound records which form a part of the sound track of the Picture; or (ii) sound recordings recorded separately but utilizing substantially the same musical score, parts and instrumentation, and essentially the same artists, music and/or dialogue and/or sound effects as is contained in the sound track of the Picture; or (iii) a combination of (i) and (ii). Sound track records do not, however, include any recordings produced solely for the purpose of advertising and exploiting the Picture and copies of which are not distributed to the public.

The term "applicable royalty rate" means and refers to the following percentages of the prevailing retail price but in no event more than the net royalty actually received and retainable by Warner for its own account with respect to the sale of any particular copies:

5% of 90% in respect of sound track records sold in the United States

2½% of 90% in respect of sound track records sold outside the United States

except that as to sound track records sold pursuant to mail order or "club" plans, the royalty rate shall be one-half of the rate otherwise applicable.

If any sound track records contain selections from other sources, the applicable royalty rate hereunder shall be prorated on the basis of the total number of minutes of selections from the sound track compared to the total number of minutes on such records.

In determining the net royalty retainable by Warner, all royalties payable to artists, conductors and other third parties in respect to such sound track records shall be deducted from the aggregate royalty payable to Warner under the applicable distribution agreement.

The term "prevailing retail price" means and refers to the price generally prevailing in the country of manufacture or sale (as determined by the Record Company), less all taxes, duties and charges for containers.

There shall be deducted from amounts included in Defined Gross hereunder a pro rata share of re-use fees and costs of recording and manufacturing masters advanced by Warner or the Record Company. Sales shall be determined on the basis of the number of records sold and for which the Record Company has been paid in U.S. currency, after allowing for all returns, cancellations, exchanges, applicable discounts, etc. and reasonable reserves which may be established therefor. No sums shall be included in Defined Gross with respect to records given away or sold at less than the Record Company's cost or for promotional purposes, or as sales inducements or otherwise.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

Form 802  rev. 4/1/03
CSP Moving Basis

Exhibit "2"
1

CONFIDENTIAL

EMH0000242

 

## MERCHANDISING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in merchandising revenue, there shall be included in Defined Gross of the Picture:

(a)  A sum equal to 50% of all license fees (in excess of all royalties and participations) received by Warner directly as a result of the exercise by Warner itself of merchandising license rights.  If, however, Warner shall sublicense or sub-contract any of such merchandising license rights, Warner shall include in the Defined Gross hereunder, at its election, either a sum equal to (i) 85% of the net sums (in excess of all royalties and participations) received from such sub-licensee; or (ii) 50% of such sub-licensee's license fees from the exercise of such licensing rights (from which there shall be deducted all royalties and participations), and out of the remaining 50% thereof Warner shall pay and discharge the fees of its sub-licensee.

(b)  If the publication rights to the underlying literary material were owned or controlled by the party entitled to share in Defined Gross of the Picture under the foregoing agreement (herein called "participant") prior to the execution of this agreement, and were acquired by Warner pursuant to or in connection with this agreement, then (i) all net sums received by Warner from nonaffiliated or nonsubsidiary publishers from the publication of such underlying literary material and  of novelizations of the screenplay of the Picture, and (ii) a sum equal to 5% of the net receipts of Warner's subsidiary or affiliated publishers from the publication of such material and novelizations, less, in either case, royalties paid out of (i) or (ii) to the writers of such material and novelizations.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

CONFIDENTIAL                                                        EMH0000243