# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, LLC, and<br>TONY DEROSA-GRUND<br>    *Plaintiffs,*<br><br>v.<br><br>WARNER BROS. ENTERTAINMENT, INC. and<br>NEW LINE PRODUCTIONS, INC.<br>    *Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:14-cv-00793<br>(SENIOR CASE) |
| EVERGREEN MEDIA HOLDINGS, LLC, TONY<br>DEROSA-GRUND, and GERALD D. BRITTLE,<br>    Plaintiffs,<br><br>v.<br><br>LORRAINE WARREN, TONY SPERA,<br>GRAYMALKIN MEDIA, LLC, NEW LINE<br>PRODUCTIONS, INC., and WARNER BROS.<br>ENTERTAINMENT, INC.,<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:14-cv-01117<br>(JUNIOR CASE) |

## DECLARATION OF MICHAEL R. PATRICK

I, MICHAEL R. PATRICK, pursuant to 28 U.S.C. § 1746, declare under penalty of
perjury that the following is true and correct.

1.      I am a Partner at Grimes, LLC, co-counsel for Plaintiffs in the above-captioned
consolidated actions and in JAMS Arbitration No. 1210031019 (the "Arbitration"). I submit this
declaration in support of Plaintiffs' MOTION FOR LEAVE TO AMEND COMPLAINT IN
SENIOR CASE (CIVIL ACTION NO. 4:14-CV-00793). I have personal knowledge of the facts
set forth herein, except as to those stated on information and belief and, as to those, I am
informed and believe them to be true. If called as a witness, I could and would competently
testify to the matters stated herein.

2.      Attached hereto as **Exhibit A** is a true and correct copy Plaintiffs' proposed First

Amended Complaint in the Senior Case.

Executed on July 25, 2014 at Norwalk, Connecticut.

MICHAEL R. PATRICK

# EXHIBIT A

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, LLC and TONY DEROSA-GRUND | § § § | CIVIL ACTION NO.  4:14-CV-00793 |
| VS. | § § | |
| WARNER BROS. ENTERTAINMENT, INC. and NEW LINE PRODUCTIONS, INC. | § § § | JURY TRIAL DEMANDED |

### PLAINTIFFS' FIRST AMENDED COMPLAINT
### AND JURY DEMAND

Plaintiffs, EVERGREEN MEDIA HOLDINGS, LLC and TONY DEROSA-GRUND, file this First Amended Complaint against Defendants, WARNER BROS. ENTERTAINMENT, INC. and NEW LINE PRODUCTIONS, INC., jointly and severally, as follows:

### Introduction

1.    This action is brought as a result of Defendants' egregious conduct, e.g., Defendants' failure to properly and fully compensate Plaintiffs, Defendants' failure to properly credit Plaintiffs and Defendants' overt attempts to violate, if not outright steal, rights belonging solely and exclusively to Plaintiffs, in connection with certain paranormal investigation case files of world renowned paranormal investigators Ed and Lorraine Warren.  Plaintiff Tony DeRosa-Grund ("Mr. DeRosa-Grund") has spent decades, and devoted substantial financial resources toward, working on, identifying, exploring and developing the Warren's approximately 8,000 paranormal investigation case files (the "Case Files") for motion picture and television production, among other things, along with the incredible and unique life stories of the Warrens.

2.    In 2010, Plaintiffs agreed to grant New Line Productions, Inc. ("New Line") an option to produce **only** theatrically released motion pictures based on an agreed upon, but very

limited, selection of just twenty-five (25) of the Case Files – *i.e.*, less than one percent (1%) of the total number of Case Files in exchange for, *inter alia*: (i) a purchase price for each theatrical motion picture production; and (ii) for crediting and employing Mr. DeRosa-Grund as producer, individually, and crediting Evergreen Media Holdings, LLC ("Evergreen"), corporately, for each aforementioned theatrical production.  Plaintiffs' grant to New Line of an option to produce **only** theatrically released motion pictures based upon the twenty-five (25) Case Files included the right to use the Warrens' life stories (the "Life Rights") in connection therewith.  All other rights were reserved by Plaintiffs -- and were never expressly transferred, assigned or conveyed in any agreement -- and, to this day, belong solely to Plaintiffs.

3.     Plaintiffs and New Line successfully developed and produced a hit theatrical motion picture entitled "The Conjuring" based on one of the selected Case Files.  Defendants, however, now seek to reap all of the profits from "The Conjuring" theatrical motion picture while denying their financial obligations to Plaintiffs, including, but not limited to, failing to pay any profits due to Plaintiffs for "The Conjuring" theatrical motion picture, failing to employ Mr. DeRosa-Grund as a producer in connection with sequels to "The Conjuring" theatrical motion picture, failing to credit Plaintiffs in connection with sequels to "The Conjuring" theatrical motion picture and violating and/or stealing rights belonging solely and exclusively to Plaintiffs.

4.     Defendants' protracted pattern of egregious conduct continues to this day.  Plaintiffs are informed and believe that New Line has developed, produced, completed production and is in the process of releasing a theatrical motion picture sequel to "The Conjuring" entitled "Annabelle" based on a different selected Case File, *i.e.*, not the Case File related to "The Conjuring."  Defendants have also commenced development, completed a script, and started pre-production on a theatrical motion picture sequel to "The Conjuring" that is

referred to in the media as "The Conjuring 2: Enfield".  Plaintiffs are informed and believe, and therefore allege, that Defendants intend to release "Annabelle" as a theatrical motion picture sequel to "The Conjuring" without properly compensating Plaintiffs for these rights and without properly crediting Mr. DeRosa-Grund or Evergreen.  Although New Line has made a payment to Plaintiffs towards the Purchase Price for the "Annabelle" sequel, such payment was patently untimely and was not complete.  Indeed, New Line has refused to engage in the contractually mandated negotiation with Plaintiffs of an increased payment amount to be paid to Plaintiffs as additional compensation in connection with the "Annabelle" sequel.  Additionally, New Line has refused to include Mr. DeRosa-Grund as a producer and to credit him individually, and to credit Evergreen corporately, for the "Annabelle" sequel.

5.     Accordingly, for the foregoing reasons and the reasons set forth herein, Plaintiffs' have brought this Complaint.

## Parties

6.     Evergreen is a Texas limited liability company with its headquarters and principal place of business in Montgomery County, Texas.

7.     Mr. DeRosa-Grund is a resident of Montgomery County, Texas.  Mr. DeRosa-Grund is a motion picture producer, and the principal of Evergreen.

8.     Warner Bros. Entertainment, Inc. is a California corporation that transacts business in Montgomery County, Texas with a headquarters and principal place of business in California.   It may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

9.     New Line Productions, Inc. is a California corporation that transacts business in Montgomery County, Texas with a headquarters and principal place of business in California.  It

may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Dallas, Texas 75201-3136.

## Jurisdiction and Venue

10.     This Court has jurisdiction over the subject matter of this action under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.  This Court also has jurisdiction pursuant to 28 U.S.C. §§ 2201, *et seq.* (declaratory judgment act), 1331 (federal question), §1338(a) (acts of Congress relating to trademarks) and 28 U.S.C. § 1367 (supplemental jurisdiction over state claims).

11.     Personal jurisdiction over the non-resident Defendants is proper because this lawsuit arises from, was connected with an act or transaction, and relates to the purposeful acts of the non-resident Defendants in Texas, and those purposeful acts are directed towards Texas. The assumption of jurisdiction by this Court over the non-resident Defendants does not offend traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in or have a principal place of business in this judicial district and because Defendants are subject to personal jurisdiction in this district.

## Conditions Precedent

13.     All conditions precedent necessary to maintain this action have been performed, have been waived, or have occurred.

## Factual Allegations

14.     Plaintiffs have known Ed Warren (now deceased) and Lorraine Warren for nearly twenty-three (23) years. Throughout that period, Mr. DeRosa-Grund held thousands of hours of

- 4 -

discussions with the Warrens about their Case Files.  The conversations were principally between Mr. Warren and Mr. DeRosa-Grund although, on occasion, Mrs. Warren would also participate.  It was during those thousands of hours of conversations that Mr. Warren would propose and discuss with Mr. DeRosa-Grund various Case Files that he felt were particularly suitable for a feature theatrical motion picture, including, but not limited to, the "Perron Farmhouse" Case File, the "Annabelle" Case File, and "The Enfield Poltergeist" Case File.

15.     In relevant part, approximately fifteen (15) years ago, Mr. DeRosa-Grund and Mr. Warren specifically discussed the "Perron Farmhouse" Case File.  During this conversation, which was recorded, Mr. DeRosa-Grund revealed his strategy and vision to develop and produce a theatrical motion picture based on the "Perron Farmhouse" Case File.  It was this conversation, as reflected in the recording, and, in particular, Mr. DeRosa-Grund's strategy and vision, that ultimately developed into and became the basis for Mr. DeRosa-Grund's written story and treatment based on the "Perron Farmhouse" Case File, all of which was used as the foundation and basis for the hit theatrical motion picture "The Conjuring."

16.     After Mr. DeRosa-Grund created, conceived, and authored the story and treatment of the "Perron Farmhouse" Case File, Mr. DeRosa-Grund created the "The Conjuring" trademark.  Mr. DeRosa-Grund intended "The Conjuring" trademark to be used in connection with a franchise that would not be limited to the production of just one of the Case Files, but numerous others.  Thus, the "Perron Farmhouse" Case File was intended to merely be the first of many Case Files used in various productions featuring "The Conjuring" trademark.  Indeed, Mr. DeRosa-Grund intended to, among other things, create a series of supernatural/horror theatrical motion pictures as well as direct-to-video productions, a television series and comic book series all using the "The Conjuring" trademark which he, alone, created and used.

17.     Approximately five (5) years ago, Mr. DeRosa-Grund formally, and exclusively, acquired the exploitation rights to the Warrens' "life rights" (the "Life Rights") as well as the exploitation rights in the Case Files.  In relevant part, four agreements were entered into (the "Warren Agreements"), for the exploitation of the Life Rights of the Warrens and the Case Files. The Warren Agreements gave Plaintiffs the sole and exclusive right to exploit film and television rights in and to the Life Rights of the Warrens and in and to the Case Files.

18.     Mr. DeRosa-Grund then sought to sell his original story and treatment of the "Perron Farmhouse" Case File, as well as theatrical motion picture rights in the Warrens' Life Rights and the Case Files, in conjunction with a theatrical motion picture series using "The Conjuring" trademark that he had created.

19.     Mr. DeRosa-Grund worked with two screenwriters, Chad Hayes and Carey Hayes, to turn the recording of his conversation with Mr. Warren and Mr. DeRosa-Grund's strategy, vision, and his original story and treatment of the "Perron Farmhouse" Case File into a "pitch" and, finally, a formal script.

