**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-0793 |
| | § | |
| WARNER BROTHERS | § | |
| ENTERTAINMENT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION GRANTING DEFENDANTS' MOTION TO DISMISS**
**IN FAVOR OF ARBITRATION**

The facts of this case read like a Hollywood movie script, and for good reason. The parties dispute who has the rights for a horror movie franchise. Acting through Evergreen Media Holdings, LLC, Tony DeRosa-Grund[1] bought the exclusive "life rights" of two paranormal investigators and wrote a screenplay drawn from one of their case files. After emerging from bankruptcy with his rights to the screenplay intact, DeRosa-Grund negotiated to sell New Line Productions (New Line) the rights to the screenplay and to the life rights. The negotiations resulted in a Quitclaim Agreement to sell DeRosa-Grund's rights to both and a Producer Agreement entitling him to production credit on certain future productions based on them. The Agreements contained clauses requiring the parties to arbitrate any disputes "arising out of or related to" them under the JAMS Arbitration Rules and Procedures. The Agreements required the parties to arbitrate whether the arbitration clauses required the parties to arbitrate their disputes. The Agreements also included forum-selection clauses requiring the parties to litigate any nonarbitrable disputes in Los Angeles County.

---

[1] Evergreen and DeRosa-Grund are often referred to as "DeRosa-Grund."

DeRosa-Grund's screenplay became the basis for "The Conjuring," a New Line and Warner Brothers Entertainment movie that grossed over $300 million worldwide. The relationship between DeRosa-Grund and New Line deteriorated. In 2013, New Line and Warner Bros. initiated arbitration proceedings against DeRosa-Grund, asserting breach of contract and interference with their trademark and intellectual property rights. DeRosa-Grund answered the arbitration complaint and asserted counterclaims for breach of contract.

After obtaining a postponement of the arbitration hearing on health-related grounds, DeRosa-Grund sued New Line and Warner Bros. in the federal district court for the Southern District of Texas, asserting similar breach-of-contract claims and adding several other allegations. New Line and Warner Bros. have moved to stay DeRosa-Grund's lawsuit under the Federal Arbitration Act (FAA) or to dismiss it under Federal Rule of Civil Procedure 12(b)(3), arguing that the disputes must be resolved in arbitration, not federal court. (Docket Entry No. 8). New Line and Warner Bros. moved in the alternative to transfer any nonarbitrable claims to the Central District of California under 28 U.S.C. § 1404(a) and the forum-selection clauses in the parties' Agreements. The court heard oral argument on the motions.

Based on the pleadings, the motion, the briefs, the record, the arguments of counsel, and the applicable law, the court grants DeRosa-Grund's unopposed motion to amend his complaint, (Docket Entry No. 41), grants the defendants' motion to dismiss in order to permit the parties to arbitrate, (Docket Entry No. 8), and denies the remaining motions, (Docket Entry Nos. 32, 33, 34, 35, 36, 40), as moot. The reasons for these rulings are stated in detail below.

## I. Background

### A. Facts

In the 1990s, DeRosa-Grund became friends with paranormal investigators Ed and Lorraine Warren. (Docket Entry No. 15-1). The Warrens had over 8,000 case files and told DeRosa-Grund about many of their experiences. DeRosa-Grund decided to write a screenplay based on what he learned. In 2009, after working on the project for over 14 years, DeRosa-Grund bought the exclusive rights to the Warrens' "life rights" and their case files. DeRosa-Grund then pitched his screenplay to several motion-picture production companies. A tentative agreement ended over concerns about whether DeRosa-Grund's bankruptcy would cloud his title to the life rights. Despite these concerns, New Line was interested in the screenplay. New Line and DeRosa-Grund negotiated and drew up a "Deal Memo" outlining a possible agreement. Further negotiations led to two contracts.

In one contract, the Quitclaim Agreement, New Line bought all of DeRosa-Grund's rights, title, and interest in literary properties including the motion-picture screenplay for "The Conjuring," the "life rights" of Ed and Lorraine Warren, and the Warrens' case-file library. (Docket Entry No. Compl. ¶ 20). The Quitclaim Agreement stated that DeRosa-Grund:

> hereby sells, grants, conveys and assigns to New Line exclusively . . . all right, title and interest in the Property (all of the foregoing being collectively referred to as the "Rights") in and to the Property . . . . With respect to works produced pursuant to the Rights, all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Property now or hereafter recognized . . . and the right to secure copyright and trademark registration and protection thereof . . . in New Line's own name . . . .

(Docket Entry No. 8-2 at 11 ¶ 7).