20.     Evergreen reached an agreement with Summit Entertainment LLC ("Summit") on or about June 19, 2009.   Ultimately, Summit refused to go forward with the agreement because, in their view, there was a question concerning the "chain of title."   Summit was concerned that the chain of title was clouded due to Mr. DeRosa-Grund's Chapter 7 bankruptcy proceeding that was pending in the U.S. Bankruptcy Court for the Southern District of Texas in Houston, Texas before the Honorable Wesley Steen (Case No. 4:09-bk-33264). At the time, the U.S. Trustee assigned to the case in Texas, David Askanase ("Mr. Askanase"), had taken the position that the bankruptcy estate had a claim on the Case Files, the Warren's Life Rights and Mr. DeRosa-Grund's story and treatment of the "Perron Farmhouse" Case File, because Evergreen had

executed valid, existing agreements with the Warrens (i.e., the Warren Agreements) prior to the commencement of the bankruptcy proceedings and had long ago authored the story and treatment of the "Perron Farmhouse" Case File.

21.     With Summit out of the picture, and no other studios in the running, New Line pursued a deal with Plaintiffs.  New Line was so determined to acquire rights related to Mr. DeRosa-Grund's story and treatment of the "Perron Farmhouse" Case File, as well as limited (i.e., theatrical motion picture) rights in certain other Case Files and the Warren's Life Rights, that New Line agreed to, and in fact insisted: (i) that it be able to intervene in Mr. DeRosa-Grund's bankruptcy proceeding in Texas; and (ii) that any agreement between New Line and Mr. DeRosa-Grund and/or Evergreen be specifically accepted by Mr. Askanase, the Trustee in the Texas bankruptcy proceeding, and approved and ordered by the Texas bankruptcy court.

22.     New Line's Senior Vice-President, Head of Business & Legal Affairs, Craig Alexander ("Mr. Alexander"), who was heavily involved in all of the negotiations and was the "lead" representative on behalf of New Line in the negotiations, represented that New Line would not move forward with negotiations unless Mr. Askanase accepted the terms of the deal between New Line and Plaintiffs, and the Texas bankruptcy court specifically approved the terms of any deal, i.e., that the Texas bankruptcy court specifically approve the parties' agreement.  That the entirety of the agreement of the party was approved by the Texas bankruptcy court, including the terms thereof, is self-evident from the title of Judge Steen's Order: "ORDER APPROVING AGREEMENT BETWEEN TRUSTEE AND EVERGREEN MEDIA HOLDINGS, LLC, NEW LINE PRODUCTIONS, INC., PETER SAFRAN, AND TONY DEROSA-GRUND", which was entered on January 27, 2010.  To that end, New Line inserted itself into Texas, i.e., New Line retained outside bankruptcy counsel so that New Line

could intervene in the bankruptcy proceedings and negotiations could continue between New Line and Plaintiffs.

23.     Importantly, when the parties were initially negotiating the terms of the proposed deal between New Line, on the one hand, and Plaintiffs, on the other hand, each side seemed willing to make the necessary concessions to reach agreement.  By way of example, there were aspects of the negotiations that were never in dispute and, indeed, were whole heartedly acknowledged and agreed upon by the parties, namely: (i) New Line was only acquiring the limited right to make theatrical motion pictures; (ii) all other rights, i.e., all other rights except rights to make theatrical motion pictures, such as television rights and direct-to-video rights, were reserved - meaning that they would belong solely and exclusively to Evergreen and/or Mr. DeRosa-Grund; (iii) Mr. DeRosa-Grund would be "locked for life" as a producer, i.e., Mr. DeRosa-Grund would be attached as a producer, credited as a producer and paid as a producer, on any sequel, prequel or remake of any theatrical motion picture made by New Line; (iv) Evergreen would be paid a rights fees in connection with any such sequel, prequel or remake; and (v) the financial terms of the deal could not be changed in the long form (i.e., New Line could not add more rights than what was approved by the bankruptcy court nor could they delete any of the fees, bonuses, and profits participations for Evergreen or Mr. DeRosa-Grund that had been approved by the bankruptcy court).

24.     When an issue did arise, New Line went so far as to make representations, warranties and promises to Mr. Askanase, to Mr. DeRosa-Grund, and to Mr. DeRosa-Grund's then-counsel, John Gatti and Nathan Hensley: (i) to induce and convince the parties to reach an agreement; (ii) to induce and convince Mr. Askanase to approve the agreement; and (iii) to induce and convince the Hon. Wesley Steen to enter an order approving the agreement.  By way

of example, Mr. Askanase asked New Line whether the agreement ought to expressly aver that Mr. DeRosa-Grund would be attached as a producer, credited as a producer and paid as a producer, on any sequel, prequel or remake of any theatrical motion picture made by New Line pursuant to the agreement, i.e., whether the agreement should specify that Mr. DeRosa-Grund was "locked for life" as a producer (as was done in the Summit Agreement).   New Line responded that it did not want to include such language in the agreement - merely because it could not guarantee that any sequel, prequel or remake would ever be made.   However, New Line represented, warranted and promised to Mr. Askanase, Mr. Gatti, Mr. Hensley and Mr. DeRosa-Grund that Mr. DeRosa-Grund was to be attached as a producer, credited as a producer and paid as a producer, on any sequel, prequel or remake of any theatrical motion picture made by New Line pursuant to the agreement and, moreover, that Evergreen would receive a fee in connection with same.

25.   Relying on New Line's representations, warranties and promises, Plaintiffs acquiesced to the terms proposed by New Line for a "Deal Memo" -- which is a "short form" agreement intended to memorialize the basic terms which the parties have agreed upon and which forms the basis for the parties to later negotiate a "long form" agreement.   The Deal Memo included two basic parts, namely, Part I: Underlying Rights to theatrical motion pictures; and Part II: Producer Fees for any theatrical motion pictures made by New Line.   The Deal Memo also set forth terms applicable to, among other things, the option payments, the payments to the bankruptcy court in Texas, the purchase price, box office bonuses and sequels, as well as the "PRODUCER FEES" to be paid.   The Deal Memo did not cover any rights other than theatrical motion picture rights.

26.    New Line had showed a "willingness" to negotiate, or at least to "appear" to negotiate, the Deal Memo in good faith.  New Line's "willingness" was chameleonic -- motivated by its desire to get to the point where the Deal Memo was a "done deal", i.e., to the point where: (i) the negotiations were concluded; (ii) the Deal Memo was executed by Plaintiffs, accepted by the Texas Trustee and approved by the Texas Court; and (iii) New Line could pay the $100,000 and be "locked in" (which it did in installments).  After that, i.e., after the Deal Memo was a "done deal," New Line began to "show its true colors" and not only refused to negotiate certain terms and conditions of the long form agreement -- New Line even went so far as to refuse to put into the long form agreement express language covering: (i) material terms and conditions from the Deal Memo; and (ii) representations, warranties and promises that they had made to induce Plaintiffs to enter into the Deal Memo, to induce the Texas Trustee to accept the Deal Memo, and to induce Judge Steen to approve the Deal Memo. When there was a dispute about the terms or conditions of the long form agreement, New Line often claimed that it was obliged not to agree merely in accordance with its corporate policies and past practices.  Thus, at most, New Line would simply make "accommodations" to other provisions which it deemed worthless.

27.    New Line claimed that many of the terms or conditions of the long form agreement were "take it or leave it", such as provisions related to related to arbitrations, governing law/disputes and remedies.  Had Evergreen and Mr. DeRosa-Grund opted to "leave it", "The Conjuring" theatrical motion picture would likely never have been made, a fact that New Line was well aware of and took advantage of throughout the negotiations, i.e., New Line knew that Mr. DeRosa-Grund and Evergreen needed to conclude the long form agreement and move forward with the project because of their financially precarious position, i.e., still being in

the middle of the ongoing bankruptcy, and because they had no other option in view of the executed Deal Memo.

28.     Among other things, New Line refused to negotiate terms and conditions of the long form agreement related to arbitrations, governing law/disputes and remedies.  Plaintiffs specifically asked that they be removed. New Line unequivocally refused and said that it **never** negotiated or otherwise removed, altered or changed arbitration provisions, governing law/disputes provisions and/or remedies provisions in its agreements.   Plaintiffs were forced to accept these one-sided, unfair terms and conditions as they had no bargaining power under the circumstances -- never imagining how New Line would misuse those unconscionable provisions as it is doing now.

A.     **The Agreements with New Line**

29.     On or around March 29, 2010, Evergreen and New Line entered into an Option Quitclaim Agreement, with a date as of November 11, 2009 (the Option Quitclaim Agreement is referred to herein as the "OQA").  Pursuant to the OQA, New Line acquired an option to purchase theatrical motion picture rights to an agreed upon, and very limited, selection of the Case Files, i.e., less than one percent (1%) of the Case Files, and to the Life Stories of the Warrens in conjunction with those selected Case Files.  In particular, from the approximately 8,000 Case Files, under the terms of the OQA, New Line was to select a limited number of Case Files, namely, just twenty-five (25) of the approximately 8,000 which would be reserved exclusively by New Line solely for the purposes of theatrical motion picture exploitation.  In exchange, New Line agreed to pay Mr. DeRosa-Grund and Evergreen a purchase price amount (the "Purchase Price"), and a percentage of the adjusted gross receipts of any theatrical motion picture made pursuant to the OQA.

-11-

30.     Evergreen and New Line also entered into a Producer Loanout Agreement on or around March 31, 2010, with a date as of November 11, 2009 (the Producer Loanout Agreement is referred to herein as the "Producer Agreement" (collectively the Producer Agreement and the OQA are referred to herein as the "Agreements")), for the producer services of Mr. DeRosa-Grund.  New Line agreed to engage and credit Mr. DeRosa-Grund as a producer in connection with any theatrical motion picture made pursuant to the Agreements, including, but not limited to, any theatrical motion picture associated with the selected twenty-five (25) Case Files.

31.     It should be noted that Warner Bros. has absolutely nothing to do with the Agreements.  Indeed, Warner Bros. is not a signatory to the Agreements and there is no privity of contract between Warner Bros. and Plaintiffs.  Moreover, in other unrelated lawsuits, Defendants have represented that New Line owns all intellectual property rights related to any contract arising prior to 2010.  Thus, Warner Bros. has no standing under the Agreements and apparently, by their own admission, no vested interest in any portion of the Agreements.

32.     Not long after the Agreements were executed, New Line began to renege upon the terms of the Deal Memo and the Agreements, and New Line began to unlawfully cut out Plaintiffs and change the terms of their deal with Plaintiffs -- again, the deal that had been agreed to by the parties, accepted by the Texas Trustee and approved by the Texas Bankruptcy Court.