DeRosa-Grund acknowledges that the parties negotiated the Quitclaim Agreement, but argues that New Line unilaterally imposed the arbitration clause. This clause stated:

> 21. GOVERNING LAW/DISPUTE RESOLUTION: All controversies, claims or disputes between the parties to this Quitclaim

Agreement arising out of or related to this Quitclaim Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, and **the determination of the scope or applicability of this agreement to arbitrate** ("Dispute"), except as set forth in Paragraphs 21(b), (c) and (d) below, shall be resolved according to the procedures set forth in **Paragraph 21(a)** below which shall constitute the **sole dispute resolution mechanism** hereunder:

(a) Arbitration: **All Disputes shall be submitted to final and binding arbitration**. The arbitration **shall be initiated and conducted according to** either the **JAMS Streamlined** (for claims under $250,000) or the **JAMS Comprehensive** (for claims over $250,000) **Arbitration Rules and Procedures**, except as modified herein, including the Optional Appeal Procedure, at the Los Angeles office of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules"). The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator appointed in accordance with the Arbitration Rules. The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute. The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages. The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award. Unless the parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry. Judgment upon the award may be entered in any court of competent jurisdiction. The parties shall be responsible for payment of their own attorneys' fees in connection with any proceedings under this Paragraph 21(a).

(b) Injunctive Relief: Notwithstanding the foregoing, either party shall be entitled to seek injunctive relief (unless otherwise precluded by any other provision of this Quitclaim Agreement) in the state and federal courts of Los Angeles County.

(c) Other Matters: Any Dispute or part thereof, or any claim for a particular form of relief (not otherwise precluded by any

4

other provision of this Quitclaim Agreement), that may not be arbitrated pursuant to applicable law may be heard only in a court of competent jurisdiction in Los Angeles County.

. . . .

(Docket Entry No. 8-2 at 19-20 ¶ 21) (emphasis added).[2]

The parties' other contract was the "Producer Loanout Agreement." New Line agreed to pay DeRosa-Grund for serving as a producer on "The Conjuring" motion picture. The Producer Agreement contained an arbitration clause similar to that in the Quitclaim Agreement, stating:

> 25. GOVERNING LAW/DISPUTE RESOLUTION: The laws of the State of California applicable to contracts signed and to be fully performed within the State of California shall apply to this Agreement. **Any and all controversies, claims or disputes arising out of or related to this Agreement or the interpretation, performance or breach thereof**, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, ("Dispute"), except as set forth in subparagraphs 25(b) and 25(c) below, **shall be resolved according to the procedures set forth in subparagraph 25(a)** below, which **shall constitute the sole dispute resolution mechanism** hereunder:

>> (a)  Arbitration: In the event that the Parties are unable to resolve any Dispute informally, then **such Dispute shall be submitted to final and binding arbitration**. The arbitration shall be **initiated and conducted according** to either the Streamlined (for claims under $250,000) or the Comprehensive (for claims over $250,000) **Arbitration Rules and Procedures**, except as modified herein, including the Optional Appeal Procedure, **of the Los Angeles office of JAMS, or its successor ("JAMS")** in effect at the time the request for arbitration is made (the "Arbitration Rules"). The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator appointed in accordance with the Arbitration Rules. The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute. There shall be no award of punitive damages. The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and

---

[2] The parties amended the Quitclaim Agreement to allow New Line to pursue a "direct deal" with Ms. Warren, (Docket Entry No. 15-1 ¶ 45), but this provision remained unchanged.

admissible in any judicial proceeding to enforce or vacate the award. Unless the Parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be retired judges or justices of any California state or federal court with substantial experience in matters involving the entertainment industry. If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other part .), may enforce the final award in any court of competent jurisdiction in Los Angeles County. The party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.

(b) <u>Injunctive Relief</u>: Notwithstanding the foregoing, either party shall be entitled to seek injunctive relief (unless otherwise precluded by any other provision of this Agreement) in the state and federal courts of Los Angeles County.

(c) <u>Other Matters</u>: Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a court of competent jurisdiction in Los Angeles County.

. . . .

(Docket Entry No. 8-3 at 19-20).

In 2013, New Line released "The Conjuring," which grossed over $300 million worldwide. New Line refused to pay DeRosa-Grund's profit and distribution fees because it believed he had breached the Agreements by: (1) filing federal trademark applications for "The Conjuring" for various media; (2) registering with the Motion Picture Association of America (MPAA) the titles "The Conjuring 2-6" or "The Conjuring Part II-Part VI"; and (3) purporting to enter an agreement with Lionsgate Entertainment the rights to "The Conjuring" for a television show. (Docket Entry No. 8-4).

## B. History

### 1. The Arbitration Proceedings

In June 2013, New Line and Warner Bros. initiated arbitration against DeRosa-Grund, claiming that he had breached the Agreements and violated their intellectual property rights by: (1) filing federal trademark applications for "The Conjuring" for motion pictures, television series, graphic novels, video game software, clothing, and board games; (2) registering with the MPAA the titles "The Conjuring 2-6" or "The Conjuring Part II-Part VI"; and (3) purporting to enter an agreement with Lionsgate Entertainment to produce and distribute a television show called "The Conjuring" without honoring New Line's contract rights of first negotiation or last refusal. (Docket Entry No. 8-4 at 4).