33.     New Line ultimately entered into a deal with Chad and Carey Hayes to write the script based on the "Perron Farmhouse" Case File, during which time, New Line received copies of the recording of Mr. DeRosa-Grund's conversation with Mr. Warren and Mr. DeRosa-Grund's story and treatment as well as any and all notes and materials he possessed relating to the "Perron Farmhouse" Case file.  Accordingly, New Line was acutely and actually aware that: (i) Mr. DeRosa-Grund's original story and treatment were the underlying foundation of and basis for the

screenwriters' work; and (ii) "The Conjuring" was the trademark that Mr. DeRosa-Grund had single-handedly created for a series of productions based upon the Case Files and that "The Conjuring" trademark belonged exclusively to him.

34.     After entering into the OQA, New Line indicated to Plaintiffs that it wanted to enter into a "direct deal" with Mrs. Warren.  At that time, there was no need for New Line to enter into any deal with Mrs. Warren because Plaintiffs solely and exclusively owned all of the rights related to the Warrens' Life Stories, the Case Files, and Mr. DeRosa-Grund's story and treatment of the "Perron Farmhouse" Case File.  Thus, Plaintiffs did not want New Line to enter into a "direct deal" with Ms. Warren.  Nevertheless, New Line was insistent that it be allowed to enter into the "direct deal".  To convince and induce Plaintiffs to allow New Line to enter into a "direct deal" with Ms. Warren, New Line specifically and expressly represented to Plaintiffs -- specifically, in an email from Craig Alexander sent directly to Mr. DeRosa-Grund -- that **none** of Plaintiffs' rights and/or benefits would be changed, altered, modified or otherwise effected by the "direct deal" between New Line and Ms. Warren.  Based on New Line's representation, the parties executed an "Amendment #1" to the OQA, entered into on or around February 7, 2011, with a date as of October 19, 2010 (the "Amendment"), although no consideration was ever provided for the Amendment.

35.     Defendants and Ms. Warren have conspired over the past several years to keep the "direct deal" hidden from Plaintiffs, in particular the content of the "direct deal", i.e., the specific terms.  Defendants and Ms. Warren did so because the "direct deal" substantially and materially changes, alters, modifies and substantially affects Plaintiffs right under the Agreements as well as under the Warren Agreements -- in fact, the "direct deal" purports to take away rights solely and exclusively belonging to Plaintiffs.

36.     Under the Amendment executed by Plaintiffs, New Line was required to select a **maximum** of twenty-five (25) of the Case Files for theatrical motion picture development upon receiving summaries (all of which were written and provided by Mr. DeRosa-Grund) of the selected Case Files prepared by Plaintiffs.   However, although New Line promptly received the summaries of the Case Files from Mr. DeRosa-Grund, in violation of the Agreements, New Line willfully delayed in selecting their allotted Case Files for development and subsequently sought to improperly change its selections of twenty-five (25) of the Case Files.   In particular, while New Line ultimately used the "Perron Farmhouse" Case File as the basis for "The Conjuring" theatrical motion picture, the "Perron Farmhouse" Case File was **not** listed in New Line's original selection of twenty-five (25) Case Files, although the original list did include the "Annabelle" Case File and the "Enfield Poltergeist" Case File.

37.     Pursuant to the Agreements, which were entered into in Texas and California, New Line produced "The Conjuring" theatrical motion picture based on the aforementioned "Perron Farmhouse" Case File.   It should be noted that, although "The Conjuring" theatrical motion picture is based on the "Perron Farmhouse" Case File, major elements of the "Annabelle" Case File are incorporated and used in "The Conjuring" theatrical motion picture.

38.     New Line paid Evergreen and Mr. DeRosa-Grund the initial Purchase Price for "The Conjuring" theatrical motion picture prior to commencing principal photography.

39.     Moreover, Mr. DeRosa-Grund provided his production services pursuant to the Producer Agreement and, in fact, was heavily (and critically) involved in the production of "The Conjuring" theatrical motion picture.   For example, Mr. DeRosa-Grund selected the "Perron Farmhouse" Case File as the Case File best suited for a theatrical motion picture, secured all associated rights, wrote the original story and treatment for "The Conjuring" theatrical motion

-14-

picture, created "The Conjuring" trademark and introduced "The Conjuring" theatrical motion picture project to director James Wan.  Indeed, Defendants have publicly acknowledged that Mr. DeRosa-Grund worked closely with the writers and other producers to develop the script for "The Conjuring" theatrical motion picture.

40.    "The Conjuring" theatrical motion picture was released on or around July 19, 2013, and was hugely successful, grossing well over $318,000,000 by the end of 2013.  With a production budget of approximately $20,000,000, "The Conjuring" theatrical motion picture has been reported to be one of the most profitable theatrical motion picture films of 2013.

**B.    Evergreen's Reserved Rights in Television, Comic Books, and Graphic Novels**

41.    Paragraph 8 of the OQA contains an express reservation of rights to Evergreen regarding exploitation of the Case Files in connection with television, comic books, graphic novels, and related merchandising, soundtrack recording, video game, commercial tie-ups, home entertainment, and music publishing.

42.    Additionally, Paragraph 4A of the OQA expressly provides Evergreen with reversion rights to all underlying rights to "The Conjuring" in the event that New Line does not produce a subsequent theatrical motion picture based on the Case Files within seven years after the release of "The Conjuring," or make a minimum payment to Evergreen.  Thus, if New Line does not make a theatrical motion picture within seven years of the release of "The Conjuring," or pay Evergreen the minimum amount, then New Line loses the right to continue to make motion pictures based on the Case Files, and such rights would revert and belong solely to Evergreen.

**C.      Evergreen's Rights to the Name "The Conjuring"**

43.      It is indisputable that the Agreements do not provide for any express transfer, assignment or conveyance from Plaintiffs to Defendants of trademark rights in general or specifically with regard to "The Conjuring" name and trademark (the "Name"), which Plaintiffs created approximately fifteen (15) years ago.  The absence of any express transfer, assignment or conveyance is understandable and was purposeful inasmuch as Evergreen has used "The Conjuring" as the brand name of the entire franchise since inception.  In particular, Evergreen has used the Name to refer to **<u>all</u>** of the approximately 8,000 Case Files that are to be used in connection with any and all of Evergreen's rights, and not just to the "Perron Farmhouse" Case File that was used for "The Conjuring" theatrical motion picture. New Line acquired only the limited right to develop and produce only theatrically released motion pictures based on the twenty-five (25) Case Files selected by New Line.  In addition, Evergreen agreed that upon New Line's request, it would withdraw, or transfer to New Line, any registration it may have with the Motion Picture Association of America ("MPAA") for the Name as a single theatrical motion picture title.  Except for this concession regarding the Name with regard to a MPAA single theatrical motion picture title registration, Evergreen retained the sole and exclusive rights to the Name, including the trademark rights to the Name.  At no point did Evergreen agree to anything that would otherwise limit its ability to freely use the Name for its reserved rights under the Agreements.

44.      New Line drafted the OQA, and it does not include any express transfer, assignment or conveyance of trademark rights in the Name from Evergreen to New Line, because it was never the parties' intent to transfer such rights.  The only limitations on Evergreen's exploitation of its reserved rights are expressly listed in the Agreements, and the

Agreements do not contain any limitation on Evergreen's use of the Name in connection with its reserved rights.  Thus, all rights in the Name were reserved to Evergreen.

45.     Consistent with its retention of rights to the Name, and at New Line's request, Evergreen has taken action to protect the Name against improper and unlawful use by third parties, including an unauthorized attempt by Silver Pictures, Inc. ("Silver Pictures") to use the Name.  In that instance, Evergreen sent several cease and desist letters to Silver Pictures demanding that it stop using the Name.  Those letters to Silver Pictures stated unequivocally that Evergreen had the right to use the Name as the title for a motion picture.  Not only were Defendants aware that Evergreen took such action against Silver Pictures, but Defendants never objected to Evergreen's rights in the Name or otherwise attempted to enforce its purported rights in the Name.

46.     Additionally, on May 3, 2012, Evergreen filed applications to register the Name as a trademark in the United States Patent and Trademark Office (the "PTO"), applications Serial No. 85/616,146 and Serial No. 85/616,159.  Defendants knew that they did not have any trademark rights in the Name and thus never filed trademark applications for the Name prior to Evergreen filing its applications.  On May 16, 2013, Evergreen also registered the titles "The Conjuring 2-6" and "The Conjuring Part II-Part VI" with the MPAA in contemplation of any sequels or prequels to "The Conjuring," thus protecting Evergreen's rights in the Name if such theatrical motion picture rights reverted to Evergreen.

47.     In blatant disregard for Evergreen's rights to the Name under the OQA and its filing of the aforementioned applications to register the Name as a trademark, on May 31, 2013, Defendants filed their own applications to register the Name with the PTO in multiple categories, including, *inter alia*, entertainment services, toys and games, clothing, paper goods, and motion

picture films.  Defendants have also filed an application to register the Name as a title with the MPAA.

**D.      The Proposed Television Show**

48.     Pursuant to their reserved television rights under the Agreements, Plaintiffs have sought to develop a television series based upon the Case Files.  It is undisputed that Evergreen has the sole right to create a television series based upon the Case Files.

49.     However, the OQA provides New Line with a right of first negotiation/last refusal in connection with such a television series if New Line elects to enter into negotiations with Evergreen for such rights.  Accordingly, in or about September 2012, Mr. DeRosa-Grund sent a written request to New Line presenting them the opportunity for New Line to develop a television series based upon the Case Files.   Initially, New Line ignored the notification. Plaintiffs again contacted New Line.  Eventually, New Line unequivocally stated that it was not interested in developing a television series based on the Case Files because it was not in the television industry and it was unwilling to work with Mr. DeRosa-Grund on any future television project based on the reserved television rights.  Thus, New Line expressly waived the first negotiation/last refusal rights under the Agreements.  New Line then took steps to block all communications from Mr. DeRosa-Grund, effectively making it impossible for him to present further information regarding the development of the television series.

50.     Accordingly, after providing adequate notice, and in reliance on New Line's unequivocal refusal, in or about January 2013, Evergreen entered into a contract with Lionsgate Entertainment ("Lionsgate") for the production of a proposed television show entitled "The Conjuring."   The proposed television show was not based on the Case Files selected by New

Line pursuant to the Agreements, but rather on the remaining unused Case Files and an original teleplay created by Mr. DeRosa-Grund.

51.     On May 9, 2013, Craig Alexander, Senior Vice President and Head of Business and Legal Affairs at New Line, telephoned Sandra Stern, Chief Operating Officer at Lionsgate, to advise Lionsgate that its planned use of the Name as a title for a television series would violate New Line's alleged rights to the Name.  Mr. Alexander knew that Lionsgate had an agreement to make a television series with Evergreen and never raised a claim that the first negotiation/last refusal provision had been breached because he knew that New Line previously waived that provision.