In December 2013, DeRosa-Grund filed a second amended response in the arbitration and asserted counterclaims that New Line: (1) breached the Quitclaim and Producer Agreements; (2) breached the implied covenant of good faith and fair dealing; (3) interfered, along with Warner Bros., with DeRosa-Grund's economic relations with Lionsgate; (4) fraudulently induced DeRosa-Grund into signing the Quitclaim Agreement and Purchaser Agreement; and (4) was liable under a promissory estoppel claim. (Docket Entry No. 8-10 at 11-15). The arbitrator denied DeRosa-Grund's request for interim relief. (Docket Entry No. 8-11). In January 2014, just before DeRosa-Grund's scheduled deposition in the arbitration and five weeks before the scheduled arbitration hearing, DeRosa-Grund sought and obtained a postponement on the basis of his medical condition. Over the next few months, New Line sent deposition demands to DeRosa-Grund, but he did not respond.

### 2. The Litigation

In March 2014, DeRosa-Grund filed two suits in the Federal District Court for the Southern District of Texas against New Line, Warner Bros. and others, asserting claims including breach of contract, tortious interference, fraud, and conversion. (Docket Entry No. 1). This court granted the defendants' motion to consolidate the two cases. (Docket Entry Nos. 14, 21). The defendants moved to stay or dismiss the lawsuits based on the arbitration clauses and moved in the alternative to transfer any nonarbitrable claims to the Central District of California based on the forum-selection clauses. (Docket Entry No. 8). DeRosa-Grund contends in opposition that the Agreements' arbitration clauses are unconscionable and fraudulent, making them unenforceable; that some of his claims are outside the scope of the clauses; and that transferring the case to California would cause him substantial hardship. (Docket Entry No. 15).

The court heard argument on the motion, ordered the defendants to file a reply, and granted DeRosa-Grund's motion to file a surreply. (Docket Entry Nos. 23, 24, 27, 28, 30). On July 25, 2014, DeRosa-Grund voluntarily dismissed one of the two cases, the "junior" case, without prejudice. (Docket Entry No. 39).

Although several motions were filed, only two remain. The first is DeRosa-Grand's motion to amend his complaint to include statements the defendants made during the litigation and to incorporate allegations from the complaint in the voluntarily dismissed "junior" case. This motion is unopposed and is granted. (Docket Entry Nos. 40, 41, 42). *See* Fed. R. Civ. P. 15(a)(2) ("[A] party may amend its pleading only with the opposing party's written consent or the court's leave," which should be given "freely . . . when justice so requires").

The second motion, the defendants' motion to dismiss, stay, or transfer the case, (Docket Entry No. 8), is analyzed below.

## III. Discussion

Section 3 of the Federal Arbitration Act (FAA) requires federal courts, on a party's motion, to stay litigation of claims subject to arbitration. 9 U.S.C. § 3. A motion to stay or dismiss under § 3 in favor of arbitration requires a court to decide "whether there is a valid agreement to arbitrate between the parties," and "whether the dispute in question falls within the scope of that arbitration agreement." *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006) (citation omitted); *see also Sharpe v. AmeriPlan Corp.*, No. 13-10922, — F.3d —, 2014 WL 5293707, at *3 (5th Cir. Oct. 16, 2014) (same).

The "first step of the analysis—the validity of an agreement—is governed by state law contract principles." *Sharpe*, 2014 WL 5293707, at *3. "Only at the second step of the analysis—determining the scope of the arbitration agreement—do courts apply the federal policy favoring arbitration and resolve ambiguities in favor of arbitration." *Id.* "Once the court finds that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims nonarbitrable." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (quotation omitted). The parties may delegate these "gateway" determinations to the arbitrator to decide. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (internal citations omitted).

### A. Who Decides the Enforceability of the Parties' Agreements to Arbitrate, Including the Agreement to Delegate that Decision to the Arbitrator?

"[A]s a matter of federal law, arbitration agreements and clauses are to be enforced *unless* they are invalid under principles of state law that govern all contracts." *Iberia Credit Bureau, Inc.*

*v. Cingular Wireless LLC*, 379 F.3d 159, 166 (5th Cir.2004) (emphasis in original) (interpreting 9 U.S.C. § 2). Contract defenses, including fraud, duress, unconscionability, or waiver, may invalidate arbitration agreements. *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *see also Miller Brewing Co. v. Fort Worth Distrib. Co., Inc.*, 781 F.2d 494, 497 (5th Cir. 1986) ("'The right to arbitration, like any other contractual right, can be waived.'") (quoting *Cornell & Co. v. Barber & Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966) (per curiam))). Applying these defenses to invalidate arbitration clauses contravenes § 2 of the FAA if the defenses "apply only to arbitration or [ ] derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011); *see also Marmet Health Care*, 132 S.Ct. at 1203–04.