52.     On May 20, 2013, Kavita Amar, Senior Counsel of Business and Legal Affairs at New Line, wrote a letter to Ms. Stern to follow up on that conversation.  In that letter, New Line expressly set forth its alleged rights to the title and asserted that "Lionsgate's planned use of 'The Conjuring' title steps over the line and threatens New Line's extensive common law trademark and related rights."  New Line further demanded that "Lionsgate abandon its plan to use 'The Conjuring' title for its upcoming television series."  New Line was well aware that Plaintiffs were the ones who actually have had the common law trademark rights in, and to, the Name for over fifteen years.  Indeed, New Line has previously acknowledged, in written correspondence to Mr. DeRosa-Grund, that Plaintiffs had in fact used the common law trademark in commerce for years, namely, in their attempts to sell the right to produce "The Conjuring" with other studios prior to their dealings with New Line.  Moreover, New Line made no mention at all of any claimed breach of the first negotiation/last refusal provision in the OQA in the aforementioned communication with Lionsgate.  Plaintiffs are informed and believe, and therefore allege, that

New Line did not have television production operations and that New Line asserted rights regarding television for the benefit of Warner Bros.

53.      After receiving the letter, Lionsgate informed Plaintiffs that it would not go forward with the production of the television show because of New Line's letter.   More specifically, Ms. Stern sent an e-mail to Plaintiffs' then-counsel, dated July 10, 2013, which stated that Lionsgate was not prepared to defend a legal dispute and asked Plaintiffs to clear up the rights to the proposed use of the Name in connection with a television series.   Ms. Stern stated that unless New Line conceded the matter or agreed not to dispute Lionsgate's use of the Name as the title for the television series, Lionsgate would not proceed with the television project.   Accordingly, after New Line contacted Lionsgate regarding New Line's purported rights to the Name, Lionsgate refused to go forward with the proposed television show.   As a direct consequence of Defendants' deliberate actions and interference, Evergreen was unable to collect the compensation owed under its agreement with Lionsgate and has suffered monetary damages that reach well into the tens of millions of dollars.

**E.      Payments Under the Agreements**

54.      Paragraph 5 of the OQA provides that Evergreen is entitled to contingent compensation in the event that "The Conjuring" theatrical motion picture exceeds certain box office receipts.   Similarly, Paragraph 5 of the Producer Agreement provides that Evergreen is entitled to additional payments/deferments in the event that "The Conjuring" exceeds certain box office receipts.

55.      Although "The Conjuring" has undisputedly achieved such box office receipt thresholds, and despite Plaintiffs' repeated demands, Defendants have refused to pay the

contingent compensation that he is owed under Paragraph 5 of the OQA and the additional payments/deferments owed under Paragraph 5 of the Producer Agreement.

56.   Defendants also initially refused to provide Plaintiffs with profit participation payments as required by the Agreements. In particular, Paragraph 5(b) of the Producer Agreement provides for participation payments to Evergreen in "[a]n amount equal to 5% of 100% of the Defined Gross of 'The Conjuring' in excess of the Contractual Start Point on a moving basis" as defined in Exhibit A to the Producer Agreement.  Plaintiffs have requested the profit participation payment owed under the Producer Agreement.  However, in addition to refusing to pay Plaintiffs the contingent compensation under the Agreements, Defendants have indicated that they will not provide any payment of profit participation under the Producer Agreement and therefore are in breach of the Agreements.

57.   To "excuse" their conduct, e.g., their failure to provide any profit participation payments to Plaintiffs, Defendants have "conjured" up a series of alleged breaches of the Agreements.  One such alleged breach is that Plaintiffs have failed to turn over to Defendants the physical Case Files.  First, as Defendants know, the Agreements do not require Plaintiffs (or anyone else) to turn over the physical Case Files (and, in fact, Plaintiffs have sole and exclusive rights to all of the Case Files, except the twenty-five (25) Case Files selected by New Line pursuant to the Agreements).  Second, as Defendants know, the physical Case Files are (and always have been) in the possession of Ms. Warren.  Indeed, Defendants are well-aware of this fact because, in a filing in *Evergreen Media Holdings, LLC, et al v. Warren, et al* (Civil Action No. 4:14-cv-1117), a declaration was submitted by Defendants' counsel that unequivocally stated that the Case Files are in Ms. Warren's possession and control.  Nevertheless, despite the foregoing, Defendants refuse to admit the allegation is false.

**F.**     **Other Motion Pictures Based on the Case Files**

58.     After releasing "The Conjuring" theatrical motion picture, Plaintiffs believe and are informed that New Line has developed, produced and completed production on a theatrical motion picture sequel to "The Conjuring" entitled "Annabelle," based on the "Annabelle" Case File.  It has been reported that production of "Annabelle" began on or about January 27, 2014.

59.     Additionally, Plaintiffs are informed and believe that Defendants intend to produce a theatrical motion picture sequel to "The Conjuring," based upon "The Enfield Poltergeist" Case File.  Specifically, New Line has already publicly announced a release date of October 23, 2015 for the sequel as "The Conjuring 2: Enfield" and on March 27, 2014 registered that title with the Motion Picture Association of America ("MPAA"). Plaintiffs are further informed and believe that New Line commissioned Chad and Carey Hayes to write the script for said sequel in or about mid-July of 2013 (but in no event later than "The Conjuring" theatrical motion picture's domestic theatrical release in July of 2013) and that said script is completed and New Line intends to commence principal photography on said sequel, i.e., "The Conjuring 2: Enfield", by the end of 2014. Upon information and belief, Defendants have already announced a release date of October 23, 2015.

60.     After learning that New Line intended to produce "Annabelle", Plaintiffs contacted New Line in or around January 2014 regarding payment to Evergreen of the Purchase Price for the production and development of the "Annabelle" Case File pursuant to the parties' Agreements.  Astonishingly, although New Line admitted that they were producing "Annabelle", New Line refused to pay anything to Plaintiffs in connection with the production of "Annabelle," representing that they were not required to pay.

61.     In claiming that New Line was not required to pay anything to Plaintiffs in connection with the production of "Annabelle", New Line made several misrepresentations, including, at various times, that New Line was not required to pay Plaintiffs anything because "Annabelle" was to be a "direct-to-video" production - in connection with which Defendants claimed that they were not required to make any payment to Plaintiffs under the Agreements.

62.     Indeed, Plaintiffs were so mislead by Defendants' misrepresentations, that Defendants eventually caused Plaintiffs to believe that Defendants would not pay Plaintiffs anything for "Annabelle" and "The Conjuring 2: Enfield" because Defendants were claiming that "Annabelle" and "The Conjuring 2: Enfield" were outside the scope of the Agreements, i.e., based upon a parallel set of rights to those owned by Plaintiffs, namely, rights in connection with chapters from *The Demonologist* (a book by Gerald Brittle) acquired (albeit illegitimately) from Mrs. Warren and/or Mr. Spera and Graymalkin Media, LLC ("Graymalkin Media").  This view was supported by publicly released social media statements made by James Wan ("Mr. Wan"), the director of "The Conjuring" theatrical motion picture, and listed by New Line as a producer of New Line and Warner Bros.' "Annabelle" and "The Conjuring 2: Enfield" theatrical motion pictures, wherein Mr. Wan openly admitted he is huge fan of Mr. Brittle's *The Demonologist*. Indeed, on or about November 29, 2011, Mr. Wan posted the following to his personal Twitter page: "I watch/read a lot of scary stories.  But [f**k], THE DEMONOLOGIST, true life account of Ed & Lorraine Warren, is the scariest book I've read."  This statement demonstrated that New Line was purportedly relying on a parallel set of rights to those owned by Plaintiffs, namely, rights in connection with chapters from *The Demonologist* purportedly acquired from Mrs. Warren and/or Mr. Spera and Graymalkin Media.

-23-

63.     It was not until June 27, 2014, exactly five (5) months after Defendants commenced production of "Annabelle," that Defendants finally admitted that "Annabelle" will be released as a theatrical motion picture and indicated that Defendants would pay the Purchase Price related thereto.  On July 3, 2014, New Line issued a check in the amount of $750,000 to Plaintiffs allegedly in connection with the production of "Annabelle."  Defendants represented in their cover letter forwarding the $750,000 check that "Annabelle" was a sequel to the original "The Conjuring" theatrical motion picture.  While the aforementioned check represents a large amount of money, in making said payment Defendants were the proverbial "day late and dollar short."  In this case, five months late and potentially over one hundred thousand dollars short in that Defendants failed to provide all of the monies due to Plaintiffs with respect to the "Annabelle" sequel, e.g., Defendants were required to engage in good faith negotiation for up to a fifteen percent (15%) increase due to the fact that "Annabelle" is -- by Defendants' own admission -- a sequel.

64.     Plaintiffs allege that, contrary to their representations, Defendants have intended to produce "Annabelle" as a theatrical motion picture all along -- from at least as early as July of 2013, if not much earlier.  One of the most telling facts is that registration reports from the MPAA show that, four days after the premiere of the "The Conjuring" theatrical motion picture, New Line registered the title "Annabelle," i.e., on July 23, 2013, for use as a title in connection with a theatrical motion picture.  Among other responsibilities, the MPAA polices and administers the registration of titles of theatrical motion pictures for its signatories, such as New Line.  The MPAA **only** registers titles for theatrically released productions. Thus, the mere fact that New Line registered the title "Annabelle" on July 23, 2013 with the MPAA shows that New Line has -- for over a year! -- intended to produce "Annabelle" as a theatrical motion picture

-24-

based on the "Annabelle" Case File and not as a direct-to-video production and not based on rights purportedly acquired outside of the Agreements.

65.     Moreover, another fact that belies their claims is the fact that Defendants have no right to make a direct-to-video production based on the "Annabelle" Case File under the Agreements as the OQA does not grant Defendants any rights to make direct-to-video productions as to any of the Case Files, let alone to the twenty-five (25) Cases Files selected by New Line pursuant to the Agreements.  Indeed, any such action by Defendants would be in violation of the rights which Plaintiff exclusively secured from the Warrens under the Warren Agreements.  In other words, any production based upon the "Annabelle" Case File that is not first released as a theatrical motion picture produced pursuant to the Agreements would be a violation of the rights of Plaintiffs under the Warren Agreements -- a fact that is well-known to Defendants.