The parties initially dispute whether the Agreements require an arbitrator or the court to determine the enforceability of the arbitration provisions. DeRosa-Grund argues that this court, not an arbitrator, must determine whether the arbitration provisions are unconscionable. The defendants argue that the Agreements delegate this issue to the arbitrator to decide.

1.      **The Applicable Legal Standards**

A series of Supreme Court decisions addresses which gateway challenges to arbitration are for arbitrators to decide and which are for a court. A challenge to the validity (rather than the existence) of the parties' contract as a whole, as opposed to a challenge to the arbitration clause contained in the contract, is for the arbitrator to decide. *See Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 406 (1967) (the arbitrator, not the court, is to decide a claim that the agreement was fraudulently induced); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440,

445–46 (2006) (a challenge to an agreement containing an arbitration clause, as opposed to a challenge to the arbitration clause itself, is for the arbitrator to decide).

When, as here, the arbitration clause itself is challenged as invalid, but the clause delegates at least some issues of arbitrability to the arbitrator to decide, the court must decide whether the parties' contract delegated that issue to the arbitrator. In *Rent–A–Center, West, Inc. v. Jackson*, 130 S. Ct. 2772 (2010), the plaintiff challenged an arbitration agreement as unconscionable because he had been required to sign it as a condition of his employment. The parties' agreement also contained a delegation clause stating that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable." *Id.* at 2775. The Court looked to its precedents holding that "'[t]he question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter. Did the parties agree to submit the arbitrability question itself to arbitration?" *First Options*, 514 U.S. at 943 (emphasis in original) (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)). The precedents emphasized that a judge "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options*, 514 U.S. at 944 (alterations in original) (quoting *AT&T Techs.*, 475 U.S. at 649). In *Rent-A-Center*, the Court distinguished between a challenge to the agreement containing the arbitration clause, and a challenge to the delegation clause. *Rent–A–Center*, 130 S. Ct. at 2778–79. Because the plaintiff "challenged only the validity of the contract as a whole" (rather than the validity of the delegation clause) and the delegation clause "clearly and unmistakably" gave the arbitrator exclusive authority to decide the enforceability

of the arbitration agreement, the Court held that the plaintiff's unconscionability challenge had to be arbitrated. *Id.* at 2775, 2779; *see also Wootten v. Fisher Invs., Inc.*, 688 F.3d 487, 493–94 (8th Cir. 2012); *In re Checking Account Overdraft Litig. MDL No. 2036*, 674 F.3d 1252, 1256–57 (11th Cir. 2012).

In the present case, however, the delegation clauses specify that the arbitrator will decide questions of the "scope or applicability of this agreement to arbitrate," but do not specify that the arbitrator will decide questions of enforceability. If "a party specifically challenges arbitration provisions as unconscionable and hence invalid, whether the arbitration provisions are unconscionable is an issue for the court to determine, applying the relevant state contract law principles." *Appelbaum v. AutoNation Inc.*, 2014 WL 1396585, at *2 (C.D. Cal. Apr. 8, 2014) (quoting *Jackson v. Rent–A–Center West, Inc.*, 581 F.3d 912, 91819 (9th Cir. 2009), *rev'd on other grounds*, 561 U.S. 63 (2010)).

In this case, if the arbitrator is to decide whether the arbitration clauses, including the delegation clauses, are unconscionable, the litigation will be stayed to permit that to occur. If the court decides the issue, it must do so applying relevant state contract-law principles, which in this case are based on California state law.

Under California law,[3] an arbitration agreement, like other contract clauses, is unenforceable if it is both procedurally and substantively unconscionable. *Davis v. O'Melveny & Myers*, 485 F.3d

---

[3] DeRosa-Grund relies on California cases in making this argument. (*See, e.g.*, Docket Entry No. 15 at 18). Elsewhere DeRosa-Grund refuses to concede that California law applies. (*Id.* at 15 n.16). Because he argues under California's unconscionability standard and the arbitration provisions specify that California law governs disputes regarding the agreements, the court applies California law. (Docket Entry No. 8-2 at 20 ¶ 21); (Docket Entry No. 8-3 at 19 ¶ 25); *see also Alkek v. Williams, Ltd. v. Tuckerbrook Alt. Invests.*, 419 F. App'x 492, 495 (5th Cir. 2011) (Texas choice-of-law principles give effect to valid contractual choice-of-law provisions).

1066, 1072 (9th Cir. 2007), *overruled on other grounds by Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 933 (9th Cir. 2013).  Although both procedural and substantive unconscionability must be shown for a contract to be declared unenforceable, they need not be present to the same degree.  *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 422 (2003).