66.     In a letter from one of Defendants' counsel, Michael J. O'Connor, dated June 27, 2014 (who has submitted declarations previously to this Court), sent on behalf of Defendants, Mr. O'Connor represented that New Line was prepared to pay the Purchase Price for the "Annabelle" theatrical motion picture.  Specifically, Mr. O'Connor represented that the payment would be issued "pursuant to Paragraph 5(b)" of the OQA "entitled 'Theatrical Sequels and Remakes'".  On July 3, 2014, Kavita Amar, Vice-President of business and Legal Affairs for New Line, sent a check to Plaintiffs for the Purchase Price accompanied by a letter stating: "This check represents the theatrical sequel rights payment for 'Annabelle' as set forth in paragraph 5(c) of the [OQA] in connection with the motion picture entitled 'The Conjuring'."  Indeed the "receipt" attached to the check states that the payment is a "SEQUEL RIGHTS PAYMENT."

67.     It should be noted that Defendants have not yet paid a dime to Plaintiffs for "The Conjuring 2: Enfield."  It may be that payments are not yet due to Plaintiffs for "The Conjuring 2: Enfield."  However, based on the foregoing misrepresentations from Defendants concerning the "Annabelle" production, it is virtually impossible for Plaintiffs to confirm whether or not payments of any kind are due or owed at this time.  Defendants claim that no payments have been made because principal photography has not commenced but, at the present time, Plaintiffs have no way of confirming the veracity of Defendants' representation.

68.     In light of the foregoing, it is readily apparent that Defendants -- and especially New Line -- have constantly made false statements and misrepresentations to Plaintiffs.  Indeed, New Line represented and agreed that Mr. DeRosa-Grund would be a producer in connection with all projects based on New Line's selected Case Files.  Nevertheless, Defendants have refused to engage Mr. DeRosa-Grund's producer services or to compensate him for producer services, to fully compensate him for the rights, or to provide him with a producer credit, or Evergreen corporate credit, in connection with the "Annabelle" sequel or the "The Conjuring 2: Enfield" sequel, or any other prequel, sequel, remake, or spinoff of "The Conjuring."

69.     New Line had also previously represented to Evergreen that it would be entitled to profit participation as the producer for any motion picture based on the Case Files.  In negotiations for the Agreements, Evergreen requested that the profit participation provision be included in the OQA, as well as the Producer Agreement, but New Line insisted that it never included profit participation in rights deals.  However, based on a recently filed action against New Line by Miramax, LLC ("Miramax"), which attaches the rights agreement between New Line and Miramax for the motion picture, "The Hobbit," Evergreen now knows that this statement and representation by the Defendants was blatantly false, and that New Line does, in

fact, grant profit participation within the scope of rights agreements, contrary to what they told the Plaintiffs.  These negotiation tactics were done in bad-faith with the intent to deceive and induce Evergreen into granting New Line certain theatrical motion picture rights without the compensation that Evergreen sought.  In any event, New Line represented to Evergreen that the profit participation provision would be included in the Producer Agreement, and that Evergreen would receive the same profit participation payments regardless because Mr. DeRosa-Grund would be tied as the producer to any and all motion pictures based upon the Case Files.

70.     Thus, Defendants misrepresented that Mr. DeRosa-Grund would be tied as the producer to any motion pictures based on the Case Files and that Evergreen would be entitled to the same profit participation payments.  Now, in addition to refusing to pay Evergreen the additional payments/deferments and contingent compensation that Evergreen is owed under the Agreements, Defendants have refused to engage Mr. DeRosa-Grund as the producer for the subsequent motion pictures based on the Case Files and failed to pay Evergreen the profit participation it is owed under the Agreements.

71.     Over the course of the past several years, Defendants have repeatedly claimed Plaintiffs have breached the Agreements, including, but not limited to: (i) Plaintiffs' allegedly improper trademark registrations; (ii) Plaintiffs' allegedly improper MPAA registrations; (iii) Plaintiffs' allegedly improper deal with Lionsgate to develop a television series under "THE CONJURING" brand name; and (iv) Plaintiffs' allegedly improper deal with Lionsgate to develop a television series with content based upon "The Conjuring" theatrical motion picture. As set forth herein and as will shown at trial, there are no such breaches.

72.     Moreover, recently, in the past several months, Defendants have claimed that Plaintiffs have breached the Agreements by failing to turn over the physical Case Files to

Defendants.   Defendants use this alleged breach as justification for refusing to pay Plaintiffs' profit participation due in connection with "The Conjuring" theatrical motion picture -- such profit participation due to Plaintiffs, by Defendants' own admission, was **$2,277,390** as of March 31, 2014.  First, the Agreements do not require Plaintiffs to provide the physical Case Files to Defendants.  Second, the Agreements do not give Defendants any ownership over the Case Files or right to the Case Files, other than access to the twenty-five (25) Case Files selected by New Line.  Finally, Ms. Warren has admitted, in a declaration filed before this Court on July 17, 2014 (Docket/Document No. 33-1) by Defendants' counsel, that **all** of her files, which include the Case Files, are solely and exclusively within Ms. Warren's possession.

73.     In addition to the foregoing, Defendants have repeatedly and continually made false statements and misrepresentations publicly concerning Plaintiffs, including, but not limited to false statements and misrepresentations: (i) concerning Plaintiffs' rights; (ii) concerning Plaintiffs' character; (iii) concerning Plaintiffs' reputation; and (iv) concerning Plaintiffs' business.  Such statements and misrepresentations have been knowingly false and have injured and damaged Plaintiffs.

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT

### (<u>Against Defendant New Line Productions, Inc.</u>)

74.     Plaintiffs hereby incorporate by reference the factual allegations contained in the preceding paragraphs as if fully set forth herein.

75.     The Agreement, namely, the OQA, as amended by the Amendment, and the Producer Agreement, are valid, binding and enforceable contracts.  Plaintiffs performed all of their obligations under the Agreements, and all conditions for New Line's performance have occurred.

76. By engaging in the above-referenced conduct, including but not limited to: (i) failing to timely select specific files from the Case Files for development and subsequently seeking to change its selection; (ii) filing applications to register the Name with the PTO and the MPAA; (iii) failing to pay Plaintiffs the additional payments/deferments that they are owed under Paragraph 5 of the OQA, the compensation owed to Plaintiffs for exploitation of the Case Files, and the contingent compensation they are owed under Paragraph 5 of the Producer Agreement; (iv) failing to pay Plaintiffs all of the monies owed under the Agreements, e.g., all of the monies due to Plaintiffs for the "Annabelle" sequel theatrical motion picture; (v) failing to provide Plaintiffs with the profit participation payments they are owed under the Agreements; (vi) manufacturing and inventing so-called "breaches" (e.g., knowingly and falsely alleging that Plaintiffs have not turned over the Case Files to Defendants) in order to excuse New Line's failure to pay profit participation payments; (vii) entering into a "direct deal" with Ms. Warren that changes, alters, modifies and/or effects Plaintiffs' rights and/or benefits under the Warren Agreements and the Agreements; and (viii) entering into a "direct deal" with Ms. Warren in order to garner greater rights than those granted to New Line in the Agreements, New Line has breached the Agreements.

77. As a direct and proximate result of New Line's breach, Plaintiffs have been damaged in an amount to be determined at the final hearing in this matter.

### SECOND CAUSE OF ACTION: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Defendant New Line Productions, Inc.)

78. Plaintiffs hereby incorporate by reference the factual allegations contained in the preceding paragraphs as if fully set forth herein.

79.     There is implicit in every contract an implied covenant of good faith and fair dealing.  The Agreements contain an implied covenant of good faith and fair dealing under which the parties must refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of that bargain.

80.     Plaintiffs have duly performed all covenants, conditions and promises required to be performed by them under the Agreements in accordance with the terms and conditions, except for those obligations that have been prevented, delayed, or excused by acts or omissions of New Line.

81.     In particular, Mr. DeRosa-Grund fully performed his producer services in connection with the production of "The Conjuring."  Nevertheless, New Line has engaged in an ongoing pattern and practice of attacking, seeking to intimidate, and threatening to punish Mr. DeRosa-Grund, as well as trying to minimize his pivotal role with "The Conjuring," simply because he has insisted upon enforcing his contractual rights.  For example, in written correspondence to Mr. DeRosa-Grund, New Line threatened to reduce Mr. DeRosa-Grund's contractual credits on "The Conjuring" in direct response to Plaintiffs' attempts to enforce Plaintiffs' rights under the Agreements.  In addition, New Line purposely disseminated public relations stories with fabricated scenarios about the origins of "The Conjuring" that intentionally omitted reference to Mr. DeRosa-Grund, refused Mr. DeRosa-Grund access to screenings of "The Conjuring," reneged on numerous representations including promises for payment of travel expenses, and severed all communications with Mr. DeRosa-Grund, including refusing to provide him with production information.

82.     Although it has been reported, and New Line has publicly confirmed in the press, that, in addition to a sequel to "The Conjuring," New Line has completed production on

"Annabelle" (another motion picture based on the Case Files), and despite Mr. DeRosa-Grund having performed all required producer services and New Line having never terminated Mr. DeRosa-Grund's producer services, New Line has refused to employ Mr. DeRosa-Grund as a producer in connection with the anticipated "The Conjuring 2" sequel to "The Conjuring" or "Annabelle" or to pay Plaintiffs anything for its use of the Case Files or materials provided to New Line or used in the "Annabelle" production.  Instead, New Line has indicated that it will utilize the services of a producer that Mr. DeRosa-Grund brought into the production of "The Conjuring" or will pay Plaintiffs nothing while at the same time using the intellectual property materials provided to New Line by Plaintiffs.  In addition, New Line has failed to provide Mr. DeRosa-Grund with the profit participation payments he is owed under the Agreements.

83.    New Line acquired the rights to develop and produce sequels and remakes to "The Conjuring," as well as other theatrical motion pictures based on the Case Files, under the Agreements.  In addition, New Line agreed to utilize Mr. DeRosa-Grund's producer services in connection with such projects.  New Line has acted arbitrarily and unreasonably in: (i) failing to pay Mr. DeRosa-Grund all compensation he is owed under the Agreements; (ii) failing to provide Mr. DeRosa-Grund with the profit participation payments he is owed under the Agreements; and (iii) refusing to employ Mr. DeRosa-Grund as a producer in connection with the sequel to "The Conjuring," "Annabelle," and any and all other motion pictures based on the Case Files.

84.    Moreover, by engaging in the above-referenced conduct, including but not limited to: (i) failing to timely select specific files from the Case Files for development and subsequently seeking to change its selection; (ii) filing applications to register the Name with the PTO and the MPAA; (iii) failing to pay Plaintiffs the additional payments/deferments that they are owed

under Paragraph 5 of the OQA, the compensation owed to Plaintiffs for exploitation of the Case Files, and the contingent compensation they are owed under Paragraph 5 of the Producer Agreement; (iv) failing to pay Plaintiffs all of the monies owed under the Agreements, e.g., all of the monies due to Plaintiffs for the "Annabelle" sequel theatrical motion picture; (v) entering into a "direct deal" with Ms. Warren that changes, alters, modifies and/or effects Plaintiffs' rights and/or benefits under the Agreements; (vi) failing to provide Plaintiffs with the profit participation payments they are owed under the Agreements; (vii) manufacturing and inventing so-called "breaches" (e.g., knowingly and falsely alleging that Plaintiffs have not turned over the Case Files to Defendants) in order to excuse New Line's failure to pay profit participation payments; and (viii) entering into a "direct deal" with Ms. Warren in order to garner greater rights than those granted to New Line in the Agreements, New Line has breached the implied covenant of good faith and fair dealings.