Procedural unconscionability "focus[es] on 'oppression' or 'surprise' due to unequal bargaining power[.]"  *Concepcion*, 131 S. Ct. at 1746 (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (2000)).  "Oppression results from unequal bargaining power, when a contracting party has no meaningful choice but to accept contract terms.  Unfair surprise results from misleading bargaining conduct or other circumstances indicating that party's consent was not an informed choice."  *Dotson v. Amgen, Inc.*, 104 Cal. Rptr. 3d 341, 346 (Ct. App. 2010).

Substantive unconscionability focuses "on 'overly harsh' or 'one-sided' results."  *Concepcion*, 131 S. Ct. at 1746 (quoting *Armendariz*, 6 P.3d at 690).  The inquiry is on "the fairness of the term in dispute."  *Pokorny*, 601 F.3d at 997 (quoting *Szetela v. Discover Bank*, 118 Cal. Rptr. 2d 862, 867 (Ct. App. 2002), *abrogated in part by Concepcion*, 131 S. Ct. 1740)).  If the disputed term "is one-sided and will have an overly harsh effect on the disadvantaged party[,]" substantive unconscionability is present.  *Id.* (citing *Harper*, 7 Cal. Rptr. 3d at 423).

## 2.    Analysis of the Unconscionability Challenges

As noted above, if the arbitrator decides whether the arbitration clauses, including the delegation clauses, are unconscionable and therefore unenforceable, the result is to stay this litigation in favor of the arbitration.  As discussed below, if this court rather than the arbitrator

decides unconscionability, the result is to dismiss this litigation to allow arbitration, because the analysis shows that the clauses are not unconscionable and are instead valid and enforceable.

DeRosa-Grund has not shown that the arbitration clauses, including the delegation provisions, are procedurally or substantively unconscionable. Unlike contracts in cases finding procedural unconscionability due to oppression, the Agreements were not an adhesive form contracts. *Cf. Unimax Express, Inc. v. Cosco N. Am., Inc.*, No. CV 11-02947 DDP (PLAx), 2011 WL 5909881, at *3 (C.D. Cal. Nov. 28, 2011) ("It is well settled that standardized, adhesive contracts drafted by the stronger party are procedurally unconscionable." (citing *Pokorny*, 601 F.3d at 996)). DeRosa-Grund, represented by several experienced lawyers, negotiated the contract with New Line over four months. The parties exchanged several different versions, resulting in some changes favorable to DeRosa-Grund and some more favorable to New Line. (Docket Entry No. 15-2 at 26 ("Tony [DeRosa-Grund]. . . is fine with the pay or play concept . . . as long as New Line is ok with the other items David [McGriff] mentioned with the [Producer Agreement]")); *see also Am. Software v. Ali*, 46 Cal. App. 4th 1386, 1392 n.3 (1996) (observing with approval that "[s]ome courts have considered the presence and advice of counsel to constitute circumstantial, if not conclusive, evidence that a contract is not unconscionable").

DeRosa-Grund argues that the arbitration clauses themselves were a boilerplate take-it-or-leave-it condition that New Line refused to negotiate. But "[t]he very fact that [DeRosa-Grund] had enough bargaining 'clout' to successfully negotiate for more favorable terms on other provisions evidences the contrary." *Ali*, 46 Cal. App. 4th at 1392.

Nor was DeRosa-Grund unfairly surprised by the arbitration clauses, including the delegation clauses, in the Agreements. He knew about the clauses well before he signed the Agreements.

Indeed, he asked to have them removed, without success. Even without such subjective knowledge, courts do not find surprise if an arbitration clause is clearly set out, such as by "bold and conspicuous language[.]" *Brazil v. Dell Inc.*, No. C-07-01700 RMW, 2007 WL 2255296, at *5 (N.D. Cal. Aug. 3, 2007); *see also Kilgore*, 2012 WL 718344, at *14 (an arbitration clause is not procedurally unconscionable when it appears in its own section of the contract and plainly states, more than once, the rights the person is giving up). The clauses here are clearly labeled "<u>Arbitration</u>" and set off with bold lettering and formatting. (Docket Entry Nos. 8-2 at 19-20 ¶ 21(a); 8-3 at 19 ¶ 25(a)).

DeRosa-Grund argues that the "Remedies" provisions, which allow New Line to seek injunctive relief, make the arbitration clauses substantively unconscionable. (Docket Entry No. 8-2 at 18 ¶ 19). "California courts consistently have found" unconscionable arbitration provisions giving one party "the right to choose a judicial forum and eliminating such a forum for" the other. *Nagrampa v. MailCoups, Inc.*, 467 F.3d 1257, 1287 (9th Cir. 2006) (en banc). But these "Remedies" provisions do not sweep as broadly as those the California courts have found unconscionable. Nor are the Remedies provisions so harsh or unfair as to make the delegation or arbitration clauses unenforceable as unconscionable, particularly in the absence of any procedural unconscionability. *Cf. Nagrampa*, 467 F.3d at 1280 ("[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (quotation omitted)).