85.     New Line has acted in bad faith and prevented Plaintiffs from receiving the fruits of the bargain under the Agreements.

86.     Accordingly, by engaging in the above-referenced conduct, New Line has breached the implied covenant of good faith and fair dealing.

87.     As a direct and proximate result of New Line's breach, Plaintiffs have been damaged in an amount to be determined at the final hearing in this matter.

### THIRD CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

### (Against Defendant New Line Productions, Inc.)

88.     Plaintiffs incorporate herein by reference the factual allegations contained in the preceding paragraph as if fully set forth herein.

89.     The Warren Agreements are valid, binding and enforceable.  At all times relevant hereto, New Line was aware of the existence of the Warren Agreements, the contents of the Warren Agreements and the fact that the Warren Agreements are valid, binding and enforceable.

90.     After entering into the OQA, New Line indicated to Plaintiffs that it wanted to enter into a "direct deal" with Lorraine Warren.  At that time, there was no need for New Line to enter into any deal with Lorraine Warren because Plaintiffs solely and exclusively owned all the rights related to the Warren's Life Stories, the Case Files, and Mr. DeRosa-Grund's story and treatment of the "Perron Farmhouse" Case File.  Thus, Plaintiffs did not want New Line to enter into a "direct deal" with Ms. Warren.

91.     Nevertheless, New Line was insistent that it be allowed to enter into the "direct deal".

92.     To convince and induce Plaintiffs to allow New Line to enter into a "direct deal" with Ms. Warren, New Line specifically and expressly represented to Plaintiffs -- specifically, directly to Mr. DeRosa-Grund -- that **none** of Plaintiffs' rights and/or benefits would be changed, altered, modified or otherwise effected by the "direct deal" between New Line and Ms. Warren.  Based on New Line's representation, the parties executed the Amendment to the OQA.

93.     Until very recently, i.e., within the last several weeks, Plaintiffs had never seen the "direct deal" between New Line and Ms. Warren.  Indeed, it has become readily apparent that Defendants and Ms. Warren have conspired over the past several years to keep the "direct deal" hidden from Plaintiffs.  Defendants and Ms. Warren did so because the "direct deal" substantially and materially changes, alters, modifies and substantially effects' Plaintiffs right under the Agreements as well as under the Warren Agreements -- in fact, the "direct deal" purports to take away rights solely and exclusively belonging to Plaintiffs.

-33-

94.     As a direct and proximate result of Defendants' interference with the Warren Agreements Plaintiffs have been damaged in an amount to be determined at the final hearing in this matter.

### FOURTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

### (Against All Defendants)

95.     Plaintiffs hereby incorporate by reference the factual allegations contained in the preceding paragraphs as if fully set forth herein.

96.     At all relevant times, there were in effect valid contracts between Plaintiffs and Lionsgate for the production of a television show entitled "The Conjuring."  Defendants knew of Plaintiffs' contract with Lionsgate and knew that the television show was not based on rights granted exclusively to Defendants, but Defendants nevertheless intentionally interfered with Plaintiffs' contract with Lionsgate and induced Lionsgate to breach its contractual relationship with Plaintiffs.

97.     In particular, Mr. Alexander and Ms. Amar at New Line contacted Lionsgate and advised Lionsgate that its planned use of the Name as a title for a proposed television series would violate New Line's alleged rights.  Moreover, New Line falsely claimed that the proposed television series was based on rights granted exclusively to Defendants.  Lionsgate subsequently informed New Line and Plaintiffs that it would not go forward with the production of the television show because of Defendants' threats.

98.     Accordingly, despite Lionsgate's agreement to purchase rights for the television project from Plaintiffs and employ Plaintiff as Executive Producer for said project, it refused to proceed with its agreement with Plaintiffs and with the development of the television show after

Defendants falsely represented it had rights that precluded Lionsgate from proceeding with a television series.

99.     As a direct and proximate result of Defendants' interference with Plaintiffs' contract with Lionsgate, including falsely representing their rights to Lionsgate, Plaintiffs have been damaged in an amount to be determined at the final hearing in this matter.

## FIFTH CAUSE OF ACTION: FRAUD IN THE INDUCEMENT

### (Against Defendant New Line Productions, Inc.)

100.     Plaintiffs hereby incorporate by reference the factual allegations contained in the preceding paragraphs as if fully set forth herein.

101.     During negotiations for the Agreements, New Line made representations relating to Mr. DeRosa-Grund's producer services in connection with any and all motion pictures based on the Case Files.   In particular, New Line, through Mr. Alexander, represented that Mr. DeRosa-Grund would be tied as the producer to **any** motion picture based on the selected Case Files, including but not limited to any sequels, prequels, spin-offs, or remakes to "The Conjuring." Moreover, Mr. Alexander represented that New Line never included provisions tying any producer to multiple motion pictures in a producer loanout agreement, but that nevertheless, here Mr. DeRosa-Grund would be tied as a producer to **any** motion picture based on the selected Case Files.   In addition, New Line represented that it never included profit participation provisions in a rights agreement, but that Evergreen would be equally entitled to profit participation payments under the Producer Agreement because Mr. DeRosa-Grund would be tied as a producer to any projects based on the Case Files.

102.     New Line, however, never had any intention of utilizing Mr. DeRosa-Grund as a producer in connection with any sequels to "The Conjuring" or other pictures based on the Case

Files.  Indeed, although it has been reported that New Line is developing a sequel to "The Conjuring" and other motion pictures based on the Case Files, New Line has failed to utilize Mr. DeRosa-Grund as a producer in connection with such pictures.  Rather, New Line has contracted with a producer that Mr. DeRosa-Grund brought to New Line in connection with "The Conjuring" to produce the sequel.  Moreover, New Line is stealing the rights to make these projects without paying Plaintiffs for those rights and it is now clear that New Line never had any intention of paying Evergreen the profit participation provided for under the Agreements.

103.    New Line made these false representations with the intent to induce Plaintiffs to rely upon them and, more specifically, to induce Mr. DeRosa-Grund to enter into the Agreements.  All the while, New Line knew that they would not utilize Mr. DeRosa-Grund as a producer in connection with any sequels or other pictures relating to "The Conjuring."

104.    The foregoing conduct and actions of New Line is part of a repeated pattern of behavior and deliberate scheme perpetrated by New Line to unlawfully reap the rewards and profits of successful theatrical motion pictures based on the rights of Plaintiffs and others.  This aforementioned pattern and scheme is clearly evident from an action recently brought by Miramax, LLC, Harvey Weinstein and Robert Weinstein in New York, *Miramax, LLC, et al v. New Line Cinema Corporation* (Index No. 161383/2013; Supreme Court of the State of New York, County of New York), wherein those plaintiffs raise similar disturbing allegations with respect to three filmed installments of J.R.R. Tolkein's "The Hobbit."

105.    Plaintiffs did indeed rely upon New Line's false representations by entering into the Agreements and by providing Mr. DeRosa-Grund's producer services for "The Conjuring," despite the fact that New Line never had any intention of allowing Mr. DeRosa-Grund to provide producer services for any other picture or of paying for those services or the relevant rights.

-36-

Plaintiffs' reliance upon New Line's false representations was justified because New Line represented that it never included provisions tying a producer to sequels or related motion pictures in a producer loanout agreement.  Accordingly, Plaintiffs had no way of knowing that New Line's representations were false.

106.    As a direct and proximate result of New Line's conduct, Plaintiffs have been damaged in an amount to be determined at the final hearing in this matter.  Additionally, as a consequence of New Line's fraud in inducing Plaintiffs to enter into the Agreements, Plaintiffs seek rescission of the Agreements, thus preventing any further exploitation of the Case Files by New Line, including the production of any sequel to "The Conjuring," "Annabelle," or any other motion picture based upon the Case Files.

### SIXTH CAUSE OF ACTION: PROMISSORY ESTOPPEL

### (Against Defendant New Line Productions, Inc.)

107.    Plaintiffs hereby incorporate by reference the factual allegations contained in the preceding paragraphs as if fully set forth herein.

108.    New Line promised that they would tie Mr. DeRosa-Grund to sequels and all other motion pictures related to "The Conjuring," and that they would pay for those rights. Because New Line knew that Mr. DeRosa-Grund would not enter into the Agreements or serve as a producer on "The Conjuring" if he were not tied to any and all other motion pictures based on the Case Files, or if the rights were not paid for, it was reasonable and foreseeable that Plaintiffs would rely on New Line's promises. Indeed, Plaintiffs reasonably relied on New Line's promises by entering into the Agreements and providing the case files and Mr. DeRosa-Grund's producer services in connection with "The Conjuring."

109.    After Plaintiffs performed all of their obligations under the Agreements, including producing "The Conjuring," New Line breached their promise to Plaintiffs by failing to employ Mr. DeRosa-Grund's producer services in connection with the anticipated sequel to "The Conjuring" or other reported motion pictures based on the Case Files.

110.    As a result of Plaintiffs' reasonable reliance on New Line's promise, Plaintiffs suffered injury.  Plaintiffs will suffer injustice unless New Line's promises are enforced.

## SEVENTH CAUSE OF ACTION: CONVERSION

## (Against All Defendants)

111.    Plaintiffs incorporate herein by reference the factual allegations contained in the preceding paragraph as if fully set forth herein.

112.    After releasing "The Conjuring" theatrical motion picture, Plaintiffs are informed and believe that New Line has developed, produced and completed production on a theatrical motion picture currently entitled "Annabelle," based on the "Annabelle" Case File.  It has been reported that production of "Annabelle" began on or about January 27, 2014.

113.    Additionally, Plaintiffs are informed and believe that Defendants intend to produce a theatrical motion picture sequel to "The Conjuring," based upon "The Enfield Poltergeist" Case File.  Specifically, New Line has already publicly announced a release date of October 23, 2015 for the sequel as "The Conjuring 2: Enfield" and on March 27, 2014 registered that title with the MPAA

114.    Plaintiffs are further informed and believe that New Line commissioned Chad and Carey Hayes to write the script for said sequel in or about mid-July of 2013 (but in no event later than "The Conjuring" theatrical motion picture's domestic theatrical release in July of 2013) and

that said script is completed and New Line intends to commence principal photography on said sequel, i.e., "The Conjuring 2: Enfield", by the end of 2014.