In addition, the Remedies provisions are in a separate portion of the Agreements and are not part of the arbitration clauses. Even if the Remedies provisions raise an issue, the provisions are severable from the delegation and arbitration clauses and do not make them unconscionable. *See*

*Ajamian v. CantorC02e, L.P.*, 203 Cal. App. 4th 771, 779 (2012) (observing that California's "strong preference is to sever *unless* the agreement is 'permeated' by unconscionability" (emphasis in original)).

Even if the court rather than the arbitrator decides whether the arbitration and delegation clauses are unenforceable due to unconscionability, the result is to find the clauses enforceable. The delegation clauses are not unconscionable.[4]

**B.      Who Decides Whether DeRosa-Grund's Claims Are Within the Scope of the Arbitration Clauses?**

**1.      The Applicable Law**

The parties dispute whether the Agreements require an arbitrator or the court to determine the scope of the arbitration clauses. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options*, 514 U.S. at 943 (1995) (internal citations omitted). Courts may "not assume that the parties agreed to arbitrate arbitrability '[u]nless the parties clearly and unmistakably provide otherwise.'" *Petrofac,*

---

[4] DeRosa-Grund also argues that he was fraudulently induced into signing the two Agreements, but he does not persuasively contend that he was fraudulently induced into agreeing to the specific arbitration provisions, apart from alleging that fraud "permeated" the agreement. (Docket Entry No. 15 at 22). A challenge to the validity of the parties' contract as a whole, as opposed to the arbitration clause contained in the contract, is for the arbitrator to decide. In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967), the Supreme Court held that a challenge to the validity of the entire agreement as having been fraudulently induced was for the arbitrator to resolve, not the court. Regardless of whether a contract as a whole is valid, agreements to arbitrate are severable from a larger contract and may be separately enforced and their validity separately determined. *Id.* at 406. This result was recently affirmed in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006). The Court held that a challenge to an agreement containing the arbitration clause, as opposed to a challenge to the arbitration provision specifically, is for the arbitrator to decide. *Id.* at 445–46. DeRosa-Grund's fraudulent-inducement challenge to the Agreements' validity is for the arbitrator to decide.

*Inc. v. DynMcDermott Petroleum Ops. Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).

DeRosa-Grund argues that the arbitration clauses do not "clearly and unmistakably" give the arbitrator exclusive authority to decide their scope. He relies on *Ajamian v. CantorC02e, L.P.*, 203 Cal. App. 4th 771 (2012), which held that "the clear and unmistakable evidence test is not met by language requiring arbitration of '[a]ny disputes, differences or controversies arising under' a contract." *Id.* at 787. That case concerned whether the parties intended "to delegate issues of the provision's *enforceability* to the arbitration panel," *id.* at 788 (emphasis added), not whether they delegated issues of the provisions' scope. The contract in *Ajamian* stated that either the arbitrator or the court could determine threshold issues. *See id.* at 777 ("In the event that an arbitration panel or *court of competent jurisdiction* shall determine that any covenant set forth in this Agreement is impermissibly broad in scope, duration or geographical area, or is in the nature of a penalty, then the parties intend that such panel or *court* should limit the scope, duration or geographical area of such covenant or reduce the amount of Liquidated Damages to the extent, and only to the extent, necessary to render such covenant reasonable and enforceable, and enforce the covenant as so limited." (emphasis added)).

Unlike the *Ajamian* contract, the Quitclaim Agreement is clear both as to what the parties intended to delegate to the arbitrator to decide and as to the effect of that intent. The delegation provision defines "the determination of the scope or applicability of this agreement to arbitrate" as a "Dispute" and directs that "[a]ll Disputes shall be submitted to final and binding arbitration" as the "sole dispute resolution mechanism." (Docket Entry No. 8-2 at 19 ¶ 21 & 21(a)).

In addition, both the Quitclaim Agreement and the Producer Agreement state that "arbitration shall be initiated and conducted according to" the JAMS rules and procedures. Those specifically give the arbitrator the authority to "determine jurisdiction and arbitrability issues as a preliminary matter." JAMS Comprehensive Arbitration Rules & Procedures, Rule 11(b) (available at http://www.jamsadr.com/rules- comprehensive-arbitration/); *see also* JAMS Streamlined Arbitration Rules & Procedures, Rule 8(b) (same); (Docket Entry Nos. 8-2 at 19 ¶ 21(a); 8-3 at 19-20 ¶ 25(a)). The Fifth Circuit recently joined other circuits in holding that "the express adoption of [certain arbitration] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" if those rules specifically provide for arbitrating arbitrability. *Petrofac, Inc. v. DynMcDermott Petroleum Ops. Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *see also Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) ("[W]e conclude that the arbitration provision's incorporation of the AAA Rules . . . constitutes a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator."); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1372–73 (Fed. Cir. 2006) (same); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005) (same); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir.2005) (same); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989) (same result under the similar ICC Rules).[5]