115.     After learning that New Line intended to produce "Annabelle", Plaintiffs contacted New Line in or around January 2014 regarding payment to Evergreen of the Purchase Price for the production and development of the "Annabelle" Case File pursuant to the parties' Agreements.  Astonishingly, although New Line admitted that they were producing "Annabelle", New Line refused to pay anything to Plaintiffs in connection with the production of "Annabelle," representing that they were entitled not to pay merely because they made the allegation that "Annabelle" was to be a direct-to-video production.  It was not until June 27, 2014, exactly five (5) months after Defendants commenced production of "Annabelle," that Defendants finally admitted that "Annabelle" will be released as a theatrical motion picture and indicated that Defendants would pay the Purchase Price related thereto.  On July 3, 2014, New Line issued a check in the amount of $750,000 to Plaintiffs allegedly in connection with the production of "Annabelle."  Defendants represented in their cover letter forwarding the $750,000 check that "Annabelle" was a sequel to the original "The Conjuring" theatrical motion picture.  However, Defendants failed to provide all of the monies due to Plaintiffs with respect to the "Annabelle" sequel, e.g., Defendants were required to engage in good faith negotiation for up to a fifteen percent (15%) increase due to the fact that "Annabelle" is -- by Defendants' own admission -- a sequel.

116.     Plaintiffs allege that Defendants never intended to produce "Annabelle" as a direct-to-video production.  One of the most telling facts is that registration reports from the MPAA show that, four days after the premiere of the "The Conjuring" theatrical motion picture, New Line registered the title "Annabelle," namely, on July 23, 2013. This fact casts serious

doubt on New Line's claim that they intended to release "Annabelle" as a direct-to-video production because direct-to-video productions are not registered with the MPAA. The MPAA only registers titles for theatrically released productions.

117.    Moreover, another fact that belies their claims is the fact that Defendants have no right to make a direct-to-video production based on the "Annabelle" Case File under the Agreements as the OQA does not grant Defendants any rights to make direct-to-video productions as to any of the Case Files, let alone to the twenty-five (25) Cases Files selected by New Line pursuant to the Agreements. Indeed, any such action by Defendants would be in violation of the rights which Plaintiff exclusively secured from the Warrens under the Warren Agreements. In other words, any production based upon the "Annabelle" Case File that is not first released as a theatrical motion picture produced pursuant to the Agreements would be a violation of the rights of Plaintiffs under the Warren Agreements -- a fact that is well-known to Defendants.

118.    In a letter from one of Defendants' counsel, Michael J. O'Connor, dated June 27, 2014 (who has submitted declarations previously to this Court), sent on behalf of Defendants, Mr. O'Connor represented that New Line was prepared to pay the Purchase Price for the "Annabelle" theatrical motion picture. Specifically, Mr. O'Connor represented that the payment would be issued "pursuant to Paragraph 5(b)" of the OQA "entitled 'Theatrical Sequels and Remakes'". On July 3, 2014, Kavita Amar, Vice-President of business and Legal Affairs for New Line, sent a check to Plaintiffs for the Purchase Price accompanied by a letter stating: "This check represents the theatrical sequel rights payment for 'Annabelle' as set forth in paragraph 5(c) of the [OQA] in connection with the motion picture entitled 'The Conjuring'." Indeed the "receipt" attached to the check states that the payment is a "SEQUEL RIGHTS PAYMENT."

119.    In addition, Plaintiffs believe and are informed that Defendants are producing a sequel to "The Conjuring", and have already announced a release date for said sequel, but have failed to pay Plaintiffs the Purchase Price for the underlying rights to such a picture.

120.    As a direct and proximate result of Defendants' conversion of the underlying rights to "Annabelle" and the sequel to "The Conjuring", including the "Perron Farmhouse" and "Annabelle" Case Files and the Life Rights of the Warrens, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be determined at trial, but which exceed the minimum jurisdictional amount of this Court.

121.    Defendants' acts alleged above were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## EIGHTH CAUSE OF ACTION: FRAUD

### (<u>Against All Defendants</u>)

122.    Plaintiffs incorporate herein by reference the factual allegations contained in the preceding paragraph as if fully set forth herein.

123.    After releasing The Conjuring" theatrical motion picture, Plaintiffs believe and are informed that New Line has developed, produced and completed production on a theatrical motion picture currently entitled "Annabelle," based on the "Annabelle" Case File.  It has been reported that production of "Annabelle" began on or about January 27, 2014.

124.    After learning that New Line intended to produce "Annabelle", Plaintiffs contacted New Line in or around January 2014 regarding payment to Evergreen of the Purchase Price for the production and development of the "Annabelle" Case File pursuant to the parties' Agreements.  Astonishingly, although New Line admitted that they were producing "Annabelle", New Line refused to pay anything to Plaintiffs in connection with the production of "Annabelle,"

representing that they were entitled not to pay merely because they made the allegation that "Annabelle" was to be a direct-to-video production.

125.    It was not until June 27, 2014, exactly five (5) months after Defendants commenced production of "Annabelle," that Defendants finally admitted that "Annabelle" will be released as a theatrical motion picture and indicated that Defendants would pay the Purchase Price related thereto.  On July 3, 2014, New Line issued a check in the amount of $750,000 to Plaintiffs allegedly in connection with the production of "Annabelle."  Defendants represented in their cover letter forwarding the $750,000 check that "Annabelle" was a sequel to the original "The Conjuring" theatrical motion picture; however, Defendants failed to provide all of the monies due to Plaintiffs with respect to the "Annabelle" sequel, e.g., Defendants were required to engage in good faith negotiation for up to a fifteen percent (15%) increase due to the fact that "Annabelle" is -- by Defendants' own admission -- a sequel.

126.    Plaintiffs allege that Defendants never intended to produce "Annabelle" as a direct-to-video production.  One of the most telling facts is that registration reports from the MPAA show that, four days after the premiere of the "The Conjuring" theatrical motion picture, New Line registered the title "Annabelle," namely, on July 23, 2013. This fact casts serious doubt on New Line's claim that they intended to release "Annabelle" as a direct-to-video production because direct-to-video productions are not registered with the MPAA.  The MPAA only registers titles for theatrically released productions.

127.    Moreover, another fact that belies their claims is the fact that Defendants have no right to make a direct-to-video production based on the "Annabelle" Case File under the Agreements as the OQA does not grant Defendants any rights to make direct-to-video productions as to any of the Case Files, let alone to the twenty-five (25) Cases Files selected by

New Line pursuant to the Agreements.  Indeed, any such action by Defendants would be in violation of the rights which Plaintiff exclusively secured from the Warrens under the Warren Agreements.  In other words, any production based upon the "Annabelle" Case File that is not first released as a theatrical motion picture produced pursuant to the Agreements would be a violation of the rights of Plaintiffs under the Warren Agreements -- a fact that is well-known to Defendants.

128.   In a letter from one of Defendants' counsel, Michael J. O'Connor, dated June 27, 2014 (who has submitted declarations previously to this Court), sent on behalf of Defendants, Mr. O'Connor represented that New Line was prepared to pay the Purchase Price for the "Annabelle" theatrical motion picture.  Specifically, Mr. O'Connor represented that the payment would be issued "pursuant to Paragraph 5(b)" of the OQA "entitled 'Theatrical Sequels and Remakes'".  On July 3, 2014, Kavita Amar, Vice-President of business and Legal Affairs for New Line, sent a check to Plaintiffs for the Purchase Price accompanied by a letter stating: "This check represents the theatrical sequel rights payment for 'Annabelle' as set forth in paragraph 5(c) of the [OQA] in connection with the motion picture entitled 'The Conjuring'."  Indeed the "receipt" attached to the check states that the payment is a "SEQUEL RIGHTS PAYMENT."

129.   In view of the foregoing, Defendants fraudulently misrepresented to Plaintiffs that "Annabelle" was not a theatrical motion picture and deprived Plaintiffs of the Purchase Price under the Agreements for over a year.

130.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at the final hearing in this matter.

## NINTH CAUSE OF ACTION: DECLARATORY JUDGMENT

### (Against All Defendants)

131.    Plaintiffs hereby incorporate by reference the factual allegations contained in the preceding paragraphs as if fully set forth herein.

132.    An actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties, in that: (A) Plaintiffs contend that: (i) Plaintiffs have the right, title, or interest to the use of the Name, including without limitation, as the title of a television series; (ii) Plaintiffs have trademark rights in the Name for use in connection with exploitation of the materials and Case Files reserved by Plaintiffs and Plaintiffs have the right to file trademark applications with the PTO for the Name; and (iii) Plaintiffs have the right to file applications with the MPAA for the "The Conjuring," "The Conjuring 2-6," and "The Conjuring Part II-VI" as movie titles; (B) Defendants have failed to pay Plaintiffs all compensation and payments due under the Agreements, including the Purchase Price; (C) Defendants have no right to develop and produce projects based on the Case Files, including, but not limited to, any sequel to "The Conjuring" and "Annabelle;" (D) the provisions related to arbitration, governing law/disputes and remedies in the Agreements are adhesive, illusory, lack mutuality, unconscionable and/or otherwise unenforceable and/or were procured by fraud and deceit; (E) the Amendment is null, void, invalid and unenforceable due to lack of consideration; (F)  pursuant to Paragraph 13 of the OQA, the Agreements are terminated, including any arbitration provisions are terminated, and all rights revert back to Plaintiffs; (G) to the extent that Defendants do develop and produce any other pictures based on the Case Files, Plaintiffs have the right to provide their producer services in connection with such pictures and receive all compensation and credits as negotiated under the Agreements; and (H) the "direct deal" between

New Line and Ms. Warren is null, void, invalid and/or unenforceable.  Plaintiffs contend that Defendants dispute these contentions and contend otherwise.

133.     Accordingly, pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaratory judgment that: (i) Plaintiffs have the right, title, or interest to the use of the Name, including without limitation, as the title of a television series; (ii) Plaintiffs have trademark rights in the Name for use in connection with exploitation of the materials and case files reserved by Plaintiffs, and have the right to file applications with the PTO for the Name; (iii) Plaintiffs have the right to file applications with the MPAA for the "The Conjuring," "The Conjuring 2-6," and "The Conjuring Part II-VI" as movie titles; (iv) Defendants have failed to pay Plaintiffs all compensation and payments due under the Agreements, including the Purchase Price; (v) Defendants have no right to develop and produce projects based on the Case Files, including, but not limited to, any sequel to "The Conjuring" and "Annabelle;" (vi) the provisions related to arbitration, governing law/disputes and remedies in the Agreements are adhesive, illusory, lack mutuality, unconscionable and/or otherwise unenforceable and/or were procured by fraud and deceit; (vii) the Amendment is null, void, invalid and unenforceable due to lack of consideration; (viii) pursuant to Paragraph 13 of the OQA, the Agreements are terminated, including any arbitration provisions are terminated, and all rights revert back to Plaintiffs; (ix) to the extent that Defendants do develop and produce any other pictures based on the Case Files, Plaintiffs have the right to provide their producer services in connection with such pictures and receive all compensation and credits as negotiated under the Agreements; and (x) the "direct deal" between New Line and Ms. Warren is null, void, invalid and/or unenforceable.  Plaintiffs contend that Defendants dispute these contentions and contend otherwise.