---

[5] *Ajamian*'s holding that "the incorporation of AAA rules into an agreement" does not provide clear and unmistakable evidence "that an employer and an employee intended to submit the issue of the *unconscionability* of the arbitration provision to the arbitrator," 203 Cal. App 4th at 790 (emphasis added), is not to the contrary. The *Ajamian* court acknowledged that California courts have recognized incorporating arbitration rules may provide clear and unmistakable intent with respect to the *scope* of arbitration. *See id.* at 789 (citing *Rodriguez v. American Technologies, Inc.* 136 Cal.App. 4th 1110, 1123 (2006) (although the scope of an arbitration clause generally is a question for the court, parties clearly and unmistakably agreed to have the arbitrator determine the scope of the clause, where the contract mandated arbitration in accordance with AAA construction arbitration rules that specified the arbitrator's authority to rule on the scope of the arbitration agreement)).

The Quitclaim Agreement's definition of "determination of the scope of arbitrability" and both Agreements' "express adoption of [the JAMS] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac*, 687 F.3d at 675. An arbitrator, not this court, must determine whether DeRosa-Grund's claims fall within the scope of the arbitration clauses.

### 3. Even if the Agreements Allowed the Court to Determine the Scope of the Arbitration Clauses, DeRosa-Grund's Claims Must Be Arbitrated

DeRosa-Grund argues that even if the arbitration and delegation clauses are enforceable, his claims fall outside the scope of those clauses. Because the parties clearly and unmistakably agreed to arbitrate scope in the delegation clauses, this issue is reserved for the arbitrator. But even if this court had to decide the issue, the outcome is unaffected. DeRosa-Grund's claims are within the scope of the arbitration clauses.

The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the arbitrability of claims should be resolved in favor of arbitration." *Wash. Mut. Fin. Group*, 364 F.3d at 263 (quotations omitted); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). "[C]ourts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (citing *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994) (comparing "relating to" language with "arising out of" language)). "Broad arbitration clauses . . . are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Id.* An "arbitration clause that cover[s] disputes 'arising under'

an agreement, but omit[s] reference to claims 'relating to' an agreement, cover[s] only those disputes 'relating to the interpretation and performance of the contract itself.'" *Tracer Research Corp.*, 42 F.3d at 1295 (quoting *Mediterranean Enter., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983)). Arbitration clauses that also cover disputes "concerning this agreement" are construed broadly. *See Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 764 (S.D.N.Y. 2013), appeal dismissed (Oct. 7, 2013).

Both Agreements require the parties to arbitrate any claims or disputes "arising out of or related to" the Agreements. (Docket Entry Nos. 8-2 at 19 ¶ 21; 8-3 at 19 ¶ 25). Three of DeRosa-Grund's claims expressly seek relief under the two Agreements and would be subject to arbitration even under a narrow arbitration clause. *See Tracer Res. Corp.*, 42 F.3d at 1295. These three claims are:

- "New Line has breached the Agreements," which are "valid, binding and enforceable contracts." (Docket Entry No. 41-1 ¶¶ 74-76);[6]

- "[t]he Agreements contain an implied covenant of good faith and fair dealing under which the parties must refrain from arbitrary or unreasonable conduct," and New Line "breached" this obligation by "act[ing] in bad faith . . . ." (*Id.* ¶¶ 78-87); and

- a claim for declaratory relief under the two agreements. (*Id.* ¶¶ 132-33).

DeRosa-Grund's other claims are sufficiently "related to" the Agreements that they fall within the broad arbitration provisions. *See Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) ("Broad arbitration clauses . . . are not limited to claims

---

[6] The court used DeRosa-Grund's First Amended Complaint, (Docket Entry No. 41-1), in this analysis.

that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." ).

The remaining claims are:

- New Line tortiously interfered with his exclusive agreement with Ms. Warren in misrepresenting that "none of [his] rights and/or benefits would be changed, altered, modified or otherwise" affected by amending the Quitclaim Agreement to allow New Line to make a "direct deal" with Ms. Warren, (Docket Entry No. 41-1 *Id.* ¶ 92);

- New Line and Warner Bros. "intentionally interfered" with his television contract with Lionsgate by "advis[ing] Lionsgate that its planned use of the Name [The Conjuring] as a title for a proposed television series would violate New Line's alleged rights" and "falsely claim[ing] that the proposed television series was based on rights granted exclusively to Defendants" under the Agreements, (*id.* ¶ 97);