### TENTH CAUSE OF ACTION: VIOLATION OF SECTION 43(a)
### OF THE LANHAM ACT

#### (Against All Defendants)

134.    Plaintiffs hereby incorporate by reference the factual allegations contained in the preceding paragraphs as if fully set forth herein.

135.    At the time the parties entered into the OQA, Defendants were aware that Mr. DeRosa-Grund had written the original story and treatment that ultimately became the basis for the "The Conjuring" screenplay and motion picture production.  Defendants, a signatory to the Writers Guild of America ("WGA"), had a proactive obligation to submit Mr. DeRosa-Grund's aforementioned story and treatment to the WGA for the purposes of a "Story by" credit and associated separated rights, which would require the Defendants to accord Mr. DeRosa-Grund additional contingent compensation for same.  Not only did Defendants refuse to submit Mr. DeRosa-Grund's story and treatment to the WGA, in conjunction with the release of "The Conjuring," Defendants engaged in an intentional, willful, and deliberate campaign in the media and press designed to purposefully hide and obscure the source of origin of the "The Conjuring," namely, to hide from consumers and the public that the original story and treatment of "The Conjuring," as well as the Name, had been created, developed and owned by Mr. DeRosa-Grund.

136.    Moreover, Defendants have publicly made false statements concerning Plaintiffs' connection to "The Conjuring" theatrical motion picture in a deliberate attempt to convey to consumers the false impression that Plaintiffs have nothing to do with "The Conjuring" theatrical motion picture, e.g., falsely conveying that Plaintiffs did not bring "The Conjuring" theatrical motion picture to director James Wan, among other things.

137.    Plaintiffs were contractually entitled to credit in connection with "The Conjuring" and all productions created based upon the Case Files.  Defendants have willfully failed to afford

Plaintiffs such credit.  By failing to afford Plaintiffs such credit, they are engaging in revisionist history and fictionalizing how the franchise came about and who put the project in front of director James Wan.

138.    By reason of the foregoing, Defendants have violated and continue to violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  As a result of Defendants' foregoing unlawful conduct set forth herein, Plaintiffs have suffered damages, as well as the continuing loss of the goodwill and value of the Name, Plaintiffs themselves as a writer and producer, and of Plaintiffs' rights in general.  The continuing loss of goodwill cannot properly be calculated and thus constitutes irreparable harm and an injury for which Plaintiffs have no adequate remedy at law.  Plaintiffs will continue to suffer irreparable harm unless this Court enjoins Defendants' conduct.

139.    Defendants' unauthorized and unlawful conduct has also deprived and will continue to deprive Plaintiffs of the ability to control the consumer perception of its rights in connection with the Case Files and the Name.

140.    Defendants had direct and full knowledge of Plaintiffs' rights as set forth above and before the acts complained of herein.  The knowing, intentional and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

### ELEVENTH CAUSE OF ACTION: DEFAMATION

### (<u>Against All Defendants</u>)

141.    Plaintiffs incorporate herein by reference the factual allegations contained in the preceding paragraph as if fully set forth herein.

142.    Defendants have negligently or maliciously published false, defamatory statements concerning Mr. DeRosa-Grund, including, but not limited to statements: (i)

concerning Mr. DeRosa-Grund's rights; (ii) concerning Mr. DeRosa-Grund's character; (iii) concerning Mr. DeRosa-Grund's reputation; and (iv) concerning Mr. DeRosa-Grund's business.

143.    Mr. DeRosa-Grund has suffered substantial injury as a result of Defendants' defamatory statements, including, but not limited to, injury to character and reputation, mental anguish, loss of past and future income and loss of earning capacity.

144.    Defendants' conduct, when viewed from the standpoint of the actors at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Furthermore, Defendants' conduct illustrates not only an attitude of conscious indifference for the rights, safety and welfare of others, but also shows Defendants' actual and subjective awareness of the dangers of such conduct.   Nevertheless, Defendants proceeded with a conscious indifference to the rights, safety or welfare of others, including Mr. DeRosa-Grund.  Therefore, Defendants are liable for exemplary/punitive damages.

### TWELFTH CAUSE OF ACTION: BUSINESS DISPARAGEMENT

### (Against All Defendants)

145.    Plaintiffs incorporate herein by reference the factual allegations contained in the preceding paragraph as if fully set forth herein.

146.    Defendants published disparaging statements about Evergreen, and those statements were false.   Defendants published those statements with malice and without privilege.

147.    Defendants' tortious conduct caused Evergreen to suffer actual damages and special damages.

148.    Defendants' conduct, when viewed from the standpoint of the actors at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of

the potential harm to others.  Furthermore, Defendants' conduct illustrates not only an attitude of conscious indifference for the rights, safety and welfare of others, but also shows Defendants' actual and subjective awareness of the dangers of such conduct.  Nevertheless, Defendants proceeded with a conscious indifference to the rights, safety or welfare of others, including Evergreen.  Therefore, Defendants are liable for exemplary/punitive damages.

### Relief

WHEREFORE, Plaintiffs, EVERGREEN MEDIA HOLDINGS, LLC and TONY DEROSA-GRUND, request that this Court grant the following relief, jointly and severally, against Defendants, NEW LINE PRODUCTIONS, INC. and WARNER BROS. ENTERTAINMENT, INC.:

a.     Entering a declaratory judgment that: (i) Plaintiffs have the right, title, or interest to the use of the Name, including without limitation, as the title of a television series; (ii) Plaintiffs have trademark rights in the Name for use in connection with exploitation of the materials and Case Files reserved by Plaintiffs, and have the right to file applications with the US PTO for the Name; (iii) Plaintiffs have the right to file applications with the MPAA for the "The Conjuring," "The Conjuring 2-6," and "The Conjuring Part II-IV" as movie titles; (iv) Defendants have failed to pay Plaintiffs all compensation and payments due under the Agreements, including the requisite Purchase Price for "Annabelle"; (v) Defendants have no right to develop and produce projects based on the Case Files, including, but not limited to, any sequel to "The Conjuring" and "Annabelle;" (vi) the provisions related to arbitration, governing law/disputes and remedies in the Agreements are adhesive, illusory, lack mutuality, unconscionable and/or otherwise unenforceable and/or were procured by fraud and deceit; (vii) the Amendment is null, void, invalid and unenforceable due to lack of consideration; (viii) pursuant to Paragraph 13 of the OQA, the Agreements are terminated, including any arbitration

provisions are terminated, and all rights revert back to Plaintiffs; (ix) to the extent that Defendants do develop and produce any other pictures based on the Case Files, Plaintiffs have the right to provide their producer services in connection with such pictures and receive all compensation and credits as negotiated under the Agreements; and (x) the "direct deal" between New Line and Ms. Warren is null, void, invalid and/or unenforceable.  Plaintiffs contend that Defendants dispute these contentions and contend otherwise.

        b.        Awarding Plaintiffs all damages suffered by Plaintiffs;

        c.        Awarding Plaintiffs recovery of punitive damages in an amount to be set by the trier of fact, including interest at the maximum rate allowed by law;

        d.        Awarding an accounting to Plaintiffs for the gains and profits of Defendants and all damages sustained by Plaintiffs by reason of Defendants' unlawful acts as alleged herein pursuant to 15 U.S.C. § 1117(a);

        e.        Awarding Plaintiffs damages under 15 U.S.C. § 1117, together with Defendants' profits and revenue, and such other damages as the Court determines to be fair and appropriate, as well as Plaintiffs' costs of the action and reasonable attorneys fees;

        f.        Awarding Plaintiffs treble damages as allowed by law;

        g.        Awarding Mr. DeRosa-Grund damages for the loss of reputation and character he has suffered in the past and will continue to suffer in the future as a result of Defendants' defamatory statements;

        h.        Awarding Mr. DeRosa-Grund damages for the mental anguish he has suffered in the past and will continue to suffer in the future as a result of Defendants' defamatory statements;

i.      Awarding Mr. DeRosa-Grund damages for the loss of any earnings sustained by him in the past, and the loss or reduction of his earning capacity in the future as a result of Defendants' defamatory statements;

j.      Awarding Evergreen damages for Defendants' business disparagement;

k.      Awarding Plaintiffs' exemplary/punitive damages to the extent permitted by law;

l.      Awarding pre-judgment and post-judgment interest as allowed by law;

m.      Enjoining and restraining Defendants from proceeding with development, production, release and exploitation of the motion picture currently entitled "Annabelle," based on the "Annabelle" Case File and the Life Rights of the Warrens, and/or any other production based upon the Case Files and/or the life rights of the Warrens;

n.      Awarding Plaintiffs any other remedy to which it may be entitled to as provided under applicable federal or state law; and

o.      Awarding Plaintiffs such other and further relief as the Court might deem proper.

## **Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all triable issues.


Dated: July 25, 2014                    Respectfully submitted,

By:___/s/ Sanford L. Dow_____
        Sanford L. Dow
        S.D. Texas No. 17162
        Texas Bar No. 00787392
        Nine Greenway Plaza, Suite 500
        Houston, Texas 77046
        (713) 526-3700/FAX (713) 526-3750
        dow@dowgolub.com

ATTORNEY-IN-CHARGE FOR PLAINTIFFS

-51-

OF COUNSEL:
DOW GOLUB REMELS & BEVERLY, LLP
Stephanie A. Hamm
S.D. Texas No. 108779
Texas Bar No. 24069841
Nine Greenway Plaza, Suite 500
Houston, Texas 77046
(713) 526-3700/FAX (713) 526-3750
sahamm@dowgolub.com

GRIMES LLC
Charles W. Grimes - Connecticut Juris No. 304368
(admitted pro hac vice to S.D. Texas)
grimes@gandb.com
Michael R. Patrick - Connecticut Juris. No. 423632
(admitted pro hac vice to S.D. Texas)
patrick@gandb.com
488 Main Avenue
Norwalk, Connecticut 06851
Tel: (203) 849-8300/FAX: (203) 849-9300

## <u>CERTIFICATE OF SERVICE</u>

On July 25, 2014, I electronically submitted the foregoing document with the Clerk of the Court of the United States District Court for the Southern District of Texas using the electronic case filing system of the Court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically using the CM/ECF filing system or by any other manner authorized by Federal Rule of Civil Procedures 5(b)(2).

By:   /s/ Stephanie A. Hamm
        Stephanie A. Hamm