- New Line made "false representations" about DeRosa-Grund's rights as a producer under the agreements to "induce [him] to enter into the Agreements," (*id.* ¶ 103);

- a promissory estoppel claim that DeRosa-Grund reasonably relied on New Line's "promise[s] that they would tie [him] to sequels" and subsequent films relating to "The Conjuring" and "pay for those rights," (*id.* ¶ 108);

- a conversion claim, alleging that New Line and Warner Bros. used another case file from the Warrens about a paranormal story to produce a sequel to "The Conjuring" but failed to pay DeRosa-Grund, in violation of the defendants' obligation to engage in good faith negotiation for up to a fifteen percent (15%) increase due to the fact that 'Annabelle' is—by Defendants' own admission—a sequel," (*id.* ¶ 115);

- New Line and Warner Bros. "fraudulently misrepresented to [him] that 'Annabelle' was not a theatrical motion picture and deprived [him] of the Purchase Price under the Agreements for over a year," (*id.* ¶ 128);

- a Lanham Act claim, alleging that although DeRosa-Grund was "contractually entitled to credit in connection with 'The Conjuring' and all productions created based upon the Case Files" exchanged in the agreements, the "Defendants have willfully failed to afford [him] such credit," (*id.* ¶ 137);

- New Line and Warner Bros. published false defamatory statements "concerning [his] rights" under the agreements and "concerning [his] business," (*id.* ¶ 142); and

- both defendants "published disparaging statements about" his business. (*Id.* ¶ 148).

Because the Agreements used broad arbitration clauses and DeRosa-Grund's claims either seek recovery under the Agreements or have a significant relationship to them, all his claims must be resolved in arbitration. *See Pennzoil*, 139 F.3d at 1067 (requiring only that the "disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute" ).

### D. Warner Bros.

DeRosa-Grund argues that even if his claims against New Line must be dismissed or stayed pending arbitration, his claims against Warner Bros. should remain in federal court because Warner Bros. was not a party to the Agreements containing the arbitration clauses. In *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524 (5th Cir. 2000), the Fifth Circuit adopted the Eleventh Circuit's equitable-estoppel test for determining whether a nonsignatory to an arbitration agreement may compel arbitration against a signatory:

equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. *First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.* When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. *Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.*

*Id.* at 527 (quoting and emphasizing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)).

DeRosa-Grund's seven claims against Warner Bros. satisfy both conditions. The claims naming Warner Bros.—declaratory judgment, tortious interference, fraud, conversion, violating the Lanham Act, defamation, and business disparagement—all "make[] reference to or presume[] the existence of" the Quitclaim Agreement, the Producers Agreement, or both. *Grigson*, 210 F.3d at 527. Each of these claims applies equally to New Line. DeRosa-Grund barely distinguishes between New Line and Warner Bros. in alleging the underlying facts. (Docket Entry No. 41-1 ¶¶ 96-99, 115-16, 125-30, 132-33, 135-40, 142-44) (referring generically to "Defendants"). DeRosa-Grund's amended complaint "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory [Warner Bros.] and one or more of the signatories [New Line] to the contract." *Grigson*, 210 F.3d at 527. If this court sent the claims against New Line to arbitration while retaining the same claims against Warner Bros., "the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of

arbitration effectively thwarted." *Id.* Warner Bros. as well as New Line may compel DeRosa-Grund to arbitrate the claims he agreed to resolve in that forum.

## III.  Conclusion

DeRosa-Grund's unopposed motion to amend his complaint, (Docket Entry No. 41), is granted.  The Agreements' arbitration clauses are enforceable and delegate the remaining arbitrability determinations to the arbitrator.  Section 3 of the FAA "requires courts to stay litigation of arbitral claims pending arbitration of those claims 'in accordance with the terms of the agreement.'" *Concepcion*, 131 S.Ct. at 1748.  The Fifth Circuit instructs courts to dismiss litigation without prejudice "when *all* of the issues raised in the district court must be submitted to arbitration." *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (emphasis in original); *see also James v. Conceptus, Inc.*, 851 F. Supp. 2d 1020, 1039 (S.D. Tex. 2012).

The defendants' motion to dismiss, (Docket Entry No. 8), is granted.[7]   The remaining motions, (Docket Entry Nos. 32, 33, 34, 35, 36, 40), are denied as moot.  This case is dismissed, without prejudice, in favor of arbitration.[8]

SIGNED on November 4, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

_____

[7]  In light of this conclusion, the court need not address the defendants' transfer arguments.

[8]  Because DeRosa-Grund has voluntarily dismissed the junior case (No. 4:14-cv-1117), that case is also dismissed without prejudice, (No. 4:14-cv-0793, Docket Entry No. 39), and its motions (No. 4:14-cv-1117, Docket Entry Nos. 16, 18, 20, 21), are denied as moot